MICHAEL VON LOEWENFELDT (178665)
KEVIN B. CLUNE (248681)
KENNETH NABITY (287927)
**KERR & WAGSTAFFE LLP**
101 Mission Street, 18th Floor
San Francisco, CA 94105–1727
Telephone: (415) 371-8500
Fax: (415) 371-0500
Email: mvl@kerrwagstaffe.com
Email: clune@kerrwagstaffe.com
Email: nabity@kerrwagstaffe.com

Attorneys for Plaintiff
SANFORD WADLER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANFORD S. WADLER,<br><br>             Plaintiff,<br><br>     v.<br><br>BIO-RAD LABORATORIES, INC.,<br>a Delaware Corporation; NORMAN<br>SCHWARTZ; LOUIS DRAPEAU; ALICE N.<br>SCHWARTZ; ALBERT J. HILLMAN;<br>DEBORAH J. NEFF,<br><br>             Defendants. | Case No.  3:15-cv-2356<br><br>**COMPLAINT FOR:**<br><br>1.   RETALIATION IN VIOLATION OF 18 U.S.C. § 1514A (SARBANES-OXLEY)<br>2.   RETALIATION IN VIOLATION OF 15 U.S.C. § 78u-6 (DODD-FRANK)<br>3.   RETALIATION IN VIOLATION OF CALIFORNIA LABOR CODE § 1102.5<br>4.   WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY<br>5.   NONPAYMENT OF WAGES UNDER CAL. LABOR CODE §§ 201, 227.3<br>6.   WAITING TIME PENALTIES UNDER CAL. LABOR CODE § 203<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiff Sanford S. Wadler ("Wadler" or "Plaintiff") hereby alleges as follows:

**Introduction**

1. This matter presents the classic case of whistleblower retaliation. After learning of his employer Bio-Rad's involvement in extensive bribery occurring in Russia, Thailand, and Vietnam, Wadler investigated evidence of similar violations of the Foreign Corrupt Practices Act ("FCPA") in China, where corruption is notoriously endemic. Key Bio-Rad officers and directors wanted Wadler to turn a blind eye to this misconduct or sweep it under the rug, but he refused. Instead, and following his mandatory duties under federal securities laws as the Company's chief legal officer, Wadler investigated this potential criminal activity and reported it up the ladder. When Wadler reasonably began to believe that the conspiracy to violate the FCPA went all the way to the top of the corporate hierarchy, he reported his concerns to the Company's audit committee. Then, just shortly before Bio-Rad was scheduled to present to the SEC and DOJ regarding the Company's investigation into potential FCPA violations, the Company fired Wadler precisely because he refused to be complicit in its wrongdoing. A company is not allowed to attempt to silence whistleblowers in this manner.

**PARTIES**

2. Wadler became the General Counsel and Secretary of Defendant Bio-Rad Laboratories, Inc. ("Defendant" or "Bio-Rad") in 1989. He was appointed to the position of Vice President in 1996 and Executive Vice President in 2012. The Company also simultaneously employed him in many different roles, for example by having him serve as a director, officer, and/or shareholder on virtually all of Bio-Rad's many subsidiaries.

3. Wadler is a member of the New York and Washington DC bars and is a registered patent attorney. He was also a registered in-house counsel with the State Bar of California.

4. Bio-Rad is a publicly traded corporation. Its corporate headquarters and principal place of business are located in Hercules, California, which is in Contra Costa County. Bio-Rad manufactures and supplies the life science research, healthcare, analytical chemistry, and other markets with a range of products and systems used to separate complex chemical and biological materials and to identify, analyze, and purify their components. It sells its products globally.

5. Bio-Rad's products are largely divided into two groups. The Life Sciences Group has products that answer biological questions. They separate, purify, identify, and amplify proteins, nucleic acids, and bacteria. The Clinical Diagnostics Group develops and sells products for clinical laboratories that include instruments, reagents, and software.

6. Frequently, Bio-Rad products are ultimately sold to hospitals, universities, clinics, laboratories, medical providers, and others around the world who are state-owned or stated controlled.

7. Although Bio-Rad's stock is traded publically, the actual voting control of the company is in the hands of the founding Schwartz family.

8. Defendant Norman Schwartz, the son of the founder, is (and was, at all relevant times) the CEO and Chairman of the Board. Wadler reported to Mr. Schwartz until his termination.

9. Defendant Alice Schwartz, the mother of Defendant Norman Schwartz, is also on the Board.

10. The three other members of the Board at the time of Wader's termination were Defendants Louis Drapeau, Albert J. Hillman, and Deborah J. Neff.

## JURISDICTION AND VENUE

11. This Court has federal subject matter jurisdiction over claims for retaliation in violation of 15 U.S.C. § 1514A and 15 U.S.C. § 78U-6 pursuant to 28 U.S.C. § 1331 because these claims arise under federal law. This Court has supplemental jurisdiction over Wadler's remaining claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendant Bio-Rad resides in this District, and all Defendants are residents of California.

## INTRADISTRICT ASSIGNMENT

13. Pursuant to Civil Local Rule 3-2(c) and (d), this action should be assigned to the San Francisco/Oakland Division because a substantial part of the events or omissions which give rise to the claims occurred in Contra Costa County.

## GENERAL ALLEGATIONS

**Bio-Rad's FCPA Violations in Vietnam, Thailand, and Russia**

14. In 2009, Bio-Rad's corporate officers became aware that certain of its employees and agents in Vietnam, Thailand, and Russia may have violated provisions of the FCPA.

15. Those schemes are outlined in vivid detail in a consent order filed publicly by the SEC, attached hereto as <u>Exhibit A</u>, under which Bio-Rad agreed to pay $55.1 million for making unlawful payments either directly or indirectly to government officials in these countries in order to obtain or maintain governmental business, and for related books and records violations. In addition to detailing the underlying bribery schemes themselves, the order also discusses the lengths that the Company went through to conceal this conduct, for example in the case of Russia by "maintain[ing] no records" concerning certain entities that were "not legitimate businesses" who received "excessive commissions" yet "did not provide the contracted-for services" for which they were purportedly retained (and indeed were clearly incapable of performing). The Bio-Rad subsidiaries also "used at least ten different personal email addresses with aliases when communicating about" such entities and "used code words like 'bad debts'" when referring to their commissions. Similarly attempts to conceal bribery were made in Vietnam, where $23.7 million in admitted bribes were improperly recorded as "commissions", "advertising fees," and "training fees." And in Thailand, a Bio-Rad subsidiary recorded over $700,000 in known bribes as commissions.

**FCPA Investigation in China**

16. As a result of the widespread allegations of illegal bribery uncovered in Russia, Thailand, and Vietnam, Bio-Rad determined that it needed to investigate whether there were similar violations in China—a country where Bio-Rad had significantly greater amounts of sales than Thailand, Vietnam, or Russia and where corruption is notoriously widespread.

17. Bio-Rad hired an outside law firm, Steptoe and Johnson LLP, to investigate allegations of potential bribery in China. That law firm came to the conclusion that there was no evidence of improper payments.

18. Wadler was surprised by that conclusion, given the volume of business that Bio-

Rad conducted in China, the company's apparently routine practice of committing FCPA violations in Russia, Thailand, and Vietnam, and the fact that China was a country notorious for its endemic corruption.

**The Life Technologies Royalty Audit**

19. Bio-Rad had licensed products from a company known as Life Technologies ("Life") for many years. As part of the licensing agreement, Life conducted audits to confirm prices paid by end-users (on which royalties are calculated) to make sure Life was being properly compensated.

20. It came to Wadler's attention in mid-2011 that, in response to Life's audit requests, Bio-Rad was unable to supply virtually any documentation to Life regarding Bio-Rad's operations in China.

21. Wadler was shocked that, with sales in the hundreds of millions of dollars over a number of years, Bio-Rad could not come up with virtually any documents evidencing such sales. Wadler repeatedly tried to obtain documents from Bio-Rad's CEO, CFO, and other key executives, but despite indicating that they would assist in tracking down such documents, these executives repeatedly failed to do so.

22. Wadler was concerned that the failure to maintain documents that would accurately reflect Bio-Rad's transactions in China was itself a books and records violation of the FCPA. More importantly, he was worried that the lack of documentation suggested efforts to conceal violations of the FCPA's anti-bribery provisions. The sheer dearth of documents in relation to Bio-Rad's extensive China operations suggested that such bribery might be rampant.

23. As time went on, Wadler became concerned that Life might file a lawsuit against Bio-Rad related to its failure to produce documents during its audits. Wadler was worried that such a lawsuit would have a substantially detrimental effect on the company by, among other things, opening up Bio-Rad to scrutiny from the U.S. Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") for its China dealings (before it even attempted to self-disclose such potential violations) as well as the FCPA violations that were already being investigated with respect to Bio-Rad's operations in other countries.

**Several Documents Are Found that Demonstrate FCPA Violations in China**

24. In late 2012, Wadler was finally able to uncover a few documents—though far less than there should have been given Bio-Rad's substantial operations in China. And, in even the relatively few documents he was able to uncover, there was unambiguous evidence of potential bribery. These documents specifically showed transactions with governmental entities (such as public universities) in which Bio-Rad distributors had contracted to provide a certain number of items, invoiced them for that number of items, but then actually provided several additional items for free. The cost of the free items was almost half of the items actually billed for. Wadler reasonably concluded that these free items reflected kickbacks being paid to governmental employees or entities for giving business to the relevant distributor.

25. In addition to alerting Wadler about likely corruption regarding the specific transactions at issue, this discovery made Wadler concerned that Steptoe and Johnson's prior investigation into potential FCPA violations in China had been deficient. Further, because there were still so few documents produced in response to the Life Audit, and even those few documents that could be identified suggested bribery, Wadler became concerned that bribery was widespread.

26. In addition to being concerned about the possibility of additional underlying FCPA violations, Wadler was concerned that this discovery would negatively impact the Company's ongoing investigations with the SEC and DOJ. Bio-Rad had been trying to work with them to minimize the penalties for the earlier FCPA violations and he knew that one of the major factors in determining the ultimate penalties imposed was the "tone at the top" of the Company. He knew that the government was only likely to grant Bio-Rad leniency if the Company was perceived as being diligent and cooperative, and that these additional revelations suggested that they were not embodying either of these traits.

27. Still more evidence of FCPA violations came to Wadler's attention in early 2013 when he learned that certain standard language concerning the need for FCPA compliance had been removed (without his knowledge or approval) from documents translated into Chinese and used for Bio-Rad's operations in China. Wadler became concerned that this represented an

5
COMPLAINT

intentional effort by Bio-Rad's agents and employees to circumvent internal controls intended to prevent FCPA violations. He also obtained additional documents that suggested additional instances of bribery.

28. Due to the repeated stonewalling he had received from the CEO, CFO, and other members of management, Wadler became suspicious that corruption issues in China were known to senior management, and that management was intentionally blocking his efforts to uncover evidence of bribery and related misconduct.

29. As a result, and pursuant to his mandatory "up the ladder" reporting requirements under federal securities laws, Wadler notified the Audit Committee in February 2013 of his concerns. He specifically relayed his concerns that he had uncovered evidence of bribery, books-and-records violations, and that language had been altered in documents in Chinese in order to circumvent Bio-Rad's internal controls to prevent such violations of the law.

30. To his amazement and disappointment, the Audit Committee reengaged Steptoe and Johnson to investigate these additional FCPA violations. This was the very same law firm that initially concluded in 2011 (incorrectly, as it had turned out) that there was no evidence of FCPA violations in China. Wadler was concerned that Steptoe had a clear conflict of interest in doing the investigation again when it failed to uncover the violations in 2011 because any finding in 2013 would have demonstrated Steptoe's prior malpractice.

31. Wadler's suspicions were further heightened on or about February 22, 2013 in a meeting between the Company and its outside auditors at which Wadler was present. There, the CFO informed the outside auditors that she wanted to send people to China to attempt to unearth the missing documents for the Life Audit, but the CEO, Norman Schwartz prevented her from doing that.

32. At a meeting in March 2013 between Bio-Rad, Steptoe and Johnson, and Bio-Rad's outside auditor Ernst & Young, Steptoe indicated that there was no evidence of improper payments regarding Bio-Rad's China Sales. Wadler was shocked by this conclusion, given the documentation that had already been uncovered before the investigation began that clearly indicated that bribery had occurred. Wadler stated that thirty percent of the documents

concerning Bio-Rad's China operations that he had reviewed contained discrepancies relating to the shipment volume. Wadler stated that this fact suggested to him that there were significant additional FCPA violations that Steptoe and Johnson had apparently not uncovered. Wadler asked Steptoe and Johnson partner Patrick Norton—the partner who actually conducted the investigations into potential FCPA violations in both 2011 and 2013—whether such discrepancies troubled him, whether Norton knew the whereabouts of the extra products shipped, and what he knew about the actual motivation for shipping them. Norton responded that he had simply not addressed those issues in his investigation. Wadler was flabbergasted. After all, the entire reason Steptoe and Johnson had been retained was to investigate these very discrepancies, and the firm had apparently not done even that.

33. Despite Wadler's comments regarding additional documents demonstrating FCPA violations, Neither Steptoe and Johnson nor Davis Polk asked Wadler for any other documents he might have that would shed light on the issues raised to the Audit Committee. Instead, Wadler was effectively shut out of the investigation over his repeated objections that he should be included.

**Bio-Rad Announces Deficiencies in its Internal Controls via its SEC Filings, Including Deficiencies Specifically Related to its Operations in China**

34. On March 8, 2013, Bio-Rad filed its 10K statement with the SEC, in which it disclosed that it had "identified significant deficiencies in [its] internal control over financial reporting, including "the unauthorized issuance of distributor contracts at [its] Chinese subsidiary," "[its] lack of controls over pricing and [its] ineffective methods of analyzing credit risk" and "[i]n some instances, the lack of sufficient documentation for the timing of revenue recognition." Thus, Bio-Rad admitted publicly that it was, in fact, engaging in some of the very misconduct Wadler had complained about.

**Wadler Is Suddenly Terminated**

35. On June 7, 2013, Bio-Rad terminated Wader. Although the CEO effectuated the termination, the decision was made by a vote of the entire Board. Mr. Schwartz subsequently confirmed that the decision was that of the entire Board in statements he made to Wadler.

COMPLAINT

36. Wadler's briefcase was then searched and he was escorted out of the office without being given any time to gather his personal items. He was not offered any recognition for his many years of dedicated service.

37. Throughout his employment, Wadler reported to the CEO, first David Schwartz and then Norman Schwartz. Wadler was never told that his work was deficient or that he was not a valued member of management. Indeed, in December 2012, Norman Schwartz after writing a positive performance review promoted him to Executive Vice President and gave him a raise.

38. When Mr. Schwartz and the rest of the Board made their decision to fire Wadler, all of the Board members—including Respondents Drapeau, Hillman, Neff, and Alice Schwartz—were aware that Wadler had reported bribery, books-and-records violations, and related misconduct to persons with supervisory authority over him and to other persons working for Bio-Rad who had the authority to investigate, discover, or terminate such misconduct. The full Board was also aware of the fact that Wadler had refused to turn a blind eye to such misconduct and refused to participate in any way in efforts to cover it up.

39. On information and belief, Respondents made the decision to fire Wadler precisely because he provided information, caused information to be provided, and otherwise assisted in an investigation regarding conduct which he reasonably believed constituted a violation of federal laws regarding mail fraud, wire fraud, bank fraud, securities fraud, rules and regulation of the Securities and Exchange Commission, and provisions of federal law relating to fraud against shareholders. Among other things, he was terminated due to his efforts to get the CEO and CFO to address properly violations of the FCPA and for complying with Wadler's mandatory "up the ladder" reporting requirements when it became clear that the company was not taking reasonable steps to investigate and remedy FCPA violations. In addition, Wadler was fired because, even after the initiation of the investigation, he continued to insist that the investigation be complete and uninfluenced by conflicts of interest.

40. On further information and belief, the reasons the company provided for firing Wadler were pretextual. Wadler would never have been terminated if he had not protested to the

1 Audit Committee and others about the existence of serious violations of the FCPA.

**Bio-Rad Discloses Wadler's Complaints to the SEC, Waiving any Potential Claim of Privilege**

41. Wadler was fired on June 7, 2013. At the time of his termination, Bio-Rad had been scheduled to give a report to the SEC and DOJ just a few weeks later during which it was supposed to update these governmental entities regarding the status of Bio-Rad's internal FCPA investigations.

42. Bio-Rad had its outside counsel for the Company, Davis Polk, give the presentation to the government. On information and belief, Bio-Rad was concerned that Wadler's termination might reflect poorly on the company by implying that his firing had something to do with potential FCPA concerns, or otherwise relate to information he might have provided to the government had he not been fired. As a result, the presentation given by Davis Polk to these governmental entities specifically disclosed (and attempted to rebut) Wadler's internal complaints and other communications with the Company concerning his view that there was likely widespread bribery and books-and-records violations regarding Bio-Rad's operations in China. The Company also discussed the various steps Steptoe and Johnson had undertaken to investigate potential FCPA violations discussed above, as well as the retention of Davis Polk. A true and correct copy of that presentation along with its transmittal email to the SEC and DOJ is attached hereto as Exhibit B. On information and belief, the presentation given to the SEC and DOJ was a self-serving attempt to avoid potential negative repercussions regarding the improper activities Bio-Rad engaged in discussed above.

43. Because Bio-Rad voluntarily disclosed Wadler's internal communications to the government, the Company waived any potential claim of privilege it might have had with respect to these communications. Indeed, in subsequent proceedings where it further disclosed these communications to the Department of Labor, Bio-Rad admitted that this PowerPoint presentation was not privileged.

**Bio-Rad's Outside Auditors Resign**

44. Bio-Rad's auditors, Ernst & Young, ultimately resigned from doing Bio-Rad's

KERR
&
WAGSTAFFE
LLP

audit work in September of 2013. On information and belief, material deficiencies and substantial disagreement between the auditors and Bio-Rad's senior leadership contributed to the resignation of the auditors.

**Bio-Rad Agrees to Pay $55.1 Million in Fines to the Government for FCPA Violations, and Admits to Precisely the type of Misconduct in China that Wadler Blew the Whistle about**

45. In its November 7, 2014 10Q filing with the SEC, Bio-Rad admitted that it had entered into a non-prosecution agreement with the DOJ and SEC, under which it would pay $55.1 million for FCPA violations in Russia, Thailand, and Vietnam.

46. In that same filing, Bio-Rad admitted that it had been investigated, and in some cases fined, for engaging in exactly the type of practices that Wadler had blown the whistle about. The filing revealed that the Company had been investigated by "the local counterpart of China's State Administration for Industry and Commerce," and that this governmental entity had required Bio-Rad's subsidiary in China to pay a penalty of $300,000 "for providing free products pursuant to contractual obligations with customers during years 2012 and 2013, which was deemed to be in violation of the Anti-Unfair-Competition Law." It also vaguely admitted that "China's Bureau of Market Supervision and Administration, through its local counterpart in Pudong New District, Shanghai ("Bureau") has begun a review of [Bio-Rad's] importation practices with respect to certain of [Bio-Rad's] products."

47. These admissions demonstrate that Bio-Rad was engaging in practices such as giving "free goods" (or, in other words bribes) in connection with obtaining governmental contracts that is forbidden by the FCPA.

**FIRST CLAIM**
**(RETALIATION IN VIOLATION OF 18 U.S.C. § 1514A (SARBANES-OXLEY)**
**(Against all Defendants)**

48. Wadler incorporates by reference paragraphs 1 to 47 above, as though fully set forth herein.

49. Wadler was an employee of Bio-Rad.

50. Bio-Rad issues and maintains a class of publicly traded securities registered

pursuant to Section 12(b) of the Securities Exchange Act of 1934, which are traded on the New York Stock Exchange.

51. Wadler engaged in activity protected under 15 U.S.C. § 1514A because he provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct that he reasonably believed constituted violations of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1344 (bank fraud), § 1348 (securities fraud), any rule or regulation of the SEC, or any provision of federal law relating to fraud against shareholders.

52. The information or assistance was provided to (or the investigation is conducted by) a Federal regulatory or law enforcement agency; any Member of Congress or any committee of Congress; or a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

53. Wadler had both a subjective and objectively reasonable belief that the conduct being reported violated a listed law, rule, or regulation.

54. Bio-Rad, including its Board of Directors, its CEO, CFO, and others, knew or suspected that Wadler engaged in such protected activity.

55. Wadler was terminated.

56. Wadler's protected activity was a contributing factor—and indeed the reason for—his termination.

57. As a proximate result of Bio-Rad's actions against Wadler, as alleged above, Wadler has been harmed in that he has suffered the loss of wages, benefits, and additional amounts of money he would have received if he had not been subjected to said treatment. Wadler has also been harmed in that he has suffered humiliation, mental anguish, and emotional and physical distress. As a result of such conduct, Wadler has suffered damages in an amount according to proof.

58. Within 180 days of his termination, Wadler filed a complaint with the secretary of labor. The Secretary of Labor has not issued a final decision and more than 180 days have elapsed, and any delay was not due to Wadler's bad faith.

**SECOND CLAIM**
**(RETALIATION IN VIOLATION OF 15 U.S.C. § 78u-6 (DODD-FRANK))**
**(Against all Defendants)**

59.     Wadler incorporates by reference paragraphs 1 to 58 above, as though fully set forth herein.

60.     Wadler was an employee of Bio-Rad.

61.     Wadler made disclosures that were required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities and Exchange Act of 1934, including 15 U.S.C. section 78j-1 (m), section 1513 (e) of title 18, and other laws, rules, or regulations subject to the jurisdiction of the SEC.

62.     Wadler had both a subjectively and objectively reasonable belief that the conduct being reported violated a listed law, rule, or regulation.

63.     Bio-Rad, including its Board of Directors, its CEO, CFO, and others, knew or suspected that Wadler engaged in such protected activity.

64.     Wadler was terminated.

65.     Wadler's protected activity discussed above was a contributing factor—and indeed the reason for—his termination.

66.     As a proximate result of Bio-Rad's actions against Wadler, as alleged above, Wadler has been harmed in that he has suffered the loss of wages, benefits, and additional amounts of money he would have received if he had not been subjected to said treatment. Wadler has also been harmed in that he has suffered humiliation, mental anguish, and emotional and physical distress.  As a result of such conduct, Wadler has suffered damages in an amount according to proof.

**THIRD CLAIM**
**(WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY)**
**(Against Defendant Bio-Rad)**

67.     Wadler incorporates by reference paragraphs 1 to 66 above, as though fully set forth herein.

68.     Wadler was an employee of Bio-Rad.

69.     Bio-Rad terminated Wadler.

70. A substantial motivating reason for Wadler's termination was his reporting to Bio-Rad, its CEO, its CFO, the Board, and its Audit Committee certain bribery and books-and-records violations of the FCPA, Sarbanes-Oxley, and related misconduct, as well as refusing to participate in Bio-Rad's attempts to turn a blind eye to, and indeed affirmatively cover up, such misconduct.

71. As a proximate result of Bio-Rad's actions against Wadler, as alleged above, Wadler has been harmed in that he has suffered the loss of wages, benefits, and additional amounts of money he would have received if he had not been subjected to said treatment. Wadler has also been harmed in that he has suffered humiliation, mental anguish, and emotional and physical distress. As a result of such conduct, Wadler has suffered damages in an amount according to proof.

72. Wadler was terminated for engaging in mandatory "up the ladder" reporting requirements under SEC rules governing attorneys such as himself who represent issuer clients appearing and practicing before the SEC, including but not limited to 17 C.F.R. 205.3. In addition, Wadler was terminated for refusing to aid and abed or be an accessory after the fact to criminal violations of the FCPA and the Sarbanes-Oxley Act.

### FOURTH CLAIM
### (WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY)
### (Against Defendant Bio-Rad)

73. Wadler incorporates by reference paragraphs 1 to 72 above, as though fully set forth herein.

74. Wadler was an employee of Bio-Rad.

75. Wadler refused to participate in Bio-Rad's attempts to turn a blind eye to, and indeed affirmatively cover up, FCPA, Sarbanes-Oxley, and other violations of federal securities laws, and Wadler took a position adverse to the employer regarding such illegal activity.

76. The activities described in Paragraph 75 would result in a violation of federal securities laws, rules, and regulations.

77. Wadler was terminated.

78. Wadler's refusal to participate in the activity described in paragraph 75 was a

contributing factor in Bio-Rad's decision to terminate him.

79. As a proximate result of Bio-Rad's actions against Wadler, as alleged above, Wadler has been harmed in that he has suffered the loss of wages, benefits, and additional amounts of money he would have received if he had not been subjected to said treatment. Wadler has also been harmed in that he has suffered humiliation, mental anguish, and emotional and physical distress. As a result of such conduct, Wadler has suffered damages in an amount according to proof.

80. Wadler was terminated for engaging in mandatory "up the ladder" reporting requirements under SEC rules governing attorneys such as himself who represent issuer clients appearing and practicing before the SEC, including but not limited to 17 C.F.R. 205.3. In addition, Wadler was terminated for refusing to aid and abet or be an accessory after the fact to criminal violations of the FCPA and SOX.

### FIFTH CLAIM
### (NONPAYMENT OF WAGES UNDER CAL. LABOR CODE §§ 201, 227.3)
### (Against Defendant Bio-Rad)

81. Wadler incorporates by reference paragraphs 1 to 80 above, as though fully set forth herein.

82. At the time of Wadler's termination, and pursuant to his employment agreement with Bio-Rad, Wadler had accrued wages in the form of paid vacation that he had not yet used.

83. Bio-Rad was obligated to pay Wadler for any unused vacation time at the time of termination pursuant to California Labor Code Sections 201 and 227.3 but failed to do so. Thus, Wadler is entitled to payment for this vacation time.

### SIXTH CLAIM
### (WAITING TIME PENALTIES UNDER CAL. LABOR CODE § 203)
### (Against Defendant Bio-Rad)

84. Wadler incorporates by reference paragraphs 1 to 83 above, as though fully set forth herein.

85. Bio-Rad intentionally failed to pay wages to Wadler regarding his vacation time when those wages were due. As such, its failure to pay wages was intentional and subjects it to waiting time penalties pursuant to Labor Code Section 203.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. Two times the amount of back pay otherwise owed to Wadler, with interest at the maximum legal rate;

2. For any other money judgment representing compensatory damages including lost wages, earnings, retirement benefits and other employee benefits, and all other sums of money, together with interest at the maximum legal rate on these amounts, according to proof;

3. For a money judgment for mental pain and anguish and emotional distress, according to proof, with interest at the maximum legal rate, according to proof;

4. For waiting time penalties pursuant to California Labor Code Section 203;

5. For an award of punitive damages, according to proof;

6. Compensation for litigation costs, expert witness fees, and attorneys' fees;

7. Reinstatement with the same seniority status that the individual would have had, but for the discrimination; and

8. For such other and further relief as the court deems proper.

Date: May 27, 2015　　　　　　　　　**KERR & WAGSTAFFE LLP**

　　　　　　　　　　　　　　　　　　By: _____/s/_____
　　　　　　　　　　　　　　　　　　　　MICHAEL VON LOEWENFELDT

　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　　　SANFORD S. WADLER



15
COMPLAINT

**DEMAND FOR JURY TRIAL**

Pursuant to Civil Local Rule 3-6, Plaintiff hereby demands a trial by jury in this matter.

Date: May 27, 2015            **KERR & WAGSTAFFE LLP**

By:    _____/s/_____
        MICHAEL VON LOEWENFELDT

Attorneys for Plaintiff
SANFORD S. WADLER