UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANFORD S. WADLER,

    Plaintiff,

    v.

BIO-RAD LABORATORIES, INC., et al.,

    Defendants.

Case No.  15-cv-02356-JCS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Re: Dkt. No. 24

## I.    INTRODUCTION

Plaintiff Sanford Wadler brings a whistleblower action against Defendants Bio-Rad Laboratories, Inc. ("Bio-Rad") and the individual members of Bio-Rad's Board of Directors, contending he was wrongfully terminated  in retaliation for  investigating and reporting to Bio-Rad's upper-level management possible violations of the Foreign Corrupt Practices Act ("FCPA") in China.  Wadler asserts claims under the Sarbanes-Oxley Act, the Dodd-Frank Act, and California state law.  Presently before the Court is Defendants' Motion to Dismiss the Complaint ("Motion"), which came on for hearing on September 4, 2015 at 9:30 a.m.  The parties submitted supplemental briefs on September 25, 2015.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.    BACKGROUND

### A.    The Complaint

In the Complaint, Wadler alleges that he became Bio-Rad's general counsel in 1989 and served in that position for nearly 25 years.  Compl. ¶ 2.  According to Plaintiff, Bio-Rad is a

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

Fortune 1000 company that manufactures and sells products and equipment around the world. *Id.* ¶ 6. Because Bio-Rad sells many of its products to hospitals, universities, and similar public entities and officials, it must abide by the terms of the FCPA, which "forbids the company or its agents from engaging in bribery and kickback schemes involving public officials and requires that companies maintain accurate accounting records and put in place adequate internal controls or face significant fines and possible criminal punishment." *Id.* ¶¶ 4, 6; Opposition at 2 (citing 15 U.S.C. §§ 78dd-2, 78ff).

Wadler alleges that "[i]n 2009, Bio-Rad's corporate officers became aware that certain of its employees and agents in Vietnam, Thailand, and Russia may have violated provisions of the FCPA." *Id.* ¶ 14. Bio-Rad "recently admitted the existence of such violations in a consent decree and agreed to pay $55.1 million in fines for this conduct as it related to Bio-Rad's operations in Thailand, Vietnam, and Russia." *Id.* ¶¶ 14-15. After discovering the illegal activities in Thailand, Vietnam and Russia, Bio-Rad hired the law firm Steptoe and Johnson LLP to investigate whether Bio-Rad employees were engaging in bribery in China - "a country where Bio-Rad had significantly greater amounts of sales than Thailand, Vietnam, or Russia and where corruption is notoriously widespread." *Id.* ¶¶ 16-17. According to Wadler, Steptoe & Johnson concluded that "there was no evidence of improper payments." *Id.* ¶ 17.

Wadler alleges that in 2011, he discovered that although Bio-Rad's sales in China were "in the hundreds of millions of dollars over a number of years," there was virtually no documentation supporting Bio-Rad's China-related sales. *Id.* ¶¶ 20-21. Wadler was concerned that the lack of documentation was a violation of the FCPA's record-keeping requirements and that it "suggested efforts to conceal violations of the FCPA's anti-bribery provisions." *Id.* ¶ 22. Wadler "repeatedly tried to obtain documents from Bio-Rad's CEO, CFO, and other key executives, but despite indicating that they would assist in tracking down such documents, these executives repeatedly failed to do so." *Id* ¶ 21. According to Wadler, in 2012, he was "finally able to uncover a few documents" and they provided "unambiguous evidence of potential bribery" by Bio-Rad in China. *Id.* ¶ 24. He also learned in early 2013 that "certain standard language concerning the need for FCPA compliance had been removed (without his knowledge or approval)

from documents translated into Chinese and used for Bio-Rad's operations in China. *Id*. ¶ 27.

Wadler alleges that the CEO, CFO and other members of management repeatedly "stonewall[ed]" him, leading him to "become suspicious that corruption issues in China were known to senior management, and that management was intentionally blocking his efforts to uncover evidence of bribery and related misconduct." *Id*. ¶ 28. Wadler alleges that he then took his concerns to the Audit Committee of the Board of Directors, which reengaged Steptoe and Johnson to investigate these violations. *Id*. ¶¶ 29-30. Wadler objected to the appointment of Steptoe and Johnson on the basis that it "had a clear conflict of interest," having failed to uncover in 2011 any FCPA violations in China; according to Wadler, "any finding in 2013 would have demonstrated Steptoe's prior malpractice." *Id*. ¶ 30.

Wadler alleges that Steptoe and Johnson again concluded that there was no evidence of improper payments in connection with Bio-Rad's China sales and reported its finding at a meeting in March 2013 between Bio-Rad, Steptoe and Johnson and its outside auditor, Ernst & Young. *Id*. ¶ 32. According to Wadler, he challenged this conclusion at the meeting and stated that "thirty percent of the documents concerning Bio-Rad's China operations that he had reviewed contained discrepancies related to the shipment volume." *Id* In response, the Steptoe and Johnson partner who had conducted the investigations in both 2011 and 2013 stated that he had "simply not addressed those issues." *Id*. Wadler alleges that he "was effectively shut out of the investigation over his repeated objections that he should be included." *Id*. ¶ 33.

Soon after the March 2013 meeting, on June 7, 2013, Bio-Rad terminated Wadler. *Id*. ¶ 35. The termination was "effectuated by the CEO" but the decision to terminate Wadler "was made by a vote of the entire Board." *Id.* In particular, Wadler alleges that Board members Louis Drapeau, Alice N. Schwartz, Albert J. Hillman and Deborah Neff made the decision to terminate Wadler and "were aware that Wadler had reported bribery, books-and-records violations, and related misconduct to persons with supervisory authority over him and to other persons at Bio-Rad who had the authority to investigate, discover, or terminate such misconduct." *Id.* ¶ 38. Wadler further alleges that he was terminated because he was investigating potential FCPA violations and because he reported his concerns "up the ladder" "when it became clear that the company was not

United States District Court
Northern District of California

1   taking reasonable steps to investigate and remedy FCPA violations." *Id*. ¶ 39.

2          Wadler alleges that throughout his employment he had always reported to the CEO, first

3   David Schwartz and then Norman Schwartz, and that he had never been told that his work was

4   deficient; in December 2012, Norman Schwartz gave Wadler a positive performance review,

5   promoted him to Executive Vice President and gave him a raise.  *Id*. ¶ 37.  According to Wadler,

6   at the time of his termination, Bio-Rad had been scheduled to give a report to the Securities and

7   Exchange Commission ("SEC") and the Department of Justice ("DOJ") just a few weeks later

8   "regarding the status of Bio-Rad's internal FCPA investigations."  *Id*. ¶ 41.  Bio-Rad's outside

9   counsel, Davis Polk, gave the presentation at that meeting.  *Id*. ¶ 42.  According to Wadler, Bio-

10  Rad was concerned that its termination of Wadler might reflect poorly on the company and

11  therefore, it disclosed and attempted to rebut the concerns Wadler had expressed regarding

12  possible FCPA violations in China.  *Id*.   Wadler alleges that "the presentation given to the SEC

13  and the DOJ was a self-serving attempt to avoid potential negative repercussions regarding the

14  improper  activities Bio-Rad engaged in."  *Id*.

15         Wadler alleges that Bio-Rad later "admitted publicly that it was, in fact, engaging in some

16  of the very misconduct Wadler had complained about," disclosing in its March 8, 2013 10K

17  statement with the SEC that it had "identified significant deficiencies in [its] internal control over

18  financial reporting, including the unauthorized issuance of distributor contracts at [its] Chinese

19  subsidiary, [its] lack of control over pricing and [its] ineffective methods of analyzing credit risk

20  and in some instances, the lack of sufficient documentation for the time of  revenue recognition."

21  *Id*. ¶ 34 (internal quotations omitted).  According to Wadler, Bio-Rad's outside auditors

22  Ernst & Young also resigned.  *Id*. ¶ 44.  Wadler alleges on information and belief that "material

23  deficiencies and substantial disagreement between the auditors and Bio-Rad's senior leadership

24  contributed to the resignation of the auditors."  *Id*.

25         Wadler asserts the following claims in his Complaint:  1) retaliation in violation of the

26  Sarbanes-Oxley Act, 18 U.S.C. § 1514A (Bio-Rad and the individual Board members); 2)

27  retaliation in violation of the Dodd-Frank Act, 15 U.S.C. § 78u-6 (Bio-Rad and the individual

28

4

1   Board members); 3) Retaliation in Violation of California Labor Code section 1102.5 (Bio-Rad);[2]

2   4) wrongful termination in violation of public policy (Bio-Rad); 5) nonpayment of wages under

3   California Labor Code sections 201, 227.3 (Bio-Rad); 6) waiting time penalties under California

4   Labor Code section 203 (Bio-Rad).

5       **B.    Administrative Proceeding**

6         On November 29, 2013, Wadler faxed his initial complaint, in the form of a letter, to the

7   Department of Labor's Occupational Safety &Health Administration ("DOL"), alleging that he

8   was terminated for engaging in protected activity under Sarbanes-Oxley. *Id.* ¶ 58; *see also*

9   Declaration of Linda Inscoe in Support of Defendants' Motion to Dismiss ("Inscoe Decl."), Ex. A

10  (DOL Complaint).   The DOL Complaint states that it is "a complaint under the Sarbanes-Oxley

11  Act against Bio-Rad Laboratories, Inc. in Hercules, CA." *Id.* at 1.   The DOL Complaint goes on

12  to state, "I was the Executive Vice President, Secretary and General Counsel of Bio-Rad until I

13  was terminated on June 7, 2013 by the Chief Executive Officer of the corporation, Norman

14  Schwartz, for engaging in whistleblowing activities." *Id.*   Wadler states in the DOL Complaint

15  that "the actual voting control of [Bio-Rad] is in the hands of the founding Schwartz family," that

16  Norman Schwartz, the son of the founder, is the CEO and Chairman of the Board," and that "[h]is

17  mother, Alice Schwartz, is also on the Board." *Id.*   In the DOL Complaint, Wadler states that he

18  was "terminated from [his] long term employment at Bio-Rad by the CEO." *Id.* at 5.   The factual

19  allegations in the DOL Complaint closely track the allegations in this action.   *Id.*

20        In its response to the DOL Complaint, Bio-Rad argued that Wadler could not "make the

21  prima facie showing that his alleged behavior was protected" and submitted declarations by, *inter*

22  *alia*, Board Members Louis Drapeau and Norman Schwartz.  *See* Request for Judicial Notice in

23  Support of Plaintiff Sanford S. Wadler's Opposition to Defendants' Motion to Dismiss ("RJN"),

24

25

---

26  [2] This claim is listed in the caption of the Complaint, but the heading for Claim Three does not cite California Labor Code section 1102.5 - an omission that Wadler contends is a typographical error.

27  Opposition at 21 n. 18. In light of the caption on the face of the Complaint, the Court finds that the failure to include a citation to section 1102.5 was an obvious clerical error, that Defendants

28  understood that Plaintiff was asserting a claim under that section (as evidenced by the Motion itself, which seeks dismissal of the claim), and that the Complaint need not be amended.

United States District Court
Northern District of California

1    Ex. B (Letter from L. Inscoe to J. Paul responding to DOL Complaint, dated January 28, 2014).[3]

2    Bio-Rad listed all of the Board members as witnesses in the DOL proceeding.  *See* RJN, Ex. C

3    (Bio-Rad's witness list).

4          On January 15, 2015, Wadler sought leave to amend his DOL Complaint to "clarify that he

5    [sought] relief from both Bio-Rad and the members of its Board of Directors individually – not just

6    against the Company itself."  RJN, Ex. D (Motion to Amend) at 1.  He stated in the Motion to

7    Amend that although it might not be necessary to amend the complaint because the Board

8    Members were "sufficiently identifie[d]" in the original DOL Complaint, he sought to do so "in an

9    abundance of caution to ensure that he [was] able to obtain full relief against the persons who

10   actually made the decision to retaliate against him by terminating his employment."  *Id.* at 1.  The

11   investigator who was presiding over the matter asked the parties for additional briefing on the

12   question of whether board members can be held individually liable under Sarbanes-Oxley, and

13   DOL ultimately "accept[ed] the revised complaint for investigation pending receipt of additional

14   evidence pursuant to the liberal amendment standard set forth in Chapter 3(VI)(B)(2) of OSHA's

15   Whistleblower Investigations Manual."  *See* RJN, Ex. F.

16         After the OSHA proceeding had been pending for more than 180 days, Wadler initiated the

17   instant action.  *See* RJN, Ex. G.  In a June 25, 2015 letter to Wadler's counsel, OSHA Regional

18   Supervisory Investigator Joshua B. Paul confirmed that Wadler had properly availed himself of

19   Sarbanes-Oxley's "kick-out" provisions allowing Wadler to withdraw the proceeding to U.S.

20   District Court because more than 180 days had passed since the DOL Complaint had been filed

21   and neither Wadler nor his counsel had acted in bad faith.  *Id.*

22         **C.    Contentions of the Parties**

23         Bio-Rad challenges Wadler's claims on several grounds.  First, it contends the claims

24

25   ───────────────
     [3] The Court grants Plaintiff's request to take judicial notice of the documents attached to the RJN.
26   Exhibit A to the RJN is Bio-Rad's 2015 10-K Report, dated February 17, 2015, and is subject to
     judicial notice on the basis that it is an SEC filing.  *See Dreiling v. Am. Exp. Co*., 458 F.3d 942,
27   946 n. 2 (9th Cir. 2006) (SEC filings subject to judicial notice).  Exhibits B-G are subject to
     judicial notice on the basis that they are documents that are part of the history of the administrative
28   proceeding.  *See Transmission Agency of N. California v. Sierra Pac. Power Co*., 295 F.3d 918,
     924 (9th Cir. 2002) (taking judicial notice of adjudicative facts before administrative tribunal).

United States District Court
Northern District of California

against the individual Board members, asserted under Sarbanes-Oxley and Dodd-Frank, should be dismissed with prejudice because neither of those laws permits suits against individual directors. Motion at 4-6. In addition, as to the claims against the Directors under Sarbanes-Oxley, Defendants contend the claims are untimely because Wadler did not move to amend his DOL Complaint to add the Directors until the 180-day period for filing an administrative complaint had already expired. *Id*. at 6-7.

Second, Bio-Rad contends Wadler's claim under Dodd-Frank fails because Wadler did not provide any information to the SEC. *Id*. at 7-10. Citing the approach taken in the Fifth Circuit - the only Circuit Court to have considered the issue - Bio-Rad argues that the plain language of Dodd-Frank makes clear that the anti-retaliation provisions are only available to "whistleblowers" and the term "whistleblower" does not include individuals who only provided information of a possible violation of securities law to others within the company. *Id*. (citing *Asadi v. G.E. Energy (U.S.A), L.L.C.*, 720 F.3d 620 (5th Cir. 2013)).

Third, Defendants assert Wadler's claim under California Labor Code section 1102.5 fails, as a matter of law, because Wadler does not allege that he made a whistleblower report to law enforcement authorities, as required under section 1102.5(b). *Id*. at 10. Further, Defendants contend, Wadler cannot state a claim under section 1102.5(c), which applies to those who have "refused to participate in activity that would violate federal or state law." *Id*. According to Defendants, Wadler may seek to invoke this section on the basis that he "refused to participate in a cover-up of allegedly unlawful activity," but he has not alleged facts sufficient to state a claim under this theory. *Id*. at 11 (citing *Banko v. Apple*, 20 F. Supp. 3d 749 (N.D. Cal. 2013)).

In his Opposition, Wadler points out that Defendants have not challenged the sufficiency of his claim against Bio-Rad (as opposed to the individual Directors) under Sarbanes-Oxley or his claims against Bio-Rad for wrongful termination in violation of public policy, failure to pay wages under California Labor Code sections 201 and 227.3 and waiting time penalties under California Labor Code section 203. Opposition at 1. Wadler rejects Defendants' assertion that he may not sue the Directors individually under Sarbanes-Oxley or Dodd-Frank. *Id*. at 7-12. Wadler contends Sarbanes-Oxley permits actions against individual Board members because it provides

United States District Court
Northern District of California

1    that "officer[s], employee[s], contractor[s], subcontractor[s], or agent[s]" can violate the Act. *Id*.

2    at 7 (quoting 18 U.S.C. § 1514A(a)). Wadler argues that a Board member may be liable as an

3    "agent" and that Defendants have pointed to no case that holds otherwise. *Id*. Wadler also cites a

4    case in which "the Fourth Circuit . . . explicitly held that individual board members *are* liable

5    when they retaliate against an employee for blowing the whistle." *Id*. at 8 (citing *Jones v.*

6    *Southspeak Interactive Corp. of Delaware*, 777 F.3d 658, 663-664, 675 (4th Cir. 2015) (emphasis

7    in original)). He also notes that at least Defendant Norman Schwartz, who is Bio-Rad's CEO, can

8    be held liable as an "officer," even if the term "agent" does not encompass Board members. *Id*. at

9    10.

10        Similarly, Wadler asserts, Dodd-Frank allows for actions to be brought against individual

11    Board members. *Id*. at 11-12. Dodd-Frank permits an action to be brought against "an employer,"

12    and although the statute does not define "employer," the proper interpretation of this term includes

13    individuals, Wadler contends. *Id*. In support of this reading of Dodd-Frank, Wadler points to the

14    Fair Labor Standards Act ("FLSA"), which he contends contains analogous anti-retaliation

15    provisions and has been held to permit actions against individual defendants. *Id*. at 11 (citing

16    *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013); *Lambert v. Ackerly*, 180 F.3d 997, 1011-

17    12 (9th Cir. 1999)). On the other hand, he distinguishes Title VII and the Americans with

18    Disabilities Act ("ADA"), in which the term "employer" has been held to exclude individuals, on

19    the basis that these statues expressly exempt from the term "employer" entities that employ fewer

20    than a certain "minimum number" of employees, reflecting a Congressional intent to exclude

21    individuals. *Id*. at 11 n. 9 (citing *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993

22    (Title VII); *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006) (ADA)).

23    Because Dodd-Frank does not include any such provision, Wadler asserts, the interpretation of the

24    term "employer" in cases involving the ADA and Title VII does not apply here. *Id*.

25        Wadler also contends his claims against the individual Board members under Sarbanes-

26    Oxley are timely. *Id*. at 13-14. In particular, he contends his initial DOL Complaint, which was

27    not on pleading paper, was sufficient to name the individual defendants. *Id*. at 13. He points out

28    that there are no pleading requirements for whistleblower complaints and argues that while he did

1   not formally name any particular defendant in any caption (as there was none), the individual

2   members were on notice of Wadler's claims from the outset. *Id.* He rejects Defendants' reliance

3   on the fact that he filed a motion to amend to add the individual defendants in the administrative

4   action, arguing that it does not support Defendants' position because that motion was ultimately

5   granted. *Id.* at 14.

6          Wadler argues that the Court should reject Defendants' invitation to follow the approach of

7   the Fifth Circuit on the question of whether Dodd-Frank offers protection to internal

8   whistleblowers. *Id.* at 16-20.  Recognizing that there is a split of authority among the district

9   courts in the Ninth Circuit on this issue, Wadler argues that the better reasoned decisions have

10   found that Dodd-Frank is ambiguous as to the definition of "whistleblower" and therefore, that the

11   interpretation of the SEC is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def.*

12   *Council, Inc.*, 467 U.S. 837, 865 (1984). *Id.* at 15.  The SEC, in turn, has concluded that Dodd-

13   Frank extends anti-retaliation protection not only to individuals who have brought information

14   concerning possible securities law violations to the attention of the SEC but also to internal

15   whistleblowers. *Id.* at 16-17; *see also* Docket No. 29 (Amicus Curiae Brief by SEC, filed in

16   support of Plaintiff, addressing the question of whether Dodd-Frank protects internal

17   whistleblowers against retaliation).

18          Finally, Wadler argues that he has alleged sufficient facts to state a claim under California

19   Labor Code section 1102.5. *Id.* at 20-24. He does not dispute that he has not alleged facts

20   sufficient to state a claim under subsection (b), but argues that he has sufficiently pled a violation

21   under subsection (c). *Id.* at 21.  According to Wadler, contrary to the assertion of Defendants that

22   he has only included "general and conclusory" allegations in his complaint that he refused to aid

23   and abet illegal activity, Wadler has alleged "in vivid detail" the facts necessary to "flesh out" his

24   claim that he refused to discontinue his investigation of Bio-Rad's misconduct. *Id.* at 21-24.

25   Wadler further argues that Defendants are incorrect in their assertion that in order to state a claim

26   under section 1102.5(c) Wadler must show that Bio-Rad explicitly asked him to violate the law

27   and Wadler expressly refused to do so. *Id.*  According to Wadler, the law does not require that

28   employers "state their illicit motivations"; rather, courts consider the import of the parties'

United States District Court
Northern District of California

1    interactions.  *Id*. at 23.

2    **III.    ANALYSIS**

3        **A.    Legal Standard under Rule 12(b)(6)**

4        A complaint may be dismissed for failure to state a claim on which relief can be granted

5    under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(6).  "The

6    purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the

7    complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a

8    plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil

9    Procedure states that "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short

10   and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.

11   8(a).

12       In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

13   takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

14   non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

15   Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

16   would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

17   1990).  A plaintiff need not plead a prima facie case in order to survive a motion to dismiss

18   pursuant to Rule 12(b)(6). *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514-15 (2002); *see also*

19   *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) (reaffirming the holding of *Swierkiewicz* in light of

20   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  A

21   complaint must however "contain either direct or inferential allegations respecting all the material

22   elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at

23   562 (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A

24   pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

25   of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Nor does a

26   complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*.

27   (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its face,'" meaning

28   that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the

United States District Court
Northern District of California

10

1   reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting

2   *Twombly*, 550 U.S. at 570).

3        **B.   Defendants' Challenges to Federal Claims**

4          **1.  Statutory Overview**

5            a.   Sarbanes-Oxley Act of 2002

6       "To safeguard investors in public companies and restore trust in the financial markets

7   following the collapse of Enron Corporation, Congress enacted the Sarbanes-Oxley Act of 2002,

8   116 Stat. 745." *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1161 (2014) (citing S.Rep. No. 107-146,

9   pp. 2-11 (2002)).   One of the measures enacted in Sarbanes-Oxley to achieve these goals was the

10  protection of whistleblowers. *Id.*  In particular, Sarbanes-Oxley provides that "no [publicly

11  traded] company . . . or any officer, employee, contractor, subcontractor, or agent of such

12  company" may retaliate against an employee for "provid[ing] information, caus[ing] information

13  to be provided, or otherwise assist[ing] in an investigation" of conduct that the employee

14  reasonably believes is a violation of securities law or the SEC's rules where "the information or

15  assistance is provided to or the investigation is conducted by," *inter alia*, "a person with

16  supervisory authority over the employee (or such other person working for the employer who has

17  the authority to investigate, discover, or terminate misconduct)."  18 U.S.C. § 1514A(a)(1)(C).

18      Under Sarbanes-Oxley, an aggrieved whistleblower can initiate an administrative action by

19  filing a complaint with the Secretary of Labor, which must be filed "not later than 180 days after

20  the date on which the violation occurs, or after the date on which the employee became aware of

21  the violation."  18 U.S.C. §§ 1514A(b)(1)(A) & 1514A(b)(2)(D).  In addition, "if the Secretary has

22  not issued a final decision within 180 days of the filing of the complaint and there is no showing

23  that such delay is due to the bad faith of the claimant," an action seeking de novo review may be

24  brought in federal district court.  18 U.S.C. § 1514A(b)(1)(B).

25           b.   Dodd-Frank Act

26      In 2010, Congress established a new whistleblower program under the Dodd-Frank Act,

27  which added Section 21F to the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78u–6.

28  "Section 21F 'encourages individuals to provide information relating to a violation of U.S.

United States District Court
Northern District of California

securities laws' through 'two related provisions that: (1) require the SEC to pay significant

monetary awards to individuals who provide information to the SEC which leads to a successful

enforcement action; and (2) create a private cause of action for certain individuals against

employers who retaliate against them for taking specified protected actions.'" *Somers v. Digital

Realty Trust, Inc.*, No. C-14-05180 EMC, 2015 WL 4483955, at *3 (quoting *Asadi v. G.E. Energy

(USA), L.L.C.*, 720 F.3d 620, 623 (5th Cir. 2013)).

Dodd-Frank defines a "whistleblower" as "any individual who provides, or 2 or more

individuals acting jointly who provide, information relating to a violation of the securities laws to

the Commission, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. §

78u–6(a)(6).   Dodd-Frank's anti-retaliation provision appears to sweep more broadly, however.

In particular, it forbids an "employer" from retaliating against  a whistleblower not only for

"providing information to the Commission" or "initiating, testifying in, or assisting in any

investigation or judicial or administrative action of the Commission based upon or related to such

information" but also for "making disclosures that are required or protected under the Sarbanes-

Oxley Act of 2002 (15 U.S.C.  [§§] 7201 et seq.), this chapter, including section 78j-1(m) of this

title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of

the Commission." 15 U.S.C. §§ 78u–6(h)(1)(A)(i)–(iii).  As discussed above, Sarbanes-Oxley

prohibits retaliation against whistleblowers who have provided information to an individual with

"supervisory authority over the employee" or "such other person working for the employer who

has the authority to investigate, discover, or terminate misconduct," even if the whistleblower did

not provide information about possible illegal conduct to the SEC.  18 U.S.C.A. § 1514A(1)(C).

`       Dodd-Frank, in contrast to Sarbanes-Oxley, does not require that a whistleblower exhaust

any administrative remedies before bringing an action in federal district court. *See Somers,* 2015

WL 4483955, at *4.  In addition, the limitations period for bringing an action under Dodd-Frank is

between six and ten years, in contrast to the 180-day limitation period under Sarbanes-Oxley. *See

id.* (citing 15 U.S.C. § 78u-6(h)(1)(B)(iii)).

c.   Exchange Act Rule 21F-2(b)(1)

Dodd-Frank provides that "[t]he Commission shall have the authority to issue such rules

and regulations as may be necessary or appropriate to implement the provisions of this section consistent with the purposes of this section." 15 U.S.C. § 78u–6(j).  In June 2011, the SEC issued final rules interpreting and implementing Section 21F of Dodd-Frank. *See* Securities Whistleblower Incentives and Protections (Adopting Release), 78 Fed.Reg. 34300, 34301–34304 (June 13, 2011).  Exchange Act Rule 21F-2(b)(1) states that for the purposes of the whistleblower-protection program, "you are a whistleblower if . . . [y]ou provide information in a manner described in . . . 15 U.S.C. 78u–6(h)(1)(A)." *See* 17 C.F.R. § 240.21F–2(b)(1).  In other words, the SEC interprets Dodd-Frank as offering protection from retaliation even for individuals who do not report possible violations to the SEC, so long as they qualify for whistleblower protection under Sarbanes-Oxley based on internal whistleblowing.

### 2.  Whether Wadler Can Sue Individual Directors under Dodd-Frank or Sarbanes-Oxley

#### a.  Sarbanes-Oxley

##### i.   Liability of Individual Directors

Surprisingly, there is scant case law that addresses whether directors who engage in retaliatory conduct may be held individually liable under Sarbanes-Oxley.  Wadler is able to point to one Fourth Circuit case in which the court of appeals affirmed a jury award imposing individual liability under Sarbanes-Oxley on the chairman of the board of directors on the basis that he was "involved in the decision to terminate" the plaintiff.  *See Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 675 (4th Cir. 2015).  In that case, as is alleged here, the actual decision to terminate was made by a vote of the entire board of directors.  *Id.*[4]  The court in *Jones* did not, however, directly address the basis for finding that the defendant in that case could be held individually liable.[5]  Although a close call, the Court finds that directors may be held individually

---

[4] Defendants attempt to distinguish this case on the basis that "the plaintiff in *Jones* [did not] bring claims against non-officer board members."  Reply at 4.  This assertion is incorrect.  There is no suggestion in *Jones* that the chairman who was held personally liable ("Phillips") was an officer of the corporation in that case.  Rather, he is consistently identified as the "chairman."
[5] The Department of Labor appears to have struggled with this issue in the administrative proceeding  as well, asking the parties for supplemental briefing on the question of whether "a member of the Board of Directors of a company covered under [Sarbanes-Oxley] [was] necessarily an 'officer, employee, contractor, subcontractor, or agent' of that company as

United States District Court
Northern District of California

1   liable under Sarbanes-Oxley for the reasons set forth below.

2       "In determining the meaning of a statutory provision, 'we look first to its language, giving

3   the words used their ordinary meaning.'" *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165 (2014)

4   (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990) (citation and internal quotation marks

5   omitted)).   Here, the difficulty lies with the word "agent" as used in Section 1514A(a), and in

6   particular, whether that term encompasses directors.  The authority cited by the parties does not

7   provide a convincing answer to this question.

8       Wadler cites to Black's Law Dictionary, which defines an agent as "[s]omeone who is

9   authorized to act for or in place of another; a representative."  Black's Law Dictionary (10th ed.

10  2014).  According to Wadler, "[b]oard members, who after all are responsible for making the most

11  important decisions for the company, are clearly authorized to act on behalf of the company and

12  thus qualify as 'agents.'"  Opposition at 8.  Wadler does not, however, cite any case that has held

13  as much.  Further, Wadler's argument is undermined by the fact that Black's Law Dictionary

14  defines "corporate agent" as "[a]n agent authorized to act on behalf of a corporation; broadly, all

15  *employees and officers* who have the power to bind the corporation."  Black's Law Dictionary

16  (10th ed. 2014) (emphasis added).

17      Defendants, on the other hand, point to the Restatement (Third) of Agency § 1.01, which

18  provides:

19          Agency is the fiduciary relationship that arises when one person (a
            "principal") manifests assent to another person (an "agent") that the
20          agent shall act on the principal's behalf and subject to the principal's
            control, and the agent manifests assent or otherwise consents so to
21          act.

22  Restatement (Third) of Agency § 1.01.  As Defendants point out, in the comment to this provision

23  it is expressly stated that "the directors are neither the shareholders' nor the corporation's agents

24  as defined in this section."  *Id*. cmt. f(2).  What Defendants fail to note is that in the Reporter's

25

26  _____

27  contemplated by 18 U.S.C. § 1514A(a)[.]"  RJN, Ex. F.  Although the Department of Labor
    ultimately accepted the amended complaint adding the individual board members as defendants, it
    does not appear to have resolved the question, noting only that it accepted the complaint under the
28  liberal amendment standards that apply in OSHA proceedings "pending  receipt of additional
    evidence."

United States District Court
Northern District of California

1    Notes for this comment, it is acknowledged that some commentators characterize directors as

2    agents and that "[s]ome corporation statutes treat directors as agents for specific purposes."

3    Restatement (Third) of Agency § 1.01, Reporter's Notes, cmt. f(2).

4           The case cited by Defendants to support their assertion that a director cannot be an agent of

5    the corporation, *Arnold v. Society for Savings Bancorp, Inc.*, also does not provide strong support

6    for Defendants' argument that directors cannot be agents under Sarbanes-Oxley because that case

7    was decided, in part, based on the legislature's intent with respect to a specific provision of the

8    Delaware code.   In *Arnold*, the court was considering whether a corporation could be held

9    vicariously liable for the acts of its directors where the directors themselves were exempt from

10   liability under a Delaware corporate code provision, Del. C. § 102(b)(7).  768 A.2d. 533, 539-540

11   (Del. S. Ct. 1996).  The court found that it could not, relying in part on the Restatement (Second)

12   of Agency, § 14 (C) (stating that "[n]either the board of directors nor an individual director of a

13   business is, as such, an agent of the corporation or its members").  *Id.* The court stated that it

14   would be "an analytic anomaly . . . to treat corporate directors as *agents* of the corporation when

15   they are acting as fiduciaries of the stockholders in managing the business and affairs of the

16   corporation."  *Id.* (emphasis in original).   However, another significant reason for reaching the

17   conclusion that the directors could not be agents for the purposes of vicariously liability was that

18   treating them as such would be inconsistent with the legislature's intent in enacting the Delaware

19   provision giving rise to the exemption of the board members.  In particular, the court found that

20   imposing vicarious liability on the corporation on the basis that the directors were agents of the

21   corporation could "lead to anomalous results" and "replicate the discredited notion of awarding

22   damages against the directors followed by indemnification of the directors by the corporation," a

23   "result [that] was considered and rejected during the drafting of section 102(b)(7)."  *Id.*

24          Because the Court finds that the meaning of the word "agent" in Sarbanes-Oxley is

25   ambiguous, it looks to legislative intent. *Cleveland v. City of Los Angeles*, 420 F.3d 981, 990 (9th

26   Cir. 2005) ("[a]ccording to the rules of statutory construction, the court can only look to legislative

27   intent when a statute is ambiguous").   Defendants point to the fact that Congress explicitly listed

28   other categories of individuals who may be liable under Sarbanes-Oxley in Section 1514A(a),

United States District Court
Northern District of California

United States District Court
Northern District of California

1   such as "officer[s]" and "employee[s]," but did not include directors in this list, arguing that this

2   omission is an indication of Congress's intent *not* to impose individual liability on directors.  The

3   Court finds this argument unpersuasive.

4         Defendants' argument is based on the "frequently stated principle of statutory construction

5   . . . that when legislation expressly provides a particular remedy or remedies, courts should not

6   expand the coverage of the statute to subsume other remedies." *Nat'l R. R. Passenger Corp. v.*

7   *Nat'l Ass'n of R. R. Passengers*, 414 U.S. 453, 458 (1974).  This principle, in turn, "reflects an

8   ancient maxim—expressio unius est exclusio alterius." *Id.*  Courts apply this rule with caution,

9   however, because it is based on the (sometimes faulty) assumption that "all possible alternative or

10  supplemental provisions were necessarily considered and rejected by the legislative draftsmen."

11  *Nat'l Petroleum Refiners Ass'n v. F.T.C.*, 482 F.2d 672, 676 (D.C. Cir. 1973);  *Abdullah v. Am.*

12  *Airlines, Inc.*, 969 F. Supp. 337, 348 (D.V.I. 1997) ("the maxim should be employed with caution

13  and in only limited circumstances").  Further, the Supreme Court has made clear that while this

14  rule "may serve at times to aid in deciphering legislative intent," it is "subordinated to the doctrine

15  that courts will construe the details of an act in conformity with its dominating general purpose,

16  will read text in the light of context and will interpret the text so far as the meaning of the words

17  fairly permits so as to carry out in particular cases the generally expressed legislative policy." *Sec.*

18  *& Exch. Comm'n v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350-51 (1943), judgment entered

19  sub nom. *Sec. & Exch. Comm'n v. C M Joiner Leasing Corp*, 53 F. Supp. 714 (N.D. Tex. 1944).

20        With these principles in mind, the Court concludes that Congress's failure to expressly

21  include directors in the list of those who may be individually liable under Sarbanes-Oxley does not

22  support the conclusion that it intended to shield directors who engage in retaliatory conduct from

23  individual liability.   As an initial matter, it is not clear that the drafters excluded directors from

24  individual liability in the first place, given that Section 1514A(a) includes "agents" – a term that

25  may or may not encompass directors, as discussed above.  While it is true that the drafters

26  imposed specific duties on "directors" in other provisions of Sarbanes-Oxley, Defendants have not

27  pointed to any actual conflict that would arise from construing "agent" as including directors in

28  Section 1514A(a).  Further, there is no indication that the drafters "considered and rejected" an

1    alternative version that specifically named directors as one of the categories of individuals who

2    could be held individually liable.  Most importantly, though, the Court finds that the context and

3    general purpose of Sarbanes-Oxley support the conclusion that the term "agent" is intended to

4    encompass directors.

5           As the Supreme Court recognized in *Lawson*, Congress enacted Sarbanes-Oxley in

6    response to the Enron debacle.  *See Lawson v. FMR LLC*, 134 S. Ct. 1158, 1161 (2014) (citing

7    S.Rep. No. 107-146, pp. 2-11 (2002)).  A key feature of the proposed law that was highlighted by

8    Senator Patrick Leahy was that it "protect[ed] corporate whistleblowers."  148 Cong. Rec. S6440

9    (daily ed. July 9, 2002).  Senator Leahy illustrated the importance of this protection – and the

10   "vulnerability of corporate whistleblowers to retaliation" – by pointing to the memorandum Enron

11   outside counsel provided to Enron management when asked whether a "high-level employee of

12   Enron" who had "reported improper accounting practices" could be terminated.  *Id.*  According to

13   Leahy, the memo gave Enron management the "good news" that "Texas law does not currently

14   protect corporate whistleblowers."  *Id.*  It is apparent from Senator Leahy's introduction that

15   Congress intended to prevent a recurrence of such a scenario when it adopted the whistleblower

16   protection contained in Sarbanes-Oxley.  Yet that purpose would be significantly undermined

17   were the Court to construe the term "agent" in Sarbanes-Oxley as excluding directors.  Such an

18   interpretation of Sarbanes-Oxley would permit a corporation's board members to fire high-level

19   employees (like the whistleblower in the Enron case) for whistleblowing even though the exact

20   same conduct on the part of a corporation's managers would give rise to individual liability. [6]

21          The conclusion that Congress intended to impose individual liability on those who have the

22

23          [6] The Court also notes that in the context of employment discrimination, courts have
     generally rejected the argument that collective action by members of a committee or board shields
24   the members of the group from individual liability, reasoning that such an approach would make it
     "all too easy for individuals with supervisory authority to avoid liability . . . simply by acting in
25   concert."  *See Heinemann v. Howe & Rusling*, 260 F. Supp. 2d 592, 595 (W.D.N.Y. 2003);  *see
     also Bostwick v. Watertown Unified Sch. Dist.*, No. 13-C-1036,  2015 WL 520701, at *8 (E.D.
26   Wis. Feb. 9, 2015) (school board members who voted in favor of discriminatory act could be held
     individually liable under 42 U.S.C. § 1983  for violation of plaintiff's due process rights).  Similar
27   logic appears to apply here.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   *functional* ability to retaliate against whistle blowers (whether as a board member or a manager) is

2   also supported by the frequent references to the "employer" as the focus of the whistleblower

3   protections in Sarbanes-Oxley.  *See, e.g.*, 148 Cong. Rec. S1785 (daily ed. Mar. 12, 2002)

4   (statement by Senator Leahy in referring to Sarbanes-Oxley whistleblower protection language as

5   necessary "to protect whistleblowers against retaliation by their employers");  S. 2010, 107th

6   Cong. (as introduced on Mar. 12, 2002 and referred to the Judiciary Committee) (describing

7   purpose of the bill as protection of  "whistleblowers against retaliation by their employers . . . .");

8   S. 2010, 107th Cong. § 6 (as reported out of the Judiciary Committee on May 6, 2002) (same); S.

9   Rep. No. 107-146, at 13 (2002) ("If the employer does take illegal action in retaliation for lawful

10   and protected conduct, subsection (b) allows the employee to file a complaint with the Department

11   of Labor, to be governed by the same procedures and burdens of proof now applicable in the

12   whistleblower law in the aviation industry").  As discussed below, Congress has given an

13   expansive meaning to the term "employer" under some statutes, such as the FLSA, and thus, the

14   use of this term in the legislative history is at least consistent with the conclusion that Congress

15   intended to impose individual liability on board members who engage in retaliatory conduct

16   against whistleblowers.

17       Finally, the Court disagrees with Defendants' characterization of the testimony of James

18   R. Doty, former General Counsel of the Securities and Exchange Commission,  before the Senate

19   Judiciary Committee prior to the enactment of Sarbanes-Oxley.  According to Defendant, Doty

20   testified that "independence, as opposed to liability, was the appropriate tool for ensuring ethical

21   governance by directors."  Defendants' Supp. Brief at 3.  In fact, Doty did not testify anywhere

22   that measures to increase the independence of directors were preferable to the imposition of

23   individual liability.  He simply testified that *one* of the ways to prevent corporate abuse of

24   investors was to enact measures that would increase the independence of directors.  *Penalties for*

25   *White Collar Crime:  Hearing Before the Subcomm. on Crime and Drugs of the S. Committee on*

26   *the Judiciary*, 107th Cong. 293 (2002) (Statement of James R. Doty) at 84.  Indeed, Doty's

27   testimony, read as a whole, suggests that he believed directors *should* face individual liability for

28   retaliatory conduct.  In particular, Doty emphasized in his testimony that a key feature of

18

1   reforming corporate governance would be the "recognition that corporate accountability and

2   responsibility starts with individual accountability." *Id*.  He continued, "[j]ust as tone from the top

3   communicates corporate values and creates corporate culture, *accountability starts as an*

4   *individual matter from the top*." *Id*. (emphasis added).  Nothing in this statement suggests that

5   board members who vote to terminate a high-level employee for whistleblowing should be

6   excused from individual liability merely because they act in their capacity as directors of the

7   corporation.   Rather, this statement points to the opposite conclusion.

8         Therefore, the Court finds that while the language of Section 1514A(a) is ambiguous, the

9   context and broad purpose of Sarbanes-Oxley support the conclusion that a director may be held

10   individually liable as an "agent" under that provision.

                        ii.   Timeliness of Sarbanes-Oxley Claim

12         Defendants contend Wadler's Sarbanes-Oxley claims against the individual defendants are

13   untimely because he did not add these defendants to his administrative complaint until after the

14   180-day limitations period had expired and his claims against the individuals in the amended

15   complaint do not relate back to the original complaint.  *See* 18 U.S.C. § 1514A(b)(2)(D).  Wadler,

16   on the other hand, argues that his claims are timely as to all of the individual defendants because

17   the original DOL Complaint was sufficient to exhaust his claims as to all of those defendants. The

18   Court concludes that Wadler's claims in the original DOL Complaint were sufficient to exhaust

19   his claims against Bio-Rad's CEO, Norman Schwartz, but not the remaining members of the

20   Board of Directors and therefore, that the Sarbanes-Oxley claims against Defendants Louis

21   Drapeau, Alice N. Schwartz, Albert Hillman and Deborah J. Neff are untimely.

22         There are no pleading requirements for whistleblower actions.  *See* 29 C.F.R. § 1980.

23   Indeed, a whistleblower complaint under Sarbanes-Oxley need not even be in writing but may be

24   made orally, in which case it is reduced to writing by OSHA. 29 C.F.R. § 1980.103(b).  Because

25   of the absence of formal  pleading requirements, complaints in OSHA administrative proceedings

26   are not expected to meet the standards of pleading that apply to claims filed in federal court under

27   Rule 12(b)(6).  *In The Matter Of: Douglas Evans, v. United States Environmental Protection*

28   *Agency*, 2012 WL 3164358 (DOL Adm.Rev.Bd., July 31, 2012), at *6.  Rather, a complaint is

United States District Court
Northern District of California

19

1    sufficient so long as the whistleblower complainants give an opposing party "'fair notice' of the

2    charges against it." *Id.*; *see also Donovan v. Royal Logging Co*., 645 F.2d 822, 826 (9th Cir.

3    1981) ("It is settled that administrative pleadings are liberally construed and easily amended").

4         In *Evans*, the DOL held that "fair notice" requires only that an administrative complaint

5    "provide (1) some facts about the protected activity, showing some 'relatedness' to the laws and

6    regulations of one of the statutes in our jurisdiction, (2) some facts about the adverse action, (3) a

7    general assertion of causation and (4) a description of the relief that is sought." *Id*. This test does

8    not, however, specifically address the question of what is required to give a particular individual

9    "fair notice" where only the corporation is expressly named as a respondent in an OSHA

10   administrative action.

11        Defendants cite a line of cases in which a handful of district courts outside of the Ninth

12   Circuit have held that an individual defendant must be named in the "caption" of an administrative

13   complaint to state a claim against that defendant.  *See Robert Hanna v. WCI Comtys.,Inc.,* Case

14   No. 04-80595-CIV-HURLEY/ LYNCH,2004 U.S. Dist. LEXIS 2565, at *3 (S.D. Fla. Nov. 15,

15   2004) (finding claim against individual defendant had not been exhausted where the administrative

16   complaint in OSHA proceeding under Sarbanes-Oxley referred to the individual's role in

17   terminating him but did not include him as a "named defendant");  *Bozeman v. Per-Se*

18   *Technologies, Inc*., 456 F. Supp. 2d 1282, 1358 (N.D. Ga. 2006) (citing *Hanna* and holding that

19   because the plaintiff had "failed to specifically name [the proper defendants] in the heading of his

20   administrative complaint," the defendants were entitled to summary judgment for plaintiff's

21   failure to exhaust his administrative remedies); *Smith v. Psychiatric Solutions, Inc*., No.

22   3:08CV3/MCR/EMT, 2009 WL 903624, at *8 (N.D. Fla. Mar. 31, 2009) aff'd, 358 F. App'x 76

23   (11th Cir. 2009) (citing *Hanna* and *Bozeman* and finding that plaintiff had not exhausted

24   administrative remedies as to certain defendants because they were not named in the caption or the

25   body of the administrative complaint).  The undersigned declines to follow this formalistic

26   approach, which is based on the assumption that a complaint filed in an OSHA proceeding must

27   meet the same pleading requirements as a complaint that is filed in federal district court.   As

28   discussed above, it is not.  To require that an individual defendant be named in the caption of an

United States District Court
Northern District of California

1   administrative complaint when no formal pleading (or even written document) is even required

2   under Sarbanes-Oxley is inconsistent with the statutory and regulatory framework established by

3   Congress and the Department of Labor to ensure compliance with Sarbanes-Oxley.

4          Ninth Circuit cases addressing exhaustion requirements under Title VII further support the

5   conclusion that an administrative complaint may, under some circumstances, be sufficient to

6   exhaust a plaintiff's administrative remedies even where a particular defendant is not named as a

7   defendant in any heading or caption.  In *Chung v. Pomona Valley Community Hospital*, the Ninth

8   Circuit addressed whether the plaintiff had exhausted his administrative remedies with respect to

9   Title VII claims asserted against several doctors, where the administrative charge in the EEOC

10  administrative proceeding had alleged only that the hospital where he worked had denied him

11  promotions, without specifically naming the individual doctors.  667 F.2d 788, 789-90 (9th Cir.

12  1982).  The district court found that the claims asserted against the doctors failed because those

13  individuals were not named in the EEOC charge.  *Id*. at 790.  The Court of Appeals, however,

14  disagreed, finding that the district court's holding was based on an "overly-restrictive reading" of

15  the EEOC charge.  *Id*. The Court of Appeals found that because the doctors named as defendants

16  "participated in promotion decision," they "should have anticipated that [the plaintiff] would name

17  in his suit those who denied him the promotions mentioned in the charge."  *Id*. at 790, 792.

18  Therefore, the Court of Appeals held, the plaintiff's "charge supplied an adequate basis for his

19  Title VII claims against the doctors" and the district court erred in dismissing those claims.  *Id*. at

20  792; *see also Sosa v. Hiraoka*, 920 F.2d 1451, 1459 (9th Cir.1990) (holding that there are three

21  exceptions to exhaustion requirement under Title VII:  "First, if the respondent named in the

22  EEOC charge is a principal or agent of the unnamed party, or if they are "substantially identical

23  parties," suit may proceed against the unnamed party . . . . Second, suit may proceed if the EEOC

24  could have inferred that the unnamed party violated Title VII. Third, if the unnamed party had

25  notice of the EEOC conciliation efforts and participated in the EEOC proceedings, then suit may

26  proceed against the unnamed party").

27          Here, Wadler alleged in his original DOL Complaint that he was "terminated from [his]

28  employment at Bio-Rad by the CEO."  Inscoe Decl., Ex. A.  Consequently, Defendant Norman

United States District Court
Northern District of California

21

1    Schwartz (Bio-Rad's CEO) received, within the 180-day limitations period, fair notice that he was

2    being charged with retaliation and would likely be named as a defendant in any subsequent

3    judicial proceeding.  On the other hand, even under the liberal standard that applies to

4    administrative complaints, the original DOL Complaint  did not give the remaining Board

5    members fair notice that they would be named as individual defendants in this action.  Wadler

6    does not cite any specific conduct on the part of these individuals that would have put them on

7    notice that he was accusing them of retaliatory conduct; nor does he state that his termination was

8    a result of a vote by the Board of Directors, even though he does not dispute that he was aware of

9    the Board's vote soon after his termination.  Finally, as discussed above, the question of whether

10   directors may be held individually liable under Sarbanes-Oxley does not appear to have been

11   squarely addressed in the case law, making it even less likely that these individuals would have

12   anticipated that Wadler would assert claims against them under Sarbanes-Oxley.

13           Because Wadler did not give any Board members except Norman Schwartz fair notice in

14   his original administrative complaint, and because the remaining Board members were not added

15   to the administrative complaint until after the 180-day limitation period expired, the Court

16   concludes that the Sarbanes-Oxley claims against all of the individual defendants except Norman

17   Schwartz are untimely.

18                   b.   Dodd-Frank

19           In contrast to Sarbanes-Oxley, which lists categories of individuals and entities who may

20   be sued, Dodd-Frank permits whistleblowers to sue an "employer" for retaliation.  15 U.S.C.A. §

21   78u-6(h)(1)(A).   The term "employer" is not defined in the statute, however, and again, there

22   appears to be no case in which a court has squarely decided the question of whether individual

23   directors may be sued under this provision.  The one case cited by Wadler in which this question is

24   addressed, *Azim v. Tortoise Capital Advisors, LLC*, lends only very weak support for Wadler's

25   position.  In that case, the plaintiff sought leave to amend her complaint to assert a claim under

26   Dodd-Frank against certain individuals.   *See* No. 13-2267-KHV, 2014 WL 707235, at *3 (D. Kan.

27   Feb. 24, 2014).   The court noted that the defendants had made a "statutory construction argument

28   that Dodd-Frank does not provide for individual liability" but had been unable to cite any

United States District Court
Northern District of California

22

1    authority in support of their position; therefore the court concluded that amendment was "not

2    futile given the state of existing law." *Id.*  The court noted, however, that it might "ultimately

3    adopt" the defendants' position on summary judgment.  *Id.*  The court did not address the specific

4    statutory construction arguments made by the defendants in that case.  *Id.*

5         Defendants assert that simply by using the word "employer," Congress made clear that

6    directors may not be held individually liable under Dodd-Frank, citing an article by three

7    practitioners who reach this conclusion based, in part, on the definition of "employer" found in

8    Black's Law Dictionary.  Defendants' Supp. Brief at 6-7 (citing *Individual Liability Unlikely*

9    *Under Dodd-Frank Act's Whistleblower Anti-Retaliation Proscriptions*, Bloomberg BNA

10   Securities Regulation & Law Report, July 6, 2015).[7]  They also point out that under other federal

11   statutes, including the ADA and Title VII, the term "employer" has been found to preclude

12   individual liability altogether.  The problem with Defendants' "plain meaning" argument is that

13   courts that have found that Title VII and the ADA do not impose individual liability have not

14   relied on any generally established definition of "employer," but rather, on specific provisions in

15   those statutes limiting liability to employers with more than 15 employees.  *See Miller v.*

16   *Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993) (Title VII); *Walsh v. Nevada Dep't of*

17   *Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006) (ADA).

18   _____

19   [7] In the BNA article, the authors write:

20        [T]he [Dodd-Frank Act] applies only to "employers," a term left
         undefined. Under the plain meaning rule, "employer" should
21        therefore be ascribed its commonly understood meaning: "[a]
         person, company, or organization for whom someone works; esp.,
22        one who controls and directs a worker under an express or implied
         contract of hire and who pays the worker's salary or wages." In the
23        corporate context in which whistleblower cases traditionally arise,
         only the company is the employer – one's "boss" or "supervisor" is
24        generally considered to be a co-employee working for the same
         employer. Thus, because the DFA's anti-retaliation provision
25        expressly applies only to "employers" with no further elaboration,
         the analysis need go no further with respect to whether individuals
26        may be held liable. Under the plain meaning rule, they may not.

27   Bloomberg BNA Securities Regulation & Law Report, July 6, 2015 at 1348 (quoting Black's Law
     Dictionary (10th ed. 2014)).

28

United States District Court
Northern District of California

1    In contrast, in the FLSA Congress defined the term "employer" much more broadly, to

2    include "any person acting directly or indirectly in the interest of an employer in relation to an

3    employee." 29 U.S.C.A. § 203.  The Ninth Circuit has held that "the definition of 'employer'

4    under the FLSA is not limited by the common law concept of 'employer,' but 'is to be given an

5    expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'" *Lambert v.*

6    *Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999) (citing *Bonnette v. California Health & Welfare*

7    *Agency*, 704 F.2d 1465, 1469 (9th Cir.1983)).  Thus, the court explained, "[w]here an individual

8    exercises 'control over the nature and structure of the employment relationship,' or 'economic

9    control' over the relationship, that individual is an employer within the meaning of the Act, and is

10   subject to liability."  *Id.* at 1012.

11   Given that the term "employer" has been used in federal statutes in both a narrow sense (in

12   the ADA and Title VII) and a broader sense (in the FLSA), and in the absence of any definition of

13   the term in Dodd-Frank, the Court finds that the meaning of the word "employer" as used in

14   Dodd-Frank is ambiguous.  Again, the Court looks to legislative intent.  Defendants make much of

15   the fact that Dodd-Frank uses the term "employer" while Sarbanes-Oxley imposes liability on

16   "any officer, employee, contractor, subcontractor, or agent" who retaliates against a

17   whistleblower.  There is nothing in the legislative history, however, that suggests that this

18   difference was intended to eliminate individual liability for those who retaliated against

19   whistleblowers.  Indeed, as discussed above, the word "employer" appears repeatedly in the

20   legislative history of Sarbanes-Oxley as a short-hand to describe those who could be sued under

21   that statute, suggesting that the use of the term in Dodd-Frank does *not* reflect an intent to

22   eliminate individual liability under Dodd-Frank.

23   This conclusion is also consistent with the legislative history of Dodd-Frank indicating that

24   its purpose was to enact more stringent measures than were contained in Sarbanes-Oxley to protect

25   whistleblowers.  The Administration proposal that led to Dodd-Frank's enactment states that one

26   of the goals of the reform was to "[s]trengthen [i]nvestor [p]rotection" by "expanding protections

27   for whistleblowers [and] expanding sanctions available for enforcement . . . ."  U.S. Treasury

28   Dept., Financial Regulatory Reform:  A New Foundation, Rebuilding Financial Supervision and

United States District Court
Northern District of California

24

United States District Court
Northern District of California

1  Regulation (June 27, 2009).   Consistent with this purpose, all of the changes in Dodd-Frank

2  relating to whistleblower protections that were discussed by Congress were aimed at increasing

3  whistleblower protection.  *See* S. Rep. No. 111-176, at p. 114 (2009) (amending § 1514A to

4  clarify that "subsidiaries and affiliates of issuers may not retaliate against whistleblowers" - in

5  addition to the issuers themselves); 156 Cong. Rec. S5873 (daily ed. July 15, 2010) (amending §

6  1514A "to extend whistleblower protections to employees of nationally recognized statistical

7  rating organizations" such as Standard & Poor's and Moody's Investors Service).  In this context,

8  the suggestion that Congress, when it enacted Dodd-Frank, intended to exclude liability on the

9  part of individuals who retaliate against whistleblowers  -  which had been a key feature of

10  Sarbanes-Oxley aimed at increasing accountability  at the top levels of corporations - is

11  implausible.  Had Congress intended to reduce whistleblower protection in this manner, one would

12  at least expect to see some mention of such a significant change.  There appears to be no

13  discussion of the change in the legislative history, however.

14      In short, the Court concludes that Congress intended that Dodd-Frank provide for

15  individual liability that is at least as extensive as that of Sarbanes-Oxley, and therefore, that

16  directors may be held individually liable for retaliating against whistleblowers under Dodd-Frank.

17  Therefore, the Court rejects Defendants' assertion that the Dodd-Frank claim must be dismissed as

18  to the individual defendants.

19          **3.  Whether Wadler Qualifies for Whistleblower Protection Under Dodd-Frank**

20      Defendants ask the Court to decide an issue that has not been addressed by the Ninth

21  Circuit, namely, the scope of protection from retaliation for whistleblowers under the Dodd-Frank

22  Act.  The Fifth Circuit and a minority of courts have concluded that Dodd-Frank's anti-retaliation

23  provisions apply only to individuals who have provided information or assistance regarding

24  possible violations of securities law to the SEC.  The majority of courts, however, have found that

25  the SEC's interpretation of the anti-retaliation provisions of Dodd-Frank, as set forth in Rule 21F-

26  2(b)(1), is entitled to deference and therefore, that it should be interpreted as providing protection

27  to internal whistleblowers as well.   The undersigned finds that the reasoning of the majority of

28  courts is persuasive and therefore concludes that Wadler's failure to provide information or

United States District Court
Northern District of California

1  assistance to the SEC does not defeat his claim under Dodd-Frank.

2  In deciding whether to follow Rule 21F-2(b)(1), the Court looks to the framework set forth

3  in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., which explained that a court should

4  take a two-step approach when it reviews an agency's construction of a statute that it administers.

5  467 U.S. 837, 842-43 (1984).  "First, always, is the question whether Congress has directly

6  spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the

7  matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent

8  of Congress." *Id*. at 843.  If, on the other hand, "the statute is silent or ambiguous with respect to

9  the specific issue, the question for the court is whether the agency's answer is based on a

10  permissible construction of the statute." *Id*.

11  In *Asadi*, the Fifth Circuit did not reach the second step of the *Chevron* inquiry because it

12  concluded that Dodd-Frank's provisions are unambiguous.  720 F.3d at 625.  In particular, it found

13  that the plain language of § 78u-6(a)(6) unambiguously defines a whistleblower as an individual

14  who provides information about possible illegal activities to the SEC, while § 78u-6(h)(1)(A)

15  unambiguously describes three categories of protected activities.  *Id*.  While the protected activity

16  includes activities that are required under any law, including Sarbanes-Oxley, the court found that

17  this language did not create any conflict with the Dodd-Frank Act's definition of a

18  "whistleblower." *Id*. at 626.  The court reasoned that "[c]onflict would exist between these

19  statutory provisions only if we read the three categories of protected activity as additional

20  definitions of whistleblowers." *Id*.  The *Asadi* court also found that "construing the Dodd-Frank

21  whistleblower protection provision to extend beyond the statutory definition of 'whistleblowers'

22  renders the [Sarbanes-Oxley] anti-retaliation provision, for practical purposes, moot." *Id*. at 629.

23  As Judge Koh found in *Connolly v. Remkes*, "a large majority of district courts before and

24  after *Asadi* have taken a different position, finding ambiguity in the interplay between §§ 78u–

25  6(a)(6) and 78u–6(h)(1)(A)(iii)." 2014 WL 5473144, at *5 (N.D. Cal. Oct. 28, 2014) (citing

26  *Murray v. UBS Securities, LLC*, No. 12 Civ. 5914 (JMF), 2013 WL 2190084 (S.D.N.Y. May 21,

27  2013);  *Khazin v. TD Ameritrade Holding Corp*., No. 13-4149, 2014 WL 940703, at *6 (D.N.J.

28  Mar. 11, 2014); *Genberg v. Porter*, 935 F. Supp.2d 1094, 1106 (D. Colo. 2013); *Nollner v. S.*

1    *Baptist Convention, Inc.*, 852 F. Supp. 2d 986, 993 (M.D. Tenn. 2012); *Kramer v. Trans–Lux*

2    *Corp.*, 3:11CV1424 SRU, 2012 WL 4444820, at *4-5 (D. Conn. Sept. 25, 2012); *Egan v.*

3    *TradingScreen, Inc.*, 10 CIV. 8202 LBS, 2011 WL 1672066, at *5 (S.D.N.Y. May 4, 2011)).

4             In *Somers v. Digital Realty Trust, Inc.*, Judge Chen addressed in detail the reasons why

5    Dodd-Frank is, in fact, ambiguous on this question.  Judge Chen rejected the *Asadi* court's

6    reliance on the plain language of the definitional term in Dodd-Frank, citing recent Supreme Court

7    cases in which the Court recognized that "an express and clear definitional term in a statute may

8    ultimately need to yield to countervailing interpretive factors in order to harmonize the meaning of

9    the statute."  *Somers*, 2015 WL  4483955 at *7 (citing *Bond v. United States*, 134 S. Ct. 2077,

10   2019 (2014)).  That is the case here, Judge Chen found, because "[a]s a number of courts have

11   recognized, Section 21F(h)(1)(A)(iii) appears to be in direct conflict with the [Dodd-Frank Act's]

12   definition of a whistleblower."  *Id*. (internal quotations and citations omitted).  The conflict arises

13   "because subsection (iii) provides protection to persons who have not disclosed information to the

14   SEC, while Section 21F(a)(6) requires the person report to the Commission."  *Id*. (citations and

15   internal quotations omitted).  "Put differently, the majority of courts to consider the issue have

16   found that subsection (iii) would be ineffective if whistleblowers must report directly to the SEC."

17   *Id*. (citing *Connolly*, 2014 WL 5473144, at * 6).

18            Judge Chen went on to offer a number of very specific reasons in support of his conclusion

19   that Dodd-Frank is ambiguous.  First, he pointed to "a number of provisions in subsection (iii) that

20   conflict with the assumption that only those who report to the SEC" are entitled to Dodd-Frank's

21   whistleblower protections.  *Id*. at *9.  As one example, he cited the fact that subsection (iii)

22   purports to make compliance with section 78j-1(b) of the Security Exchange Act of 1934 protected

23   conduct, but that provision only permits auditors to report illegal conduct to the SEC *after* they

24   have reported the illegal conduct internally and no action has been taken, indicating that

25   "Congress wished to cover auditors who made required internal reports about illegal acts."  *Id*.

26   Similarly, he reasoned, subsection (iii) clearly covers internal reports by attorneys that are required

27   under Sarbanes-Oxley, which does not permit attorneys to report violations to the SEC except

28   under limited circumstances.  *Id*.

1        Second, to the extent that applying Dodd-Frank to internal whistleblowers would "read the

2  words 'to the Commission' out of the statutory definition," Judge Chen found this argument was

3  not dispositive; were the court to find that the whistleblower protection of Dodd-Frank did not

4  apply to internal whistleblowers, there would be surplusage in subsections (i) and (ii). *Id.* For

5  example, subsection (i) prohibits retaliation against a whistleblower "in providing information to

6  the Commission in accordance with this section" but that language would be entirely unnecessary

7  if only those who provide information to the SEC can be whistleblowers under Dodd-Frank. *Id.*

8  He noted that "the canon against superfluity assists only where a competing interpretation gives

9  effect to every clause and word of a statute." *Id.* (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 131

10  S. Ct. 2238, 2248 (2011)).

11        Third, Judge Chen examined the legislative history, noting that subsection (iii) was added

12  at the last minute, suggesting that "Congress intended for the scope of the [Dodd-Frank] whistle-

13  blower provisions to be broader than in earlier version of the bill." *Id.* at * 10-11.

14        Fourth, he rejected the *Asadi* court's suggestion that an expansive reading of Dodd-Frank

15  would render Sarbanes-Oxley moot, pointing out that some individuals may prefer the

16  administrative forum that is available under Sarbanes-Oxley but not under Dodd-Frank, and also

17  noting that certain kinds of non-economic damages (e.g. emotional distress) are available under

18  Sarbanes-Oxley but not under Dodd-Frank. *Id.* at *11.

19        Finally, he found that policy reasons supported a finding of ambiguity, namely, the public

20  policy of "encouraging reporting of securities violations." *Id.*

21        The undersigned agrees with the reasoning of Judge Chen, who like the majority of courts

22  found that Dodd-Frank is ambiguous on the question of whether its anti-retaliation provisions

23  apply to an individual who has provided information regarding possible illegal activity internally

24  but has not provided such information to the SEC. Further, the Court finds that Judge Chen's

25  reasoning has particular force in light of the Supreme Court's recent decision in *King v. Burwell*,

26  135 S. Ct. 2480 (2015). In that case, the Supreme Court cautioned against reading statutory

27  language in isolation, explaining:

28                If the statutory language is plain, we must enforce it according to its

*United States District Court*
*Northern District of California*

1   terms. *Hardt v. Reliance Standard Life Ins*. Co., 560 U.S. 242, 251,
2   130 S.Ct. 2149, 176 L.Ed.2d 998 (2010). But oftentimes the
    "meaning—or ambiguity—of certain words or phrases may only
3   become evident when placed in context." *Brown & Williamson*, 529
    U.S., at 132, 120 S.Ct. 1291. So when deciding whether the
4   language is plain, we must read the words "in their context and with
    a view to their place in the overall statutory scheme." *Id*., at 133,
5   120 S.Ct. 1291 (internal quotation marks omitted). Our duty, after
    all, is "to construe statutes, not isolated provisions." *Graham County
6   Soil and Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280, 290, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) (internal
    quotation marks omitted).

7   135 S. Ct. at 2489.   With this admonition in mind, the Court rejects *Asadi's* conclusion that the

8   plain language of the "whistleblower" definition in Dodd-Frank is controlling.

9         Having found that Dodd-Frank is ambiguous, the Court next addresses whether the SEC's

10  interpretation of the statute, as stated in Rule 21F-2(b)(1) is entitled to deference on the basis that

11  it is a "permissible construction of the statute."   The Court finds that it is.

12        Once again, the Court looks to the reasoning in *Somers*, in which Judge Chen concluded

13  that Rule 21F-2(b)(1) was entitled to deference under *Chevron*.  2015 WL 4483955, at *5. In

14  *Somers*, the court noted that every court that has reached step two of the *Chevron* analysis has

15  found that Rule 21F-2(b)(1) is a "permissible construction" of Dodd-Frank.  *Id*. (citing *Connolly*,

16  2014 WL 5473144, at *6;  *Khazin*, 2014 WL 940703, at * 6; *Murray*, 2013 WL 2190084, at *5).

17  He went on to offer four reasons for finding the SEC's interpretation to be reasonable.

18        First, the court in *Somers* found the SEC's rule to be reasonable because it resolves the

19  tension between the narrow definition of a whistleblower and "seemingly very broad coverage of

20  subsection (iii)." *Id*. at *12.   "Put simply, the SEC's interpretation is reasonable because it

21  permits a large class of individuals to qualify as protected whistleblowers, a result which appears

22  consistent with the broad language Congress employed in subsection (iii)." *Id*.

23        Second, Judge Chen found that "the SEC's interpretation is reasonable because it

24  'comports with Dodd-Frank's scheme to incentivize broader reporting of illegal activities.'" *Id*.

25  (quoting *Connolly*, 2014 WL 5473144, at *6).

26        Third, Judge Chen found that "the SEC's interpretation is reasonable because it encourages

27  internal reporting of possible law violations."  *Id*. at *12.  In support of this conclusion, Judge

28  Chen cited the SEC's amicus brief in that case, in which the SEC argued that establishing a two-

United States District Court
Northern District of California

1    tiered structure of anti-retaliation protections . . . might discourage some individuals from

2    reporting internally in appropriate circumstances, . . . thus jeopardizing the benefits that can result

3    from internal reporting." *Id*.  The Court notes that the SEC makes the same argument here.  *See*

4    SEC Amicus Brief at 9-13.

5           Fourth, Judge Chen found that the SEC's interpretation of Dodd-Frank was reasonable

6    because "a narrow reading of Dodd-Frank would 'significantly weaken the deterrence effect on

7    employers who might otherwise consider taking an adverse employment action.'"  *Id*. at *13

8    (quoting SEC Amicus Brief at 29).  Again, the SEC makes the same argument in this case.  *See*

9    SEC Amicus Brief at 30.

10          For the reasons expressed by Judge Chen in *Somers*, the undersigned finds that Rule 21F-

11   2(b)(1) is entitled to deference under *Chevron*.  Further, because Rule 21F-2(b)(1) provides that

12   internal whistleblowers are protected from retaliation under Dodd-Frank, the Court rejects

13   Defendants' assertion that Wadler's Dodd-Frank Act claim fails as a matter of law because he did

14   not provide any information or assistance to the SEC.

15          **C.     Defendants' Challenge to California Labor Code Section 1102.5 Claim**

16          California Labor Code section 1102.5, like Dodd-Frank and Sarbanes-Oxley, seeks to

17   protect whistleblowers by prohibiting employers from retaliating against employees for engaging

18   in certain categories of protected activity.  Cal. Lab. Code § 1102.5.  The subsection upon which

19   Wadler relies, subsection (c), prohibits employers from retaliating against employees "for refusing

20   to participate in an activity that would result in a violation of state or federal statute, or a violation

21   or noncompliance with a state or federal rule or regulation."  *Id*. § 1102.5(c).  Defendants contend

22   Wadler fails to state a claim because he has not alleged facts showing that he "refused to

23   participate in a cover-up of allegedly unlawful activity."  Motion at 11.  The Court disagrees.

24           Defendants cite a single case in support of their position, *Banko v. Apple*, 20 F. Supp. 3d

25   749 (N.D. Cal. 2013).  In that case, Judge Seeborg found that the plaintiff's allegations were

26   sufficient to state a claim under section 1102.5 where they supported an inference that the plaintiff

27   refused to participate in a cover-up of his supervisee's embezzlement.  20 F. Supp. 3d 749, 759-

28   60.  The Court concludes that Plaintiff's allegations in this case also support such an inference.

United States District Court
Northern District of California

While Defendants attempt to distinguish the facts in *Banko*, citing allegations that the defendants specifically instructed the plaintiff to ignore the illegal conduct in that case, *see id*. at 752-53, the court did not hold that such specific instructions are a requirement for stating a claim under section 1102.5   Nor does the Court find any authority that supports such a stringent pleading requirement.   At this early stage of the case, Plaintiff's claim under section 1102.5 is sufficiently pled.

## IV.    CONCLUSION

For the reasons stated above, the Motion is GRANTED as to Plaintiff's First Claim, under Sarbanes-Oxley, to the extent it is asserted against Defendants Louis Drapeau, Alice N. Schwartz, Albert J. Hillman and Deborah J. Neff.  As to those Defendants (but not as to Defendant Bio-Rad or its CEO, Norman Schwartz), the Sarbanes-Oxley claim is dismissed with prejudice.  In all other respects, the Motion is DENIED.

**IT IS SO ORDERED.**

Dated:  October 23, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

31