# EXHIBIT F

# EXPERT REPORT

## Sanford S. Wadler, Plaintiff

## v.

## Bio-Rad Laboratories, Inc. et. al.

Case No. 3-15-cv-2356

United States District Court

Northern District of California

August 17, 2016

Donald A. Walker, Jr. MBA CPA CGMA

Donald Walker Consulting LLC

## QUALIFICATIONS

Since 2008, as a CPA, I have provided independent forensic accounting services in SEC and GAAP accounting and auditing matters.

From February 1991 to May 2008 I was a CPA in the Division of Corporation Finance of the U. S. Securities and Exchange Commission ("SEC"). For the last nine of those seventeen years, I was one of the twelve Senior Assistant Chief Accountants (industry review group leaders) responsible for all financial reviews of disclosure documents filed with the SEC. Those reviews, including filings on Forms S-1 through S-4, Forms 10 and 10-K and 10-Q, Forms 8-K and 12b-25, and Forms 20-F and 6-K by foreign private issuers, encompassed the financial statements required by SEC Regulation S-X and Regulation S-K, as well as the written disclosures about the registrant business required by Regulation S-X and Regulation S-K and certifications by management required by SEC Regulation S-K and the Sarbanes-Oxley Act of 2002 and the Graham-Leach-Bliley Act. I supervised 15-20 CPAs and performed parallel reviews of disclosure documents as part of my supervisory duties. I was responsible for interpretation of the SEC financial disclosure rules for registrants. I also taught various topics in the Division training programs for accountants and attorneys.

I have been a CPA for more than 45 years and am licensed in Michigan and New York. During my career, I have audited and managed audits of large and small business entities and have provided consulting services including forensic and SEC accounting services and training of internal auditors.

I currently teach as an adjunct professor of accounting at Northeastern University's D'Amore-Kim Graduate School of Business and have taught as an adjunct professor of accounting at Georgetown University and its McDonough Graduate School of Business and its Graduate Law Center, and at Colby College.

I received my M.B.A. degree from The Tuck School of Business at Dartmouth in 1967 and my A.B. degree from Amherst College in 1965.

My curriculum vitae is attached to this report as Exhibit A.

## INTRODUCTION

I have been engaged to opine on the accuracy of the conclusions of E. Emre Carr, Ph.D, CPA ("Carr") in his report submitted on July 1, 2016 in the matter of *Wadler v. Bio-Rad Laboratories Inc.*  In forming my opinions in this case, I have relied upon my professional experience and education, and have drawn my conclusions from that experience and review of the documents listed in Exhibits B to this report and otherwise cited herein.

## OPINIONS

**I.**   **Carr's Conclusions Regarding Wadler's Role in the Life Technologies Accrual and a Related 10-K filing in March of 2013 Are Erroneous in Numerous Respects**

**A.**   ***Carr is incorrect in his conclusions as to why Wadler's position regarding the Life Technologies accrual supposedly conflicted with Generally Accepted Accounting Principles ("GAAP")***

In February and March of 2013, Sanford S. Wadler ("Wadler") was asked by the outside auditors to provide a representation letter concerning contingent liabilities associated with actual or threatened litigation against Bio-Rad.  *(See Mar. 18, 2013 Legal Representation Letter (EY-BRL-MISC-000001).)* At the time, Bio-Rad was engaged in a dispute with Life Technologies concerning an audit of royalties Bio-Rad had previously paid.  *(Mar. 9, 2013 Memorandum Regarding Accrual Summary (Ex. 118).)*  In addition, Bio-Rad was also involved with a series of other disputes at the time with Life Technologies related to certain patent licenses.  *(See id.)*

Based on the information he knew at the time, Wadler stated that "a comprehensive settlement in the range of $25-31 million" was the best estimate of the loss Bio-Rad faced concerning all outstanding issues with Life Technologies.  *(Id.)*  He stated that "[t]his accrual is the best estimate at the time, but only in the context of settlement of [Life Technologies'] various claims and [Life Technologies'] offer to settle all outstanding issues for $39.9 million"—in other words, in the context of a global settlement with Life Technologies.  *(Id.)*  Wadler stated that $13.6 million should be sufficient given this best estimate of the $25-$31 million loss, and the fact that an additional $13-$18 million could be offset

from an escrow account (associated with the Quanta Life acquisition).  *(Id.)*   Bio-Rad management ultimately agreed with this accrual amount.  *(See Mar. 14, 2013 E&Y Memo re "Life Technologies Royalty Accrual" (Ex. 119).)*  Bio-Rad's outside auditor, Ernst & Young, did not "take exception with the Company's conclusion and accounting thereof." *(Id.)*  Bio-Rad had previously accrued only $4.8 million associated with disputes against Life Technologies. Thus, the company had to recognize an increase in its accrual from $4.8 million to $13.6 million.  *(Id.)*

Carr's Report proffers several different reasons why Wadler's conclusions are supposedly inconsistent with GAAP, none of which withstand scrutiny.

First, Carr asserts that it was somehow improper for Wadler to insist on increasing the reserve under FASB Accounting Standards Codification ("ASC") 450. ASC 450 prescribes the accounting for probable losses from, among other events, litigation. As Carr himself notes, ASC 450 requires a company to accrue the best estimate within a range of estimates or, if no figure within a range is a better estimate than any other, the minimum amount in the range*.  (ASC 450; see also Carr Report p. 13.)*  Carr then suggests that "it would have been appropriate to take a small accrual for the loss related only to the Life Tech Royalties dispute," which Carr suggests would have been the previously accrued amount of $3.5 million from the prior financial reporting period.  *(Carr Report p. 13.)*

But Carr's conclusion does not follow from its premise.  New information had come to light since the prior accrual had been recorded that had changed both the best estimate within the range of estimates for this litigation contingency and the range of estimates itself.  In addition, further settlement discussions had occurred that informed counsel's estimate of a likely settlement loss.  *(Wadler Dep. 139:6-148:24.)*  Moreover, the information Wadler uncovered regarding a lack of documentation in China increased, in Wadler's stated view, the exposure the company faced in that Life Technologies Lawsuit.  *(Id.)* Company Patent counsel had advised the CFO that the multiplier for the estimated cost of infringement increased from 1.0 to 1.67 when no documentation was available. (*Nov. 16, 2012 email from J. Cassingham (Ex. 66).)* Wadler was not alone in this conclusion that this new information might require a higher reserve. *(See, e.g., Feb. 25, 2013 Email from L. Drapeau to D. Neff, (Ex. 44); Mar. 14, 2013 E&Y Memo re "Life Technologies Royalty Accrual" (Ex. 119); Feb. 27, 2013 Steptoe Call Notes*

*(Ex. 76).)* In addition, as the company's most senior lawyer with deep involvement in the Life Technologies settlement discussions, Wadler was in a good position to evaluate the actual loss the company faced.  Indeed, the skill and understanding of pending litigation matters that attorneys such as Wadler have is precisely why, under the relevant auditing standards, accountants must consult with attorneys in charge of litigation matters to obtain their views of probable and reasonably estimable litigation losses. *(See PCAOB Accounting Standards, AS 2505 ¶ .06.)* Thus, contrary to Carr's unfounded assertion, GAAP required incorporating these new best estimates of the litigation loss—not reflexively using the prior accrual simply because it was smaller. *(See ASC 450.)*  Thus, there was nothing improper under GAAP with Wadler relying on this new information that he was familiar with and in a good position to evaluate given his skills and experience. In fact, to have recorded only the lowest point estimate in the company's prior range of estimates would have been contrary to ASC 450, and thus not in accordance with GAAP, where Wadler was the most knowledgeable and had indicated his best estimate of the probable loss.

Second, Carr asserts that Wadler was somehow incorrect in viewing the Life Technologies dispute as a "global" settlement—rather than separating out each component of the settlement into its constituent parts (for example, by viewing the Life Technologies Royalty dispute independently from the dispute regarding patent licenses associated with QuantaLife).  *(Carr Report pp. 11-12, 14.)*  But, nothing under GAAP rules precludes linking settlement estimates in the way Wadler proposed, as Bio-Rad's outside auditor correctly noted at deposition *(Nolet Dep. 160:3-12.)*  And, given Wadler's factual contention that a settlement with Life Technologies could only reasonably be estimated in the context of a global settlement of all issues with Life Technologies, linking these various legal disputes with Life Technologies was in no way in conflict with GAAP.

Finally, Carr's assertion that Wadler's conclusions are inconsistent with GAAP is highly suspect and not supportable given that both the Company and its outside auditors at Ernst & Young ultimately agreed with Wadler's view of the accrual. *(Mar. 14, 2013 E&Y Memo re "Life Technologies Royalty Accrual" (Ex. 119).)*  In my experience, outside auditors—particularly those as experienced and well respected as Ernst & Young—do not sign off on financial statements that violate GAAP.

**B.      Carr is incorrect in his conclusion that Wadler overstepped his role
         as General Counsel with regard to the Life Technologies accrual**

Carr also incorrectly concludes that Wadler overstepped his role as General
Counsel with respect to the Life Technologies accrual by refusing to sign off on a
legal representation letter with which he disagreed.

Initially, although Carr suggests that Wadler insufficiently outlined the
"facts and circumstances" concerning his view of the Life Technologies accrual
*(Carr Report pp. 11-15),* I see no evidence of that from an accounting perspective.
Wadler had summarized the key reasons for his position by discussing the
underlying disputes with Life Technologies, and the parties' settlement
discussions, with company management and with E&Y*. (Nolet Dep. 143:18-144:2;
see also Mar. 8, 2013 Life Technologies Accrual Memo (Ex. 118); Memo re Feb. 27,
2013 Call with Steptoe (Ex 76); Mar. 14, 2013 E&Y Memo re "Life Technologies
Royalty Accrual" (Ex. 119).)*  Indeed, these same facts were what Bio-Rad and its
outside auditors ultimately relied upon in issuing their audit reports on the
financial statements and internal controls that were included in the 10-K for 2012
that was later filed.  *(Nolet Dep. 143:18-144:2; (Ex. 118); E&Y Mar. 14, 2013
Memo re "Life Technologies Royalty Accrual," (Ex. 119); Memo re Feb. 27, 2013
Call with Steptoe (Ex 76).)*  Thus, Wadler sufficiently communicated the underlying
facts and circumstances to support his position on the litigation accrual consistent
with GAAP and PCAOB Auditing Standards. *(ASC 450 and AS 2502.)*

In addition, Carr incorrectly concludes that Wadler "dictated" an actual
accrual amount.  *(Carr Report pp. 5, 11, 15.)*  I am not aware of any requirement
by the SEC or relevant accounting principles that requires that the Chief Legal
Officer of a company actually sign off on litigation accruals before SEC statements
are filed.  While I am aware that the principal executive (typically the CEO) and
the principal financial officer (typically the CFO) sign a certification at the time of
filing SEC statements confirming the accuracy of those filings, as required by 17
C.F.R. § 240.13a-14(a), I am aware of no similar requirement for the Chief Legal
Officer.  Companies should, of course, seek input from the general counsel as it
relates to those filings.  *(See, e.g., ASC 450; PCAOB Auditing Standards AS 2505.)*
But the ultimate decision as to what position the company takes on accounting
related issues is ultimately up to management—the CEO and CFO who certify the

financial statements—not the Chief Legal Officer.  *(See 17 C.F.R. § 240.13a-14(a); see also Nolet Dep. 144:16-22.)*  A company could conceivably file using a litigation reserve that internal legal counsel disagreed with if the outside auditors and audit committee were to support financial management's judgment in a dispute.

Although not specifically required to do so by law, companies may nevertheless ask their Chief Legal Officers, as a matter of internal company policy, to certify information to their superiors, and possibly to the outside auditors, that the company will rely upon in its public filings.  This appears to be what Bio-Rad did here, as indicated by the legal representation letters actually used by the Company, which specified not just a summary of facts and circumstances giving rise to a contingent liability, but also a particular accrual amount for each litigation contingency.  *(See Nov 8, 2012 legal Representation Letter at p. BIORAD0000020388, Mar. 18, 2013 Legal Representation Letter EY-BRL-MISC-000004).*  Bio-Rad's outside auditors also apparently wanted a representation of the amount of the accrual to help the auditors understand the probable loss the company faced.  *(Nolet Dep. 144:24-146:12.)*  Given that Wadler was being asked to sign off on a particular accrual amount as part of his legal representation letter, he was not somehow "overstepping" his boundaries when he insisted on certifying information that he actually agreed with (and refusing to certify information he did not agree with).

### C.   Carr is incorrect in his conclusion that Wadler did not timely raise the issue of an insufficient accrual for the Life Technologies disputes

Carr is also incorrect that Wadler's raising of his concerns regarding the Life Technologies disputes was somehow untimely under relevant accounting standards.  Accounting standards do not prescribe the timing of disclosures and advising of relevant accounting information. The timing of information gathering for public disclosures is generally specified by companies in their specific closing calendars.  Various witnesses have testified that Bio-Rad's auditors would generally check in with the legal department approximately one to two weeks prior to the filing of a 10-K to discuss the legal representations that needed to be made and, in particular, to discuss litigation accruals.  *(Nolet Dep. 30:3-25; Tsingos Dep. 119:3-22.)*

As a general matter, the issue concerning whether Bio-Rad was adequately reserved for the probable loss in the Life Technologies dispute had been raised repeatedly since the issue first arose.  In April of 2012, and after the initial royalty audit was completed by the independent auditing firm (Global Royalty Audit), Bio-Rad had only accrued $807,000.  *(Oct. 27, 2011 Email from J. Stark (BIORAD7536).)*  That number was later increased to $1.470 million in July of 2012 *(July 18, 2012 Email from B. Thomsen (BIORAD 7956)),* and later increased again to $3.5 million in November of *2012 (Nov. 8, 2012 legal Representation Letter (BIORAD0000020388).)*  This increasing accrual, as time went on, reflected a continuous trend of the increasing estimate of the probable litigation loss the company faced resulting from the Life Technologies Royalty dispute as more information came to light regarding the difficulty of obtaining documents in China*.  (See generally Oct. 27, 2011 Email from J. Stark (BIORAD0000007536); July 18, 2012 Email from B. Thomsen (BIORAD0000007956); Nov. 8, 2012 legal Representation Letter (BIORAD0000020388).)*

Thus, when Wadler sent his memo to the Audit Committee on February 8, 2013 raising still more concerns about the inability to gather documents in China and the problems identified in the very few documents that had come to light, any reasonable accountant or member of the Audit Committee would have recognized that the issues he was raising were serious concerns that would likely impact the Life Technologies accrual.  Beyond the Life Technologies dispute, it also indicated a significant problem concerning internal controls regarding Bio-Rad's China operations, which likewise was a significant accounting problem, and indicated that these issues were likely to affect the disclosures in and timing of filing of Bio-Rad's 10-K.  Indeed, Wadler himself had highlighted these risks for the Audit Committee and stated that the auditors needed be informed immediately. (*Feb. 8, 2013 Memo from S. Wadler to Audit Committee (Ex. 38)* ("Because the evidence of the violations is so clear, we have a duty to report these suspicions to the government agencies immediately and to our auditors Ernst & Young." "I am concerned that much of this lack of documentation and bribery could be exposed in litigation with Life Technologies. Such litigation appears imminent because we have been unable to provide the documents the Life Technologies auditors are seeking.").)

The Audit Committee chairman Lou Drapeau (by his own admission) then "dropped the ball" by not telling Ernst & Young about the disclosures, even though he stated that he—not Wadler—should have been the one to do that. *(Drapeau Dep. 206:1-15.)* Based on my familiarity with accounting procedures and auditing standards and practices, Mr. Drapeau was correct in concluding that he should have immediately told the outside auditors regarding the issues Wadler raised.

From an accounting perspective, the fact that Wadler's disclosure would likely impact the Life Technologies Accrual given Wadler's statements was obvious, particularly given the identified need for additional investigation in China.  And indeed, numerous people, including Wadler, repeatedly expressed precisely such a concern.  For example:

- On February 19, the company's disclosure committee adjourned because, as Wadler put it, "I don't think we can have a meaningful Disclosure meeting until Pat [Norton] reports back to us" regarding his conclusions in China.  *(Ex. 70.)*

- On February 20, outside counsel for the Audit Committee wrote an email to the Chair of the Audit Committee stating: "The discussion of these issues has also focused attention on the Life Technologies dispute and whether we are adequately reserved. This appears to be a separate issue from the FCPA concerns . . ." *(Ex. 40.)*

- On February 21, Ernst & Young first became aware of Wadler's disclosure to the Audit Committee *(Tsingos Dep. 153:9-15),* and it was decided that Steptoe & Johnson would go to China to investigate the matter. *(Ex. 41.)*

- As of February 26, and before Bio-Rad's earnings release, Wadler still had expressed his view that the Life Technologies Accrual was too low.  *(Nolet Dep. 113:2-114:14; 115:17-116:6.)*

- From February 25-27 Patrick Norton of Steptoe and Johnson went to China and provided updates regarding his investigation there. (Ex. 113, Ex. 114, Ex. 115.)  Among other things, he noted on February 27

that "no matter what efforts are made, [Bio-Rad] is not going to obtain the documents . . . that Life is demanding for each transaction in order to establish the end user price." *(Ex. 113 p. 2.)*

- As of <u>February 27</u>, there had still not been resolution of the "adequacy of the reserve for the Life Tech Audit," and that discussion was "tabled" to review the results of the investigation memos from China. *(Memo re February 27, 2013 Call with Steptoe (Ex. 76).)*

Thus, as a matter of accounting procedures and practices (and in particular in light of Bio-Rad's standard closing timeline for 10-K filings discussed above) Wadler provided timely notice to Bio-Rad's Audit Committee, its finance department, its outside auditors, and others about his concerns in China and how they related to the Life Technologies accrual.  Carr's conclusions to the contrary are incorrect.

Further, Carr asserts that he is "not aware of any events that occurred between February 21 and February 28 to cause a change in the royalty accrual." *(Carr Report p. 25.)*  But the timeline above indicates that there were several relevant events that had occurred during that period in time with respect to the Life Technologies accrual, specifically those events related to Norton's investigation into the activities in China and his conclusion on February 27, 2013 that "no matter what efforts are made," Bio-Rad would not be able to obtain he documents in question. *(Ex. 113.)*  It was, after all, the lack of documentation that gave rise to concerns about the Life Technologies Accrual *(see, e.g. Nov. 16, 2012 email from J. Cassingham (Ex. 66))*, and thus Norton's investigation confirmed on February 27, 2013 that such documentation would never be forthcoming. It is important to understand that the royalty dispute and the lack of documentation in China are connected because terms of the royalty agreement included a significantly increased royalty rate when documents supporting sales are not available, and that the increase in rate multiplier from 1.0 times to 1.67 times resulting therefrom significantly increased—in Wadler's view—the company's probable loss from litigation when those documents could not be found.  *(See Ex. 66.)*  The consequences of documentation issues in China were not just the potential for FCPA violations. Thus, Carr's conclusion that Wadler was not basing

his refusal to sign a legal representation letter on new information learned between February 21 and February 28, 2013 is erroneous.

> ### D. Carr is incorrect in his assumption that Wadler caused the 10-K delay and that Wadler is therefore responsible for any consequences flowing from it

Carr's report also makes an erroneous factual conclusion: that the 10-K would have been filed on time but for Wadler's refusal to sign off on the legal representation letter, and therefore Wadler supposedly caused harm to the company (both in the form of creating a significant deficiency and in causing the 12b-25 to be filed late).

This conclusion appears to lack factual support given the number of other issues that were holding up the 10-K filing.

For example, even before Ernst & Young became aware of the new issues in China, Chris Nolet of Ernst & Young stated "with all the 'known' control matters we already have on our collective plates, I do have some concern re the achievability of the Company's planned Form 10-K filing date." *(Feb. 20, 2013 Email from C. Nolet to C. Kaufman et al. (Ex. 111).)*

Then, when the issues in China that Wadler was raising became apparent, counsel for the Audit Committee with Davis Polk noted "[t]he March 1 10-K filing deadline is not going to be met. Bio-Rad will file a form (12b-25) with the SEC explaining the reasons for the delay*." (Feb. 22, 2013 Email from William M. Kelly to L. Drapeau (Ex. 41).)*

The Company's outside auditor also noted that he had asked Bio-Rad's finance department to prepare a memo on these issues regarding internal controls and revenue recognition in accordance with SEC Staff Accounting Bulletin 204 ("SAB 104") before the 10-K was filed. *(See Feb. 24, 2013 Email from C. Nolet (Ex. 43); Feb. 28, 2013 email from C. Nolet (Ex 116).); see also Nolet Dep. 96:21-23; 95:3-98:4*). In my experience, the process for preparing, reviewing with outside auditors, and approval of a SAB 104 memo to support a company's revenue recognition where distributors are involved is a complex process. Consultations with financial and sales management, the audit committee and the outside auditors are required, and the process generally takes more than one week to

complete. It is not surprising that the memo was not prepared until March 9, 2013, well after the original March 1, 2013 10-K deadline.  *(See Mar. 9 2013 Accrual Memo (Ex. 77).)*

Finally, when the 12b-25 was actually filed, the filing itself stated that the filing was delayed for at least two reasons: "because the Company *has not finalized its assessment of the effectiveness of internal control over financial reporting due in part to recently raised issues and has not finalized an accrual for royalties payable by the Company as of December 31, 2012 under certain patent licenses from a third party."  (Bio-Rad Mar. 4, 2013 12b-25 Filing (Ex. 31)* (emphasis added)). Carr's conclusion to the contrary—that only the Life Technologies Accrual caused the delay in the 10-K filing—thus assumes that both Bio-Rad and its outside auditors misrepresented the true reason for the filing.  In my experience with accounting, that assumption is not well founded, as it is reasonable to assume that independent auditors and the companies themselves would not misrepresent the reasons for the delay. Furthermore, a company would not want to subject itself to the penalties for making a false statement in an SEC filing.

In addition, Carr suggests that there would not have been a significant deficiency but for the issue with the Life Technologies accrual.  *(Carr Report pp. 18-21.)*  That conclusion is speculative given that many unrelated controls issues concerning its "accounting close" that Bio-Rad was facing at the time *(See Mar. 18, 2013 memo re 2012 integrated audit results (BIORAD0000002032).)*

Thus, because Carr's factual assumptions regarding the reasons for the delay lack support, his conclusions flowing from that premise are likewise erroneous.

### E.    Carr is incorrect in his conclusion that Wadler did not perform his internal controls responsibilities concerning the accounting close process in February/March 2013

Carr erroneously concludes that Wadler did not perform two accounting control functions supposedly delegated to him as part of the accounting controls process.

Carr cites control number LE-6-010-020, which he identifies as follows: "Documentation is maintained by Legal to support all legal accruals and adjustments provided to the Corporate Controller."  *(Carr Report p. 21.)*  Carr implies that Wadler somehow violated this control.  But there is no evidence that Wadler lacked sufficient documentation of his position concerning legal accruals. Indeed, the outside auditor concluded just the opposite*.  (Nolet Dep. 143:18-144:2; see also Mar. 8, 2013 Accrual Memo (Ex. 118); Mar. 14, 2013 E&Y Memo re "Life Technologies Royalty Accrual" (Ex. 119); Memo re Feb. 27, 2013 meeting with Steptoe (Ex. 76).)*

Carr then cites LE-6-010-010, which he claims consist of the following: "The General Counsel has read SFAS # 5 – Accounting for Contingencies, and has procedures around reporting SFAS # 5 contingencies such as pending or threatened domestic and international litigation, to the Corporate Controller for quarterly financial accrual and disclosure." (Carr Report p. 21.) Here, again there is no support for the conclusion that Wadler failed to adhere to this control.  The content of Wadler's discussions in his legal representation letters indicates that he had read SFAS # 5 *(see, e.g., Nov. 08 , 2012 Legal Representation Letter (BIORAD0000020385)),* and there were clearly procedures in place (such as the regular meetings, discussed above) to provide information regarding litigation accruals to Bio-Rad's outside auditors and finance department.  To the extent that Carr is simply reiterating his conclusion that Wadler failed to *timely* communicate these issues, I have already addressed that issue above.

## II.   Carr's Conclusion Is Erroneous that Wadler Acted Improperly by Making "Severe Allegations Regarding Bio-Rad's Business in China on February 8, 2013 Without Adequate Support"

Carr suggests that Wadler acted improperly by going to the Audit Committee on February 8, 2013 and raising issues "without adequate support." *(Carr Report p. 15.)*

Carr offers no support for the notion that a general counsel with concerns about FCPA, bribery, internal controls, or similar problems with a company must have conclusive proof of such problems before they can even be raised for potential investigation.  The entire purpose of conducting an investigation is to determine whether or not there is, in fact, a problem.  Further, Carr's suggestion

that the Audit Committee should have been kept in the dark about Wadler's concerns is inconsistent with my understanding of the role of the Audit Committee and appropriate disclosure principles, which err on the side of encouraging precisely such disclosures even in cases where there might still be doubt.

As discussed above, the issues that Wadler was raising had a high level of significance for the Company's financial statements and public disclosures. The type of issues that Wadler was raising suggested potential problems regarding additional FCPA violations in China, including potential bribery and books and records violations. These were major issues that any company would want to look into, especially given the ongoing investigation concerning Bio-Rad's operations elsewhere (e.g., in Russia, Thailand, and Vietnam) and the related negotiations with the SEC and DOJ about potential sanctions related to those violations. In my experience, candor with the SEC and aggressive actions to research and self-report violations and timely and thorough remediation are necessary to avoid onerous penalties and consequences for FCPA violations.

In addition, although Carr points to a single set of documents that Wadler identified and suggests there are potential alternative explanations for the discrepancies in them other than bribery *(Carr Report pp. 15-16),* the problems that Wadler was raising went well beyond discrepancies in the sole set of documents discussed by Carr. Wadler also identified the sheer inability to find documentation for a significant number of transactions in China (despite extensive efforts to look for these documents), the fact that a significant number of those few documents that were able to be identified showed discrepancies between the number of products ordered and the number of items shipped, and discrepancies between the language of different versions of various contracts used in China (including the removal of certain FCPA compliance language). *(See Feb. 8, 2013 Memo (Ex. 38).)* Further, Wadler noted that the lack of documentation itself likely hurt the company's position with regard to the Life Technologies accrual. *(See id.)* In addition, even before Mr. Wadler raised his concerns, Bio-Rad had already had a long history of deficiencies with its internal controls, which it had been trying to remediate for years. (Nolet Dep. 18:2-10; 21:24-22:11; 100:12-19; 101:11-17; 219:12-220:6.). In light of this history, the discovery of still more problems concerning internal controls would call Bio-Rad's

remediation efforts into serious question, further demonstrating the importance of raising these issues.

Thus, even if Carr was correct that the documents Wadler specifically attached to his February 8, 2013 memo did not show unambiguous evidence of bribery, that did not mean that Wadler was not raising serious concerns that the company needed to, at the very least, immediately investigate.  These were serious issues from an accounting and regulatory perspective that warranted further investigation. In particular, the company's outside auditor took this matter seriously and stated that it was appropriate for Wadler to raise the issues with the Audit Committee. *(Nolet Dep. 78: 3-9.)*

Further, Carr's conclusion that Wadler's concerns were somehow unsubstantiated ignores the fact that the Audit Committee investigation actually confirmed the factual bases for many of Wadler's concerns.  For example, Norton's investigation concluded that "no matter what efforts are made, [Bio-Rad] is not going to obtain the documents between the [Import/Export] company and the end user that Life is demanding for each transaction in order to establish user price*." (Feb. 27, 2013 Email from P. Norton (Ex. 113).)*  That investigation also concluded that there were inconsistencies between the Chinese and English Language contracts, including the removal of FCPA compliance language and the addition of unapproved incentive payments (*Feb. 27, 2013 Email from P. Norton (Ex. 115); Mar. 8, 2013 Email from P. Norton (Ex 50).)*  It also demonstrated that there were, in fact, inconsistencies between the product lists and prices in the documents that were identified, including transactions where "apparently 'free' products were added into the order" including "one or two cases where a significant addition was made (e.g., a $7k item added to a $10k order)." *(Mar. 8, 2013 Email from B. Kelly (Ex. 48); see also Feb. 27, 2013 Email from P. Norton (Ex. 114).)*  Thus, in identifying these potentially problematic—and ultimately substantiated—facts to the Audit Committee, Wadler was not somehow making accusations without "adequate support."

Of course, even if Wadler's concerns had not been substantiated, that does not mean that he should not have raised these issues in the first place or that they should not have been investigated after he raised them.  Indeed, even Bio-Rad, its Audit Committee, and its various outside counsel have themselves noted

even after Wadler raised his concerns that additional investigation was warranted.  For example, the Company sent Patrick Norton of Steptoe and Johnson to China *(Feb. 22, 2013 email from W. Kelly (Ex. 41))*; even after Patrick Norton provided his initial report, it was determined that he still needed to follow up on a number of issues (*see Memo re Feb. 27 Meeting with Steptoe (Ex 76); Mar. 19, 2013 email from William Kelly to Lou Drapeau (BIORAD0000014559);* and even after that, it was determined that there were a number of additional issues that still needed to be investigated *(April 10, 2013 email from D. Greenburg to S. Wadler (BIORAD0000014721); April 12, 2013 email from S. Wadler (Ex. 32).)*

Indeed, in its ultimate report to the Government, counsel for Bio-Rad's Audit Committee expressly noted that "the China issues warranted further investigation" after Wadler raised them, and that "the Company took prompt, *reasonable,* and effective steps" to investigate the issues Wadler raised.  *(June 4, 2013 Presentation by Davis Polk (BIORAD0000002393.)* Thus, Carr's conclusion that no investigation was necessary again is contrary to what Bio-Rad, its outside counsel, its outside auditors, and ultimately what it felt the government would conclude.  That all of these parties felt the need to conduct such substantial investigation further discredits Carr's conclusion that Wadler went to the Audit Committee on February 8 without "adequate support," or that he otherwise should not have even raised these concerns.

### III.    Carr is Incorrect that the General Counsel Is Necessarily Responsible for Internal Controls Related to Bio-Rad Agreements in China

Carr asserts (without citation of any authority) that "it was the General Counsel's responsibility to implement internal controls to ensure that the correct, up to date contracts were being used, and to monitor the use of those contracts." This assertion is inconsistent in my experience with how corporations implement systems of internal controls.  In my experience with corporate controls, the office of General Counsel generally does not take responsibility for testing or assuring compliance with corporate policies and procedures. That function is usually the responsibility of the internal audit function.

The General Counsel is a legal advisor to the corporation and provides legal knowledge and perspective to the management group. He or she generally manages a group of attorneys that evaluate and advise on corporate legal actions

and exposures. Operating management develops policies and procedures for executing contracts and agreements with advice and counsel from his/her office. The General Counsel's office may handle routine litigation, but also coordinates the work of outside counsel to the corporation in some significant legal matters.

The General Counsel does not generally develop internal controls or accounting systems or determine the amounts to be entered in financial books and records. The SEC specifically requires that the CEO and CFO/Chief Accounting Officer, and not the General Counsel, take responsibility for internal controls and financial statements by signing the required certifications in Form 10-K.

Thus, it is incorrect to simply conclude, based on his role as General Counsel, that Wadler was himself responsible for any particular internal control regarding these issues, for example that he was responsible for ensuring that the Chinese distributor contracts at issue here were correct, that the most recent versions were being used, or that the internal audit function followed in their duties generally.

## IV.  Carr is Incorrect as to His Conclusions Regarding the Impact of Bio-Rad's 12b-25 Filing

Carr opined that there are serious consequences for late filing of periodic reports with the SEC.  Carr's suggestion that Bio-Rad was somehow at risk of losing its SEC registration or accelerated access to the capital markets or similar sanctions for the filing of the 12b-25 on March of 2013 is incorrect.  *(See Carr Report p. 27.)*  As Carr himself notes, when a 12b-25 is filed, that extends the time by when the 10-K has to be filed and, provided the filing is made within that timeframe, it is not late.  Here, Bio-Rad made the relevant 12b-25 filing within the requisite time period for such filings, and ultimately filed its 10-K within the resulting grace period.  As such, Bio-Rad's 10-K filing was not late, and thus it was not exposed to the laundry list of supposed "consequences" mentioned by Carr for late filings.

Carr also contends that Bio-Rad faced significant risk that the equity markets would significantly reevaluate Bio-Rad's share price downward as a result of the 10-K filing.  But, as he himself notes, Bio-Rad's stock price did not, in fact fall by any statistically significant amount in this case, undermining the proposition that filing such a form necessarily has dire consequences for the

company.  *(Carr Report p. 28.)*  Further, given the numerous variables at play with such a large, multinational corporation such as Bio-Rad, Carr provides no basis to believe that any change in the stock price over such a short period in time was solely (or even partially) attributed to the 12b-25 filing, as opposed to the numerous other variables at issue, or that its relative change comparable to other life sciences companies had anything to do with this filing.  And indeed, Bio-Rad's stock price ended the month of March substantially higher than the stock had been at the end of February, again suggesting a lack of harm to the company.  *(YAHOO Historical Stock Data.)*

<u>CONCLUSION</u>

The above represents my conclusions in this matter based on the information currently available to me.  I reserve the right to amend these conclusions should additional information come to my attention.

Dated: August 17, 2016

Donald A. Walker, Jr.
MBA CPA CGMA

**Exhibit A:**

# Donald A. Walker, Jr. MBA CPA CGMA

12205 Rainy Day Way ■ Gainesville, VA 20155
■ Telephone: 703-505-7053
■ Email: Profwalkerdo@hotmail.com

## EXPERIENCE

DONALD WALKER CONSULTING, LLC – GAINESVILLE, VIRGINIA
**Managing Director,** 2013 to present
Provides expert and litigation support services in disputes and auditing and financial reporting matters. Provides expert services in accounting and auditing malpractice matters. Provides expert services in civil and criminal matters.

Provides SEC advisory services and forensic accounting services in accounting, financial reporting, and auditing matters.

Consults regarding Sarbanes-Oxley Act and internal controls matters.

FTI CONSULTING, INC. — WASHINGTON, DC
**Senior Managing Director,** 2008 to 2012
Consulted on SEC and GAAP accounting matters, disclosure matters and professional practice matters and forensic accounting engagements. Specialized in financial services issues including loan loss reserves, fair value, and impairments.

- Assisted counsel and corporate clients with advice and guidance in SEC accounting, auditing and reporting areas

- Provided forensic accounting, consulting, and litigation expert services.

- Consulted with audit committees regarding compliance with SEC reporting and Sarbanes-Oxley Act requirements.

- Frequent speaker at the AICPA National Banking Conference and at various panels and premier providers of continuing education and CLE seminars.

- Co-Author of FTI White Paper regarding "Allowances for Loan Losses".

- Co-Author of FTI Alert August 2009 regarding "SEC Warns about Accounting for Allowances for Loan Losses, Provides Disclosure Guidance".

- Co-Author of FTI Alert July 2009 regarding "Look for Increased SEC Scrutiny of Income Tax Accounting and Disclosures".

UNITED STATES SECURITIES AND EXCHANGE COMMISSION — WASHINGTON, DC
**Senior Assistant Chief Accountant** (Financial Services Group & Division of Corporation Finance), 2001 to 2008
Managed all SEC reviews of financial statements and disclosures by US and foreign financial service companies. Had principal responsibility for resolution of accounting and financial disclosure issues including working with SEC Office of the Chief Accountant and SEC Division of Enforcement. Conducted accounting and disclosure training sessions for accountants in SEC Division of Corporation Finance.

- Worked closely with the Commission's Office of the Chief Accountant, the Division of Enforcement, and the federal banking regulators, as well as outside counsel and companies' independent auditors.

- Member of the interagency working group on loan loss allowances which included SEC and bank regulatory officials, and co-authored SEC Staff Accounting Bulletin No. 102 regarding loan loss allowances.

- Leader in technical accounting training for US and international filings for SEC accounting and legal staff.

- Reviewed the initial registrations of many large foreign private issuers, and responsible for reviewing IFRS-based financial statements in foreign private issuer annual reports filed with the SEC.

- Focused on loan impairment and loan loss reserves, financial instruments and related valuation and hedge accounting issues, revenue recognition, International Financial Reporting Standards regulations, consolidation issues, and goodwill impairment and other asset impairment issues.

- Speaker on loan loss allowances to the large bank examiner training of the Office of the Comptroller of the Currency.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION — WASHINGTON, DC
**Staff Accountant to Assistant Chief Accountant** (Division of Corporation Finance), 1991 to 2001
Conducted SEC reviews of disclosures by financial services, retail, and manufacturing companies.

- Directed the SEC staff's examinations of consumer products companies, mining companies, financial services companies, business service companies, and electronics and medical products and chemical manufacturers.

---

CPA FIRM — PORTLAND, ME
**Sole Proprietor,** 1989 to 1991

---

SMITH BATCHELDER CPAS — PORTSMOUTH, NH
**Principal,** 1988 to 1989

---

HILTON WALKER CPAS — NEWTON, MA
**Principal,** 1985 to 1988

---

CPA FIRM — PORTLAND, ME
**Sole Proprietor,** 1984 to 1985

---

MACDONALD PAGE & CO. CPAS — PORTLAND, ME
**Partner,** 1979 to 1984

---

CPA FIRM — WATERVILLE, ME
**Sole Proprietor,** 1974 to 1979

---

ERNST & YOUNG — DETROIT, MI
**Auditing Staff Member promoted to Manager**, 1967 to 1974
Specialized in audits and consulting services to financial institutions and health care companies.

- Managed audits and directors' examinations of public and private banks and bank holding companies.

- Provided extensive services to financial services companies including loan review and credit evaluation, development of internal audit programs and training of internal auditors, advising chief auditors, review and testing of internal controls, directors' examinations, and fraud investigations, and consulting with regulators.

- Managed audits of large and small hospitals and Medicare and Medicaid audits

## EDUCATION AND PROFESSIONAL CREDENTIALS

**Certified Public Accountant**, State of Michigan, 1969 and New York State, 2010

**Chartered Global Management Accountant,** AICPA, 2014

TUCK SCHOOL OF BUSINESS AT DARTMOUTH — HANOVER, NH
**Master of Business Administration**, 1967

AMHERST COLLEGE — AMHERST, MA
**Bachelor of Arts**, 1965

## PROFESSIONAL AFFILIATIONS

**American Institute of Certified Public Accountants**

**Virginia Society of Certified Public Accountants**

**Michigan Association of Certified Public Accountants**

**Association of Securities and Exchange Commission Alumni**

## PUBLICATIONS

**Author of "SEC Matters" column for "Journal of Corporate Accounting and Finance" 2014 - present**

**SEC Staff Accounting Bulletin No. 102: "Loan Loss Allowances"**

**FTI Alert July 2009: "Look for Increased SEC Scrutiny of Income Tax Accounting and Disclosures",** Co-author with John McGrath

**FTI Alert August 2009: "SEC Warns about Accounting for Allowances for Loan Losses, Provides Disclosure Guidance",** Co-author with Thomas Rees and Patricia Woodbury

**FTI White Paper 2009: "Allowances for Loan Losses",** Co-author with Thomas Rees, Patricia Woodbury, Richard Haynes and Martin Wilczynski

## TEACHING EXPERIENCE

NORTHEASTERN UNIVERSITY – D'AMORE-KIM GRADUATE SCHOOL OF BUSINESS
**ADJUNCT PROFESSOR OF ACCOUNTING, 2016**

GEORGETOWN UNIVERSITY LAW CENTER — WASHINGTON, DC
**Adjunct Professor,** 1999 to 2010
Teaching Accounting for Lawyers in JD and LLM Programs

GEORGETOWN UNIVERSITY — WASHINGTON, DC
**Adjunct Professor of Accounting**, 1998 to 1999
Teaching Managerial and Cost Accounting and Analysis of International Financial Statements

COLBY COLLEGE — WATERVILLE, ME
**Adjunct Professor,** 1978
Teaching Managerial Accounting

## SPEAKING ENGAGEMENTS

Numerous presentations and participation in panels on technical accounting and disclosure matters from 1998 to present before AICPA National SEC Conference, AICPA National Banking and Thrift Conferences, SEC Institute Conferences, and CPE, Inc. Conferences on SEC compliance matters and Sarbanes-Oxley Act internal control matters.

Presenter of small CPA firm annual Accounting and Auditing conferences.

Annual Lecturer to Northeastern University Graduate Accounting Program.

**Exhibit B - Publications & Testimony**

*Publications in the last 10 years:*

Donald A. Walker Jr., "The Use of Non-GAAP Disclosures," The Journal of Corporate Accounting & Finance 91-93 (July/August 2016)

Donald A. Walker Jr., "AICPA SEC and PCAOB National Conference Highlights," The Journal of Corporate Accounting & Finance 91-93 (May/June 2016)

Donald A. Walker Jr., "SEC-Materiality," The Journal of Corporate Accounting & Finance 105-107 (March/April 2016)

Donald A. Walker Jr., "SEC," The Journal of Corporate Accounting & Finance 121-123 (January/February 2016)

Donald A. Walker Jr., "The SEC and International Cash Management," The Journal of Corporate Accounting & Finance 31-33 (November/December 2015)

Donald A. Walker Jr., "SEC," The Journal of Corporate Accounting & Finance 109-110 (November/December 2015)

Donald A. Walker Jr., "SEC Matters," The Journal of Corporate Accounting & Finance 115-128 (September/October 2015)

Donald A. Walker Jr., "SEC Matters," The Journal of Corporate Accounting & Finance 119-121 (July/August 2015)

Donald A. Walker Jr., "The Annual AICPA National SEC/PCAOB Conference in Washington, DC," The Journal of Corporate Accounting & Finance 127-130 (May/June 2015)

SEC Staff Accounting Bulletin No. 102: "Loan Loss Allowances"

Donald A. Walker Jr., John McGrath, "Look for Increased SEC Scrutiny of Income Tax Accounting and Disclosures," FTI Alert (July 2009)

Donald A. Walker Jr., Thomas Rees, Patricia Woodbury, "SEC Warns about Accounting for Allowances for Loan Losses, Provides Disclosure Guidance," FTI Alert (August 2009)

Donald A. Walker Jr., et al, "Allowances for Loan Losses," FTI White Paper (2009)

**Prior Testimony**

No court/deposition testimony has been provided by the Expert in the past four years.

## Exhibit C - Materials Reviewed

Bates Numbered documents

1. Mar. 18, 2013 Memo re 2012 integrated audit results (BIORAD00002032-41)
2. Mar. 18, 2013 Summary of Control Deficiencies (BIORAD00002065-91)
3. June 4, 2013 Presentation by Davis Polk (BIORAD00002393)
4. Oct. 27, 2011 Email from J. Stark (BIORAD00007536-37)
5. July 18, 2012 Email from B. Thomsen (BIORAD00007956-57)
6. Mar. 19, 2013 Email from William Kelly to Lou Drapeau (BIORAD00014559-60)
7. April 10, 2013 Email from D. Greenburg to S. Wadler (BIORAD00014721-22)
8. Mar. 2013 Memo re FCPA Investigation: New China Issues (BIORAD00015810-20)
9. Nov. 8, 2012 Legal Representation Letter (BIORAD000020385-98)
10. Mar. 2013 Memo re Year-end 2012 Disclosure Issues (BIORAD00021099-100)
11. May 10, 2013 Memo from Jim Stark re "Royalty Audit Accrual" (BIORAD00028083-86)
12. Mar. 18, 2013 Legal Representation Letter (EY-BRL-MISC-00001-14)

Deposition Exhibits

1. Mar. 31, 2013 Board Minutes (Drapeau Ex. 30)
2. Mar. 4, 2013 Bio-Rad 12b-25 Filing (Drapeau Ex. 31)
3. April 12, 2013 Email from S. Wadler (Drapeau Ex. 32)
4. Feb. 8, 2013 Memo from S. Wadler to Audit Committee (Drapeau Ex. 38)
5. Feb. 20, 2013 Email from outside counsel for Audit Committee (Drapeau Ex. 40)
6. Feb. 22, 2013 Email from William M. Kelly to L. Drapeau (Drapeau Ex. 41)
7. Feb. 24, 2013 Email from C. Nolet (Drapeau Ex. 43)

8. Feb. 25, 2013 Email from L. Drapeau to D. Neff (Drapeau Ex. 44)
9. Mar. 8, 2013 Email from B. Kelly (Drapeau Ex. 48)
10. Mar. 8, 2013 Email from P. Norton (Drapeau Ex. 50)
11. Feb. 20 2013 Email from Nolet to C. Kaufman et al. (Nolet Ex. 111)
12. Feb. 27, 2013 Email from P. Norton (Nolet Ex. 113)
13. Feb. 27, 2013 Email from P. Norton (Nolet Ex. 114)
14. Feb. 27, 2013 Email from P. Norton (Nolet Ex. 115)
15. Feb. 28, 2013 Email from C. Nolet (Nolet Ex. 116)
16. Mar. 9, 2013 Accrual Memo (Nolet Ex. 118)
17. Mar. 14, 2013 E&Y Memo re "Life Technologies Royalty Accrual" (Nolet Ex. 119)
18. Nov. 16, 2012 Email from J. Cassingham (Tsingos Ex. 66)
19. Feb. 23, 2013 Email string from S. Wadler (Tsingos Ex. 70)
20. Feb. 27, 2013 Steptoe Call Notes (Tsingos Ex. 76)
21. Mar. 9, 2013 Memo re China Distributor Agreements (Tsingos Ex. 77)
22. Mar. 10, 2013 ASC Memo re Accrual (Tsingos Ex. 78)
23. Feb. 8, 2013 Email from J. Schumacher re China Contract Issue (Wadler Ex. 8)

Deposition Transcripts Excerpts

1. Drapeau Depo, pp. 203-207
2. Nolet Depo, pp. 18, 21-22, 30, 78, 95-116,137-140, 143-146, 160-171, 221-227, 249-258.
3. Tsingos Depo, pp. 117-121, 153
4. Wadler Depo, pp. 139-148

Other Materials

1. Report of E. Emre Carr, Ph.D, CPA, submitted on July 1, 2016 in Wadler v. Bio-Rad Laboratories, Inc.
2. FASB Accounting Standards Codification 450
3. PCAOB Accounting Standards, AS 2505
4. 17 C.F.R. § 240.13a-14(a)
5. YAHOO Historical Stock Data
6. Bio-Rad Form 8-K, filed Feb. 26, 2013.