UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANFORD S. WADLER,

Plaintiff,

v.

BIO-RAD LABORATORIES, INC., et al.,

Defendants.

Case No.  15-cv-02356-JCS

**ORDER DENYING MOTION TO EXCLUDE**

Re: Dkt. No. 94

## I.      INTRODUCTION

On the eve of trial, Defendants[1] have brought a Motion to Exclude Protected Information from the Trial of this Action ("Motion" or "Motion to Exclude") asking the Court to exclude virtually all of the evidence and testimony Plaintiff might rely upon to prove his case, including "all testimony that may be based on information [Plaintiff] learned in the course of his service as Bio-Rad's general counsel."  A hearing on the Motion was held on December 15, 2016.  For the reasons stated below, the Motion is DENIED.[2]

## II.     BACKGROUND

### A.      The Underlying Dispute

Bio-Rad Laboratories, Inc. manufactures and sells products and equipment around the world.  Complaint ¶ 6.  Because Bio-Rad sells many of its products to hospitals, universities, and similar public entities and officials, it must abide by the terms of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-2, 78ff, which forbids the company or its agents from engaging in

---

[1] For the purposes of this Order, the Court refers to Defendants collectively as "Bio-Rad."
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

bribery and kickback schemes involving public officials and requires that companies maintain accurate accounting records and put in place adequate internal controls or face significant fines and possible criminal punishment. *Id*. ¶¶ 4, 6.

Plaintiff Sanford Wadler became Bio-Rad's general counsel in 1989 and served in that capacity for nearly 25 years. *Id*. ¶ 2.   He was terminated by Bio-Rad in June 2013. *Id*. ¶ 35. Wadler asserts he was terminated because he was investigating potential FCPA violations in China and because he reported his concerns to Bio-Rad's Audit Committee "when it became clear that the company was not taking reasonable steps to investigate and remedy FCPA violations." *Id*. ¶ 39.[3]   Bio-Rad contends it terminated Wadler "due to poor work performance and behavior." Declaration of Kevin B. Clune in Support of Sanford S. Wadler's Opposition to Defendants' Motion to Exclude Protected Information from the Trial of This Action ("Clune Decl."), Ex. H (Defendant Bio-Rad Laboratories, Inc.'s Second Amended Objections and Responses to Plaintiff Sanford Wadler's First Set of Interrogatories) at 3.

**B.    Administrative Proceedings**

Wadler's allegations were addressed in administrative proceedings conducted by the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") in connection with an  investigation of potential FCPA violations in China on the part of Bio-Rad ("the SEC Proceedings").  They were also the subject of a whistleblower complaint filed by Wadler with the Department of Labor ("DOL"), which he brought under the 2013 Sarbanes-Oxley Act.

In the SEC Proceedings, Bio-Rad's outside counsel, Davis Polk & Wardwell ("DPW") presented a 41-page Powerpoint presentation ("DPW Presentation" or "Presentation") to the SEC on behalf of the Audit Committee on June 27, 2013 addressing Wadler's concerns about suspected FCPA violations in China.  Clune Decl., Ex. I.   The presentation begins with an "Investigative Chronology" that provides a timeline of Wadler's communications to the Audit Committee and

---

[3] The Complaint contains detailed allegations regarding Wadler's suspicions and internal complaints.  Because the Court summarized these allegations in its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Docket No.53, it does not do so here.

2

the investigations of both Steptoe & Johnson – which Bio-Rad hired in 2011 to investigate potential FCPA violations worldwide – and DPW's investigation of Wadler's allegations to the Audit Committee.  DPW Presentation at 3-5.  The presentation addresses the two "primary issues" raised by Wadler with the Audit Committee regarding Bio-Rad's China operations:  1) "Execution in 2012 of inconsistent Chinese- and English-language versions of CDG distributor agreements," which "[m]ay reflect an attempt to negate more robust anti-corruption provisions contained in post-remediation English model of distributor agreement;" and 2) "apparent inconsistencies in some of the documentation for Bio-Rad's LSG sales into China through I/E companies, including with respect to products purchased and pricing, and inability to obtain complete documentation of sales," which "[m]ay be indicative of corrupt payments to officials at end-users."  DPW Presentation  at 4-5.  The DPW Presentation goes on to address these concerns in detail, and in particular, describes the involvement of the Bio-Rad Legal Department in Hercules and the specific investigative efforts of outside counsel, as well as specific advice provided by counsel as to the issues. *See, e.g., id.* at 16-17, 26-27.  The Presentation concludes that "[t]he issues identified by Mr. Wadler do not raise corruption concerns.  We have found no evidence that those issues are indicative of any violation – or attempted violation – of the FCPA."[4] *Id*. at 33.

Wadler initiated the DOL proceeding in November 2013, filing a retaliation complaint ("DOL Complaint") that described in great detail his reasons for believing that Bio-Rad had committed violations of the FCPA in China and that it had terminated him for communicating his concerns to the Audit Committee.  *See* Docket 25-1 (DOL Complaint, filed in unredacted form in the public record by Bio-Rad in this action in support of its motion to dismiss).  Bio-Rad addressed Wadler's allegations in its January 28, 2014 response ("DOL Response"), asserting that Wadler did not use reasonable diligence in investigating Bio-Rad's activities in China and that his accusations were not made in good faith.  Clune Decl., Ex. G (DOL Response). The DOL

---

[4] The DPW Presentation also describes interviews conducted by outside counsel in connection with anonymous complaints it received about possible FCPA violations in China.  *See id*. at 35-38.

United States District Court
Northern District of California

Response also described the investigations by outside counsel of Wadler's claims and asserted that these investigations established that Wadler's allegations were groundless.  Rather than firing Wadler for whistleblowing, Bio-Rad asserted in the DOL Response, it fired Wadler because his behavior and performance had deteriorated over the previous year.   Among other things, Bio-Rad said in its Response that Wadler had problems with anger, had unreasonably refused to sign off on a Form 10-k due to an accrual amount he disputed and similarly delayed a quarterly report, acted without support of senior management in settlement discussions with Life Technologies, instructed the legal department not to cooperate with Bio-Rad's compliance officer,  and acted irate and with hostility in connection with the question of whether the French legal department would answer directly to him.

Along with the response Bio-Rad filed on January 28, 2014, Bio-Rad also submitted to the DOL five declarations of individuals in high-level positions at Bio-Rad addressing, *inter alia*, Bio-Rad's investigation, through outside counsel, of Wadler's concerns regarding possible FCPA violations in China and the alleged deterioration in Wadler's performance.  *Id*.   These declarations described interactions and communications between Bio-Rad and Wadler and between Bio-Rad and outside counsel on a wide variety of issues.[5]

---

[5] For example director Louis C. Drapeau stated that "Wadler believed that evidence of possible corruption in Bio-Rad's China operations had been uncovered in the course" of an audit conducted at the request of licensee Life Technologies, that Wadler "brought these concerns to the Audit Committee in February 2013, and recommended that a new independent law firm of his choosing, Davis Polk & Wardell . . . be engaged to investigate his suspicion." Clune Decle, Ex. G, Drapeau Decl. at 4.  He further stated that Wadler had "grossly overstepped his authority when, without any authorization from management or the Board of Bio-Rad he sought to negotiate a multi-million dollar settlement with Life Technologies, offering far more than management was willing to pay and putting the Company in a deeply compromised position in subsequent negotiations with Life Technologies." *Id*.  Drapeau also discusses Wadler's refusal to sign off on a Form 10-k, stating that he "learned during a conference call in March 2013 that, on the very day before the Company intended to file its 10-K, Mr. Wadler for the first time insisted that the preexisting accrual for the Life Technologies audit was too low." *Id*. at 5.  According to Drapeau, Wadler also "waited until the last minute to demand that another accrual be increased" in connection with the Company's quarterly report that was due to be filed with the SEC at the end of April 2013.  *Id*.  Similarly, Bio-Rad's CEO, Norman Schwartz discussed in his declaration Wadler's "last-minute objection" to the accrual stated in the Form 10-K, which he says caused Bio-Rad to have to make an "embarrassing" request for a ten-day extension on the Form 10-K deadline.  Clune Decl., Ex. G, Schwartz Decl. at 3.  Schwartz also refutes allegations made by Wadler in his DOL complaint that Schwartz prevented Bio-Rad employees from going to China to collect documents related to potential corruption, stating that instead, he "worked with outside counsel to ensure that the matter

United States District Court
Northern District of California

Despite discussing the merits of Wadler's allegations in the DOL Response and supporting declarations, Bio-Rad argued in its Response that it had not waived attorney-client privilege. In particular, it stated that "[d]espite Mr. Wadler's disclosure in his complaint of certain attorney-client privileged communications and materials, Bio-Rad has not authorized him to share any confidential information, and has not waived any protections over communications or materials protected by the attorney-client privilege, work product doctrine or any other protection, and does not intend to do so." DOL Response at 13. Bio-Rad further asserted that it would not be proper for DOL's Occupational Safety & Health Administration ("OSHA") "to draw any inferences from Bio-Rad's assertion of attorney-client privilege, as the OSHA Whistleblower Investigation Manual at 1-211 indicates it might do." *Id.*, DOL Response at 13-17. In any event, Bio-Rad argued, the "clear, convincing and unprivileged evidence" showed that Mr. Wadler was terminated "solely because his performance had deteriorated to the point that he seemed incapable of interacting professionally with the Company's senior management and other employees." *Id.* at 17.

In a subsequent letter to DOL responding to requests for further documentation, Bio-Rad characterized all of the previously submitted evidence as "non-privileged." Clune Decl, Ex. I (March 20, 2014 Letter). On the other hand, it claimed that privilege and work product protection applied to Wadler's February 2013 memorandum to the Audit Committee ("Audit Committee Memo") and documentation from DPW's and Steptoe & Johnson's investigation, both of which Bio-Rad refused to produce in the DOL Proceeding. *Id.* Bio-Rad did, on the other hand, provide DOL with a copy of the DPW Presentation, asserting that it would be unlawful and unnecessary for the DOL's investigator to draw an adverse inference based on Bio-Rad's assertion of privilege as to the Audit Committee Memo and investigation documentation because the "DPW presentation addresses Mr. Wadler's allegations and describes the resulting investigation." *Id.*

---

was appropriately investigated by that counsel, including making available for interview employees in both Hercules and China, paying for counsel to go to China to interview employees and review documents, and providing all sales documents the Company could recover from third parties." *Id.* at 3-4. An attached performance review that Schwartz said he completed in April 2013 but never gave to Wadler (which Wadler contends was written after the fact to bolster Bio-Rad's assertion that it terminated Wadler for bad performance) lists a number of criticisms relating to specific legal services that Wadler provided to Bio-Rad. *Id.*

**C.      Treatment of Potentially Privileged or Confidential Information in This Action**

Prior to filing the complaint in the instant action, Wadler's counsel provided Bio-Rad's counsel with a copy of the complaint he intended to file to determine whether Bio-Rad had any privilege or confidentiality objections to it.  Clune Decl., Ex. J (January 26, 2015 letter with complaint attached).   Like the DOL complaint, Wadler's complaint in the instant action contains detailed allegations regarding the conduct Wadler contends is protected, as well as Bio-Rad's alleged retaliation.  *See* Docket No. 1.  Bio-Rad's counsel did not object to the public filing of the Complaint but informed Wadler's counsel that she had a confidentiality objection to filing Exhibit B to the complaint – the DPW Presentation – in the public record.  Clune Decl. ¶ 11 & Ex. K.  Consequently, Wadler filed the complaint in the public record, without redaction, but filed Exhibit B under seal.  *See* Docket Nos. 1, 15.

Subsequently, in July 2015, Bio-Rad filed a motion to dismiss.  *See* Docket No. 24.   In the motion to dismiss (which was filed without redaction in the public record), Bio-Rad discussed many of Wadler's substantive allegations without raising any objection on the basis of confidentiality or privilege.  *Id.*  In addition, as an exhibit to that motion, Bio-Rad filed in the public record the same DOL Complaint it had earlier said disclosed attorney-client privileged materials and communications.  *See* Docket No. 25-1; Clune Decl., Ex. G, DOL Response at 13.  On October 23, 2015, the Court ruled on Bio-Rad's motion to dismiss.  Because no objection had been raised as to potential privileged or confidential information the Court, like the parties, filed its Order in the public record in unredacted form and described Wadler's specific allegations regarding Bio-Rad's suspected FCPA violations in China.  *See* Docket No. 53.

Several weeks later, the Court approved a stipulation by the parties pursuant to Rule 502 of the Federal Rules of Evidence, negotiated at the urging of the Court, in which they agreed that production of documents in discovery would not, by itself, give rise to waiver of any attorney-client privilege or work product protections that might otherwise attach to those documents.  *See* Docket No.56 ("FRE 502 Order").

**D.      The Motion to Strike**

On September 2, 2016, Bio-Rad filed a Motion to Strike Rebuttal Report of Bradley

Wendel ("Motion to Strike"). *See* Docket No. 82.  The main argument Bio-Rad advanced in the Motion to Strike was that Mr. Wendel's opinions, while purportedly rebutting opinions offered by Defendants' expert, Dr. Emre Carr, were instead new opinions that should have been disclosed by the July 1, 2016 expert disclosure deadline.   In support of the Motion to Strike, Bio-Rad's counsel filed in the public record a declaration with a number of unredacted expert declarations attached. *See* Docket No. 83.  These included reports by Dr. Emre Carr (Docket No. 83-1) and Dr. Donald Walker (Docket No. 83-6), both of whom addressed in detail Wadler's communications with the Audit Committee and whether his concerns about potential FCPA violations in China were justified, as well as the specific criticisms of Wadler's performance that Bio-Rad contends are the actual reason for his termination.   These reports cite to or quote scores of documents Bio-Rad marked "SUBJECT TO FRE 502 ORDER."

### E.    The Court's Dispositive Motion Deadline and the Instant Motion

Following the Initial Case Management Conference, the Court issued a scheduling order setting September 23, 2016 as the deadline for filing dispositive motions in this action.  *See* Docket No. 46.  On July 29, 2016, Bio-Rad informed the Court that it did not intend to file a summary judgment motion. *See* Docket No. 81.  At the October 7, 2016 Case Management Conference, Bio-Rad disclosed to the Court and Wadler's counsel, for the first time, that it intended to bring a motion to exclude on the basis that Wadler would likely be unable to prove his case without using Bio-Rad's privileged or confidential information.

### F.    The Motion

Bio-Rad contends Wadler's claims and Bio-Rad's defenses are "inextricable intertwined with Bio-Rad's privileged and confidential information," requiring that the Court make a document-by-document, witness-by-witness and question-by-question privilege determination at the upcoming trial.  Motion at 2.  Bio-Rad points to the stringent ethical and statutory rules that apply to attorneys who practice in California, citing in particular California Rule of Professional Conduct 3-100 and California Business and Professions Code section 6068(e).  *Id.* at 4-7. According to Bio-Rad, under these provisions, "client confidences are protected in the face of every peril but one: threatened criminal activity that could lead to death or serious bodily harm."

United States District Court
Northern District of California

*Id*. at 4.  This level of protection is more stringent than the standards set forth in Model Rule of Professional Responsibility 1.6, which has been adopted by many other states, Bio-Rad contends. *Id*. at 4-5.

Bio-Rad argues that California's rules and statutes governing attorney conduct apply even in federal court because federal courts look to state ethical rules in areas of "traditional state regulation." *Id*. at 6 (citing *U.S. v. Quest Diagnostics, Inc.*, 734 F.3d 154, 163 (2d Cir. 2013); *U.S. v. Lopez*, 4 F.3d 431, 449 (2005);  *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). Further, it asserts, nothing in the Sarbanes-Oxley or Dodd-Frank Acts "evidences a clear legislative intent to preempt California's ethical and statutory rules regulating an attorney's duty of confidentiality when an attorney brings claims for retaliatory discharge under those Acts." *Id*. at 7 (citing 7 U.S.C. § 7245; *SEC Final Rule:  Implementation of Standards of Professional Conduct for Attorneys*, 68 Fed. Reg. 6296-01, 2003 WL 247093, *6297 (Feb. 6, 2003) (codified at 17 C.F.R. 205)).  Bio-Rad acknowledges, however, that the federal common law of privilege applies in federal proceedings under Rule 501 of the Federal Rules of Evidence.  *Id*.

Bio-Rad argues that in order to prove his retaliatory discharge claim, Wadler will have to prove that: 1) he engaged in protected activity; 2) Bio-Rad knew that he engaged in protected activity; 3) Wadler suffered an unfavorable personnel action; and 4) the circumstances are sufficient to support an inference that the protected activity was the reason for the unfavorable personnel action.  *Id*. at 8 (citing *Van Asdale v. International Game Technology*, 557 F.3d 989, 996 (9th Cir. 2009)).  In addition, they contend, Wadler will have to show that he subjectively believed that Bio-Rad had violated the FCPA.  *Id*.  To establish that these elements are satisfied, according to Bio-Rad, Wadler will likely have to use "(i) confidential information Mr. Wadler learned in the course of his role as Bio-Rad's general counsel; (ii) Mr. Wadler's communications with Bio-Rad and with outside counsel;  (iii) outside counsel's communications with Bio-Rad and each other; and (iv) advice of inside and outside counsel reflected in Bio-Rad's documents."  *Id*. at 8.  All of these categories of documents are protected under the ethical and statutory rules discussed above, Bio-Rad contends.  *Id*.

Because Wadler's case is so dependent on privileged and confidential information, Bio-

Rad argues, it is Wadler's burden to show that a fair trial is possible without the disclosure of such information. *Id.* at 9.  Bio-Rad concedes that California law does not preclude outright retaliatory discharge claims asserted by in-house counsel, but contends such claims can only be pursued where the claim is capable of resolution without breaching client confidences. *Id.* (citing *General Dynamics v. Superior Court*, 7 Cal. 4th 1164, 1170 (1994)).   According to Bio-Rad, sometimes courts applying the rule of *General Dynamics* have found that the only option is dismissal of the plaintiff's claim. *Id.* (citing *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451 (2001); *McDermott, Will & Emory v. Superior Court*, 83 Cal. App. 4th 378 (2000)).   Factors that courts may consider in determining whether a claim can go forward are whether: 1) the evidence at issue is the client's confidential information that the client maintains must remain confidential; 2) the confidential information is "highly material" to the defendant's defenses; 3) the trial court cannot effectively use ad hoc equitable measures to allow the action to proceed; and 4) it would be fundamentally unfair to proceed. *Id.* at 10-11 (citing *Dietz v. Meissenheimer & Herron*, 177 Cal. App. 4th 792-94 (2009)).

According to Bio-Rad, a handful of courts have addressed similar issues but in "very different procedural postures (pretrial dispositive motions or before an administrative law judge), under the law of other jurisdictions (the Model rules or other state rules that are far less stringent than California's) or both." *Id.* at 11 (citing *Van Asdale*, 557 F.3d at 995-96; *Carroll v. California ex rel California Comm'n on Teacher Credentialing*, 2013 WL 4482934 (E.D. Cal. 2013)).  The case that is the closest to the situation here, Bio-Rad contends, is *Willy v. Administrative Review Board*, 423 F.3d 483, 489 (5th Cir. 2005).  In that case, the Fifth Circuit found that attorney-client privilege would not prevent an attorney's offensive use of privileged information in a claim for retaliatory discharge. *Id.*  Bio-Rad contends *Willy* is distinguishable, however, because it applied the more lenient standard of Model Rule 1.6 and was decided in the context of an administrative proceeding. *Id.*  The case is also an "outlier," Bio-Rad contends. *Id.* at 12.  According to Bio-Rad, a Massachusetts court reached a different result in *Siedle v. Putnam Investments, Inc.*, 147 F.3d 7, 11 (1st Cir. 1998). *Id.*

Finally, Bio-Rad contends, it will suffer "true prejudice" if its confidential information is

9

United States District Court
Northern District of California

disclosed. *Id*. at 12-13.  In particular, Bio-Rad asserts, because it is a large, publicly-traded company that holds a large patent portfolio and engages in frequent litigation the confidential information disclosed in this action could be used against it in other actions. *Id*. at 13.

In his Opposition brief, Wadler contends the Motion to Exclude is untimely because it is, in effect, a dispositive motion that had to be filed by September 23, 2016 under the schedule set by the Court.  Opposition at 8-9.  Even if the Motion is timely, Wadler contends, Bio-Rad is mistaken in its assertion that state privilege law applies. *Id*. at 8.  Instead, where an action brought in federal court involves federal and state claims that significantly overlap, Plaintiffs argue, federal privilege law applies. *Id*. (citing *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014)).  According to Wadler, federal privilege law allows the use of privileged or confidential information in attorney whistle-blower actions. *Id*. at 9 (citing *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009); *Willy v. Admin. Review Bd.,* 423 F.3d 483 (5th Cir. 2005); *Jordan v. Sprint*, ARB Case No. 06-105, 2009 WL 3165850, at *10 (Dep't of Labor, Admin. Review Bd. Sept. 30, 2009)).

Wadler argues that Bio-Rad is incorrect in its assertion that California's law governing attorneys' ethical duties preclude Wadler's claims, citing *Van Asdale*. *Id*.  He also argues Bio-Rad's reliance on *Siedle* is misplaced because in that case the defendants vigorously protected the confidentiality of the information at issue, in contrast to the facts here. *Id*. at 11.  Moreover, Wadler contends, Sarbanes-Oxley and Dodd-Frank do, in fact, preempt state ethical duties and statutes. *Id*. at 11-12 (citing *SEC Final Rule:  Implementation of Standards of Professional Conduct for Attorneys*, 68 Fed. Reg. 6296-01, 2003 WL 247093, *6296 (Feb. 6, 2003) (codified at 17 C.F.R. 205)).  Wadler notes that the SEC has argued in other proceedings that "use of client confidences in Section 806 retaliation proceedings is appropriate, and . . . that Section 205 preempts federal common law." *Id*. at 12.

Wadler further contends Bio-Rad has repeatedly waived any privilege or confidentiality regarding his claims and Bio-Rad's defenses by disclosing such information in government proceedings and in publicly filed documents in this action. *Id*. at 12-18 (citing *Cave Consulting Grp., Inc. v. OptumInsight, Inc*., No. 15-cv-3424-JCS, 2016 WL 6216696 (N.D. Cal. Oct. 25,

United States District Court
Northern District of California

2016);  *In re Oracle Sec. Litig*., No. 01-cv-0988 MJJ JCS, 2005 WL 6768164, at *5 (N.D. Cal. Aug. 5, 2005); *In re Pac. Pictures Corp*., 679 F.3d 1121, 1126-27 (9th Cir. 2012)).  According to Wadler, it is Bio-Rad's burden to show that the privilege was not waived and Bio-Rad has not met that burden.  *Id*. at 14-15.

First, he argues that Bio-Rad's disclosure of privileged information during the SEC and DOL Proceedings resulted in an express waiver of any privilege to which Bio-Rad might have been entitled as to the subject matter of those communications.  *Id*. at 15-16 (citing *McMorgan & Co. v. First California Mortg. Co*., 931 F. Supp. 703, 708 (N.D. Cal. 1996);  *IGT v. All Gaming Corp*., No. 02-cv-1676-RCJ RJJ, 2006 WL 8071393 (D. Nev. Sept. 28, 2006)). In particular, Wadler points to the DPW Presentation summarizing the work and conclusions of Bio-Rad's outside counsel, Steptoe & Johnson and DPW, in connection with the concerns Wadler expressed to the Audit Committee.  *Id*. at 15.  In addition to presenting this information to the DOJ and SEC, Plaintiff points out, Bio-Rad also transmitted the same presentation to the DOL and Wadler himself after Wadler's termination.  *Id*. (citing Clune Decl., Ex. I).  In the letter to the DOL from Bio-Rad that accompanied the DPW Presentation, Bio-Rad expressly acknowledged that the presentation described outside counsel's investigations "into Mr. Wadler's allegations and their findings."  *Id*. (quoting Clune Decl., Ex. I (March 20, 2014 cover letter)).

Second, Wadler contends, Bio-Rad "aggressively litigated against Mr. Wadler's complaint before the DOL, describing in detail Mr. Wadler's purported failings as general counsel."  *Id*. Wadler cites Bio-Rad's assertions that he: "1) 'asserted that the pre-existing accrual for the Life Technologies audit was too low' just before Bio-Rad's filing of its Form 10-K with no event-driven reason, causing Bio-Rad to file late; 2) delayed a disclosure causing Bio-Rad acrimony in the lead-up to its filing of a Form 10Q; and 3) 'without any authorization from management or the Board, he sought to negotiate a multi-million dollar settlement with Life Technologies related to the 2011 audit, offering far more than management was willing to pay."  *Id*. (citing Clune Decl., Ex. G attach. 1 at 4-7).  Wadler points out that Bio-Rad also submitted detailed declarations from its senior management addressing these same issues.  *Id*.  According to Wadler, while Bio-Rad has marked many documents that address these issues as being "SUBJECT TO FRE 502 ORDER" in

1    this litigation, in fact any privilege that might have existed has already been waived as to these

2    issues.  *Id*. at 16.

3          Finally, Wadler contends any privilege that might have been preserved has been waived

4    through Bio-Rad's actions in this litigation.  *Id*. at 16-18.  Rather than taking steps to protect its

5    confidential information, Wadler argues, Bio-Rad "took affirmative acts to publicly file

6    documents revealing *all* of the information it now claims is privileged, confidential, and

7    'inextricably intertwined' with the claims and defenses at issue."  *Id*. at 16.  Wadler points to the

8    fact that Bio-Rad permitted Wadler to file his complaint publicly and did not object on the basis of

9    privilege to Wadler's recitation of the facts in his complaint (or any other pleading), that Bio-

10   Rad disclosed *additional* facts relating to Wadler's claims in its own publicly filed materials, that Bio-

11   Rad did not raise any objections on the basis of privilege in its motion to dismiss, did not include

12   an affirmative defense in its answer based on Wadler's inability to proceed without using

13   privileged information, did not bring a summary judgment motion on this basis and never alerted

14   the Court that this was a disputed legal issue or that it intended to bring a motion seeking to

15   preclude virtually all of the evidence likely to be used at trial.  *Id*.  By permitting its attorneys to

16   disclose client confidences without objection, Wadler asserts, Bio-Rad has waived any protections

17   of these materials.  *Id*. (citing *Fox v. California Sierra Financial Services*, 120 F.R.D. 520, 527

18   (N.D. Cal. 1988)).

19         Wadler further asserts that Bio-Rad has similarly waived protection of "all

20   communications concerning the investigation into Mr. Wadler's claims to the Audit Committee"

21   by "repeatedly referenc[ing]" the conclusions of Davis Polk and Steptoe & Johnson with respect

22   to their investigation of Wadler's claims. *Id*. at 17 (citing Clune Decl., Ex. G Attach. 2 ¶¶ 8-9; Ex.

23   H (Bio-Rad Interrogatory Responses, Docket No. 101-9, at Response  6 ("Bio-Rad hired two

24   renowned international law firms that conducted a thorough investigation of Plaintiff's allegations

25   and concluded that the allegations had no factual basis"); Docket No. 89 (September 23, 2016

26   Joint Case Management Statement) (stating that "[t]he law firm of Davis Polk & Wardell and

27   Steptoe & Johnson, the Department of Justice and the SEC all investigated or reviewed Mr.

28   Wadler's claim and *all unanimously concluded*  that there was no merit to anything Mr. Wadler

United States District Court
Northern District of California

was saying.").

With respect to all of the defenses Bio-Rad has listed, Wadler argues, Bio-Rad has waived confidentiality by its own intentional conduct, namely, its aggressive litigation in the DOL and this action, including its public assertions that Wadler was fired due to his conduct in connection with the late Form 10-K filing, his conduct during the filing of the Form 10-Q and his allegedly unauthorized conducted during settlement negotiations with Life Technologies. *Id.* Bio-Rad's filing of detailed expert reports "replete with 'confidential' information" in support of its motion to strike further supports a finding of waiver, Wadler asserts. *Id.* at 18. According to Wadler, "[t]he FRE 502 Order does not contemplate or cover any of these continuous and intentional disclosures." *Id.*

Wadler contends that if any "shred of confidentiality or privilege remains with respect to the evidence that will be presented in this case . . . the proper remedy is not to bar Plaintiff from presenting his claims altogether but instead using sealing orders, protective orders and other means to address any such concerns." *Id.* at 19 (citing *Van Asdale*, 577 F.3d at 996; *General Dynamics Corp.*, 7 Cal. 4th at 1194; *Jordan*, 2009 WL 3165850, at *10). Wadler further rejects Bio-Rad's suggestion that he should be required to preview his case for the Court and Bio-Rad by identifying all of the evidence he intends to present at trial. *Id.* at 19-20. Wadler argues that there is no authority to support such an approach and that it would be fundamentally unfair for the Court to impose such a requirement. *Id.*

In its Reply brief, Bio-Rad argues that its Motion is timely. Reply at 2. According to Bio-Rad, privilege issues such as those raised here are rarely raised at the pleading stage of the case and are routinely raised in motions in limine. *Id.* at 2-3. A motion to exclude is not the same as a summary judgment motion because it addresses the admissibility of evidence rather than the sufficiency of the plaintiff's claims, Bio-Rad asserts. *Id.* at 3. Nor is there any requirement that the issue must be listed as an affirmative defense, Bio-Rad contends. *Id.*

Bio-Rad also argues that it does not dispute that the federal law of privilege applies here but that this does not change the analysis because "[w]hile federal privilege law governs the admissibility of documents and testimony as an *evidentiary* matter, it does not relieve Plaintiff of

his statutory obligation under California law '[t]o maintain inviolate the confidence, and at every peril to himself . . . to preserve [Bio-Rad's] secrets.'"   *Id*. at 4 (quoting Cal. Bus. & Prof. Code § 6068(e)).  Bio-Rad argues that *Van Asdale* and *Willy* are not on point for the same reasons discussed in the Motion.  *Id*. at 4-5.

According to Bio-Rad, Wadler does "not even attempt to argue that he is not bound by Rule 3-100 and Section 6068(e)" but instead tries to "nullify these obligations by arguing they are preempted by the Sarbanes-Oxley Act."  *Id*. at 5.  Wadler's preemption argument fails, Bio-Rad argues, because under Ninth Circuit authority, "where  . . . 'the state law prohibits acts that the federal regulations allow but do not require,' there is no conflict and the state law is not preempted."  *Id*. (quoting *Barrientos LLC v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1211 (9th Cir. 2009)).  Bio-Rad further asserts there is no preemption based on "field preemption" because the state rules at issue here relate to states' historic police powers and Congress has not manifested a clear intent to supersede these rules under Sarbanes-Oxley.  *Id*. at 5-6 (citing *Barrients LLC*, 583 F.3d at 1209).   Finally, Bio-Rad rejects Wadler's reliance on the amicus brief filed by the SEC in *Jordon v. Sprint*, arguing that it is not relevant because it addressed an administrative proceeding rather than litigation involving a jury trial and did not address California's rules of confidentiality. Reply at 7 n. 5.

Bio-Rad also argues that there has been no "blanket subject-matter waiver" of privilege or confidentiality.  *Id*. at 7.  With respect to the DPW Presentation, Bio-Rad concedes that "its report to the government is not privileged" but contends the waiver of privilege as to that presentation is "limited to communications conveyed during the presentation."  *Id*. at 7.  According to Bio-Rad, even if there is a waiver as to the communications conveyed during the presentation, this does not address California's duty of confidentiality under Cal. Bus. & Prof. Code § 6068, which is broader than attorney-client privilege.  *Id*. (citing *Elijah W. v. Superior Court*, 216 Cal. App. 4th 140, 151 (2013)).  Furthermore, Bio-Rad argues, under Rule 502 of the Federal Rules of Evidence subject matter waivers arise as a result of disclosures in federal proceedings only in "unusual situations." *Id*. at 7-8.  In particular, it contends, such a waiver occurs only when "a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner."  *Id*. at 8

14

(quoting Advisory Committee Notes to Rule 502).  Bio-Rad has not done this, it asserts.  *Id*.  Bio-Rad argues that the cases cited by Wadler, *In re Pacific Pictures Corp*. and *Cave Consulting*,  in which courts found that a selective presentation of information gave rise to subject matter waiver, are distinguishable.  *Id*. at 9.

Bio-Rad similarly contends its disclosures in the DOL proceeding did not give rise to a broad waiver because it "vigorously asserted privilege with the Department of Labor."  *Id*.  Moreover, Bio-Rad asserts, it revealed "no privileged information" in the DOL Proceeding but only disclosed "specific historical facts necessary to rebut Plaintiff's claims."  *Id*.  In particular, Bio-Rad contends the declarations merely disclosed "conversations including Plaintiff, the Company, and the Company's outside auditors; facts regarding Plaintiff's abrupt determination that the company's litigation accruals were too low on the eve of its 10-K filing; Plaintiff's allegations that certain documents collected in connection with an audit were insufficient; and Plaintiff's abusive behavior towards his colleagues."  *Id*. at 10.  According to Bio-Rad, none of this information is privileged because "these facts were either disclosed to Bio-Rad's outside auditors at the time or was never privileged."  *Id*.  Bio-Rad contends Wadler has "not identified any specific disclosures within these declarations that implicates privilege."  *Id*.   Bio-Rad also argues that the disclosures in the DOL Proceeding were, in essence coerced to the extent that it was told an adverse inference would be drawn if it invoked attorney-client privilege.  *Id*.  Bio-Rad argues that it made the disclosures in the DOL Proceeding "on the express condition that it not constitute a waiver of attorney-client privilege."  *Id*. (citing *Dukes v. Wal-Mart Stores, Inc*., No. 01-cv-2252 CRB JSC, 2013 WL 1282982, *4 (N.D. Cal. Mar. 26, 2013)).

Bio-Rad also rejects Wadler's assertion that its conduct in this action has given rise to a subject matter waiver.  *Id*.  It is dismissive of Wadler's reliance on the fact that it did not object to the public filing of the complaint, contending the complaint contained only "limited historical facts, as opposed to the contents of privileged communications."  *Id*.  The privilege protects only communications, Bio-Rad asserts, and not underlying facts.  *Id*. (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981)).   Bio-Rad also rejects Wadler's reliance on the fact that it filed various expert reports in the public record in connection with its Motion to Strike.  *Id*. at 11.

United States District Court
Northern District of California

1   Bio-Rad contends that a waiver arises only when a party is attempting to use the privileged

2   communication as "both a sword and a shield" and that was not the purpose of the expert reports

3   here.  *Id*.  Instead, Bio-Rad argues that these reports were offered merely to show that Dr.

4   Wendel's report exceeded the scope of a rebuttal report and therefore was improper.  *Id*. (citing

5   *Akamai Techs., Inc. v. Digital Island, Inc*., No. C-00-3508 CW (JCS), 2002 WL 1285126, at *8

6   (N.D. Cal. May 30, 2002);  *Kirola v. City and County of San Francisco*, 2010 WL 3476681, at *10

7   (N.D. Cal. Sept. 2, 2010)).

8        Finally, Bio-Rad argues that Wadler's reliance on sealing orders and protective orders does

9   not offer an adequate solution.  *Id*. at 11-12.  Bio-Rad asserts that an offer of proof by Wadler that

10  he can try his case without privileged information is necessary because attorney-client privilege is

11  "all but 'sacred'" under California law.  *Id*. at 11 (citing *Solin v. O'Melveny & Myers, LLP*, 89

12  Cal. App. 4th 451, 457 (2001)).  Bio-Rad argues that the issue is not only *disclosure* of privileged

13  information but also its use.  *Id*. at 12.  According to Bio-Rad, "Rule 502 was not intended to give

14  parties a windfall by allowing them to *use* at trial (through sealing orders or otherwise)

15  information they otherwise never would have been entitled to obtain."  *Id*.  For these reasons,

16  Bio-Rad contends, the Court should either require that Wadler make an offer of proof showing that

17  he can prove his case without relying on Bio-Rad's confidential material or Wadler should "accept

18  that his case cannot fairly proceed."  *Id*. at 13.

19  **G.     The Amicus Brief**

20      On December 13, 2016, the SEC filed an amicus brief in which it argues, *inter alia*, that the

21  Sarbanes-Oxley Act preempts California's ethical rules regarding the disclosure of attorney-client

22  communications and the client's confidential information.  Bio-Rad filed a response to the amicus

23  brief on December 16, 2016.

24  **III.     ANALYSIS**

25      **A.     Whether the Motion is Timely**

26       Under the Standing Order for All Judges of the Northern District of California, parties

27  must inform the Court in their case management statements of "[a]ll prior and pending motions,

28  their current status, and *any anticipated motions*."  *See* www.cand.uscourts.gov/judges, Standing

United States District Court
Northern District of California

1   Order for All Judges of the Northern District of California Contents of Joint Case Management

2   Statement.  On September 10, 2015, the Court established the schedule in this case in its Case

3   Management and Pretrial Order (Jury), which stated that "[a]ll dispositive motions shall be heard

4   on September 23, 2016."  Docket No. 46.  At the July 15, 2016 Case Management Conference, the

5   Court asked the parties to advise whether they intended to file summary judgment motions. The

6   parties informed the Court in a July 29, 2016 joint letter that they did not intend to file summary

7   judgment motions.  *See* Docket No. 81.

8        On September 13, 2016, new counsel entered the case on behalf of Bio-Rad.  Ten days

9   later, on September 23, 2016, the parties filed a further Case Management Statement informing the

10  Court that they "anticipate[d] filing motions to strike one or more of the opposing side's experts

11  pursuant to *Daubert*."  Docket No. 89.  No other motion was mentioned.  Nonetheless, at the

12  October 7, 2016 Case Management Conference, Bio-Rad's new counsel informed the Court that

13  Bio-Rad intended to file a motion challenging Wadler's ability to prosecute his claims in light of

14  the attorney-client privilege that Bio-Rad said applied to most, if not all, of the evidence Wadler

15  might rely upon.  According to counsel, the motion would seek, at a "bare minimum," the

16  preclusion of certain testimony related to privileged communications; but counsel stated that there

17  was also an argument that the case can no longer go forward based on the fact that Wadler's case

18  is predicated on privileged communications.  The Court told Bio-Rad's counsel unequivocally

19  that having failed to file a summary judgment motion, it could not file a motion based on the latter

20  theory and that it "did not get to ask that the case be dismissed."  It further rejected Bio-Rad's

21  characterization of the anticipated motion as a "garden-variety" motion in limine, stating that the

22  motion Bio-Rad asked to bring was "anything but garden-variety."  The Court permitted Bio-Rad

23  to bring a motion to exclude, but cautioned Bio-Rad's counsel that it would be required to

24  "delineate with precision" the specific evidence that Bio-Rad would seek to preclude, on a "line-

25  by-line" basis.

26        Bio-Rad did not comply with the Court's instructions.  Although it is Bio-Rad's burden to

27  establish that attorney-client privilege precludes disclosure of any particular evidence, it has

28  argued in the Motion that if *Wadler* cannot offer a detailed trial plan previewing all of the

evidence he seeks to introduce – and showing that that evidence is not protected – he should "accept that his case cannot fairly proceed."  Reply at 13.  While studiously avoiding stating outright that the *Court* should hold that the case cannot proceed, that is in essence what Bio-Rad's counsel is asking the Court to hold.  That is exactly the sort of motion the Court informed counsel at the October 7, 2016 Case Management Conference it would not permit.  There can be no dispute that a motion that seeks such relief is "dispositive" and therefore must be filed by the dispositive motions deadline.  Having failed to meet that deadline, Bio-Rad was required to obtain the Court's permission and show good cause to modify the deadline.  *See* Fed. R. Civ. P. 16(b)(4).  Bio-Rad has not met that standard.   Nor did Bio-Rad file the type of motion the Court said it *would* permit, namely, a targeted motion identifying the specific evidence Bio-Rad asks the Court to preclude.

Because Bio-Rad's Motion constitutes a dispositive motion that was filed after the Court's deadline and without the Court's consent, the Motion is DENIED. However, the Court also addresses its arguments on the merits.

### B.   Ethical and Statutory Requirements Governing the Obligations of In-House Counsel in Whistleblower Retaliation Cases:  California Law versus Federal Common Law

a. **1.   Legal Standards**

Rule 501 of the Federal Rules of Evidence

Under Rule 501 of the Federal Rules of Evidence, federal common law governs claims of attorney-client privilege in a civil case except where state law supplies the rule of decision as to a claim or defense, in which case state privilege law applies.  Fed. R. Evid. 501.  Where evidence relates to both state and federal claims, a federal court applies federal common law to the question of attorney-client privilege.  *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014).  Because of the

b.
overlap between Wadler's retaliation claims under state law and federal law, the Court applies federal common law to Bio-Rad's privilege claims.

California Law Governing Ethical Obligations of Attorneys

Under California law, an attorney is required to "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client."  Cal. Bus. & Prof.

18

United States District Court
Northern District of California

Code § 6068(e)(1).  The law provides a limited exception, however, permitting an attorney to "reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death of, or substantial bodily harm to, an individual." Cal. Bus. & Prof. Code § 6068 (e)(2).  California's ethical rules incorporate this standard, providing that "[a] member [of the State Bar] shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the informed consent of the client" unless the member "reasonably believes the disclosure is necessary to prevent a criminal act that the member reasonably believes is likely to result in death of, or substantial bodily harm to, an individual."  Rule of Professional Conduct 3-100.

### 2. Whether the California Supreme Court's Decision in *General Dynamics* applies to Wadler's Retaliation Claims Under Sarbanes-Oxley and Dodd-Frank

Bio-Tech relies heavily on *General Dynamics Corp. v. The Superior Court of San Bernadino County*, 7 Cal. 4th 1164 (1994) in support of its contention that Wadler's case cannot go forward in light of California's privilege and confidentiality rules because his claims, and Bio-Rad's defenses, implicate protected information that cannot be used at trial.  In *General Dynamics*, the California Supreme Court addressed the question of whether in-house counsel can bring a claim for retaliatory discharge under California tort law, given the conflict between the "fiducial nature of the relationship with the client, on the one hand, and the duty to adhere to a handful of defining ethical norms, on the other."  7 Cal. 4th at 1169.

The *General Dynamics* court recognized that some courts have concluded that the threat to the attorney-client relationship posed by in-house counsel's assertion of a retaliatory discharge claims is so significant that such claims are not maintainable, citing as a leading example *Balla v. Gambro, Inc.*, 145 Ill. 2d 492 (1991).  *Id*. at 1182. The California Supreme Court, however, found that this approach left in-house counsel without a remedy, which would "almost certainly foster a degradation of in-house counsel's professional role."  *Id*. at 1188.  Instead, the court found that in-house counsel should be afforded "a limited remedy under defined circumstances."  *Id*.  In particular, such claims are permitted only where the attorney's claim is "grounded in explicit and

19

United States District Court
Northern District of California

unequivocal ethical norms embodied in the Rules of Professional Responsibility and statutes" and can proceed only if the claim can be "fully established without breaching the attorney-client privilege." *Id*. at 1190. The court further cautioned that attorney-client privilege should be "strictly observed" and that there should be no "dilute[ion] [of the privilege] in the context of in-house counsel and their corporate clients." *Id*.

The court opined that to the extent California law permits disclosure of client confidences under limited circumstances (e.g., "[m]atters involving the commission of a crime or a fraud, or circumstances in which the attorney reasonably believes that disclosure is necessary to prevent the commission of a criminal act likely to result in death or substantial bodily harm," which are "well-recognized exceptions to the attorney-client privilege"), "many of the cases in which in-house counsel is faced with an ethical dilemma will fall outside the scope of the statutory privilege." *Id*. The Court further found that trial courts "can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege." *Id*. at 1191.

While *General Dynamics* addresses the limitations on in-house counsel attempting to bring retaliatory discharge claims under California state law, the Ninth Circuit's decision in *Van Asdale v. International Game Technology*, 577 F.3d 989 (2009) suggests these limitations do not apply under federal common law. In *Van Asdale*, the plaintiffs were attorneys who were licensed in Illinois (and in no other state) and who were hired to work as in-house counsel at a Nevada-based company. 577 F.3d at 991-992. After they were terminated, they brought claims for retaliatory termination under the whistleblower protections of Sarbanes-Oxley and under state law. *Id*. at 994. The defendant cited to the *Balla* decision (discussed above), in which the Illinois Supreme Court held that in-house counsel cannot bring a claim for retaliatory discharge as a tort claim under Illinois law, arguing that the plaintiffs could not maintain the action because they were licensed in Illinois and their claims violated the state's rules of professional conduct. *Id*. at 994. The Ninth Circuit disagreed, however, reasoning that the holding of *Balla* was based, in part, on the purposes served by the Illinois tort of retaliatory discharge. *Id*. at 995. The court further noted that *Balla* had never been applied to claims asserted under federal law and pointed out that federal

courts in Illinois had "uniformly declined to apply *Balla* to claims based on federal law." *Id.*

As in *Van Asdale*, the Court here rejects  Bio-Rad's assertion that the rules and limitations adopted by the California Supreme Court in *General Dynamics* as to the contours of the state law tort of retaliatory discharge in cases involving in-house counsel apply to a federal claim asserted under Sarbanes-Oxley.  The assertion by Bio-Rad that *Van Asdale* can be distinguished on the basis that Nevada's ethical rules are not as stringent as those in California finds no support whatsoever in that decision.  The plaintiffs in *Van Asdale* were licensed *only* in Illinois and there was no suggestion in that case that Nevada's rules of professional conduct even applied.  In short, the court's refusal to follow *Balla* had nothing to do with Nevada's rules of professional conduct. Therefore, the Court looks to federal common law for guidance.

### 3.   Federal Common Law Relating to the Use of Privileged Information in Whistleblower Actions Brought Under Federal Law

As the Ninth Circuit recognized in *Van Asdale*, "[t]here are few federal circuit court cases addressing the rights of in-house counsel to use attorney-client privileged information in a retaliation suit." *Id.* at 995.  Moreover, the Circuit Court decisions that have addressed the issue do not provide specific guidance with respect to how the privilege issues raised here should be handled at trial.  Nonetheless, the cases that have been decided support the conclusion that Wadler's retaliation claim may go forward despite confidentiality concerns and that he may rely on privileged and confidential communications that he reasonably believes are necessary to prove his claims and defenses.

In *Van Asdale*, the Ninth Circuit held that "confidentiality concerns alone [did] not warrant dismissal of the Van Asdale's claims" on summary judgment.  *Id.*   In reaching that conclusion, the court spoke with approval of the Third Circuit's "suggest[ion] [in *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173 (3d Cir. 1997)] that a district court should 'balanc[e] the needed protection of sensitive information with the in-house counsel's right to maintain the suit.'" *Id.* (quoting *Kachmar*, 109 F.3d at 182)).   The court further explained its conclusion as follows:

> As a threshold matter, it is not at all clear to us to what extent this lawsuit actually requires disclosure of IGT's confidential information. Shawn and Lena allege that they raised claims of

1      shareholder fraud at their November 24, 2003, meeting with Johnson
2      and that they were terminated in retaliation for these allegations.
    There is no reason why the district court cannot limit any testimony
3      regarding this meeting to these alleged disclosures, while avoiding
    testimony regarding any litigation-related discussions that also took
4      place. To the extent this suit might nonetheless implicate
    confidentially-related concerns, we agree with the Third Circuit that
5      the appropriate remedy is for the district court to use the many
    "equitable measures at its disposal" to minimize the possibility of
    harmful disclosures, not to dismiss the suit altogether.

6  *Id.*

7         The decision referenced by the Ninth Circuit, *Kachmar v. SunGuard Data Systems*,

8  involved a claim for discriminatory retaliation asserted under Title VII. The defendant in that case

9  argued that the claims should be dismissed because "maintenance of [the plaintiff's] retaliatory

10  discharge action would improperly implicate communications subject to the attorney-client

11  privilege and/or information relating to [the plaintiff's] representation of [the defendant]." 109

12  F.3d 173, 179 (3d Cir. 1997). The Third Circuit disagreed. *Id.* Citing the "important public

13  policies underlying federal antidiscrimination legislation and the supremacy of federal laws," as

14  well as "the policy to liberally construe the discrimination laws to best effectuate their remedial

15  purpose," the court found that concerns about disclosure of client confidences would not "alone . .

16  . warrant dismissing a plaintiff's case, especially where there are other means to prevent

17  unwarranted disclosure of confidential information." *Id.* at 181. The court further recognized

18  that "'[a] lawyer . . . does not forfeit his rights simply because to prove them he must utilize

19  confidential information. Nor does the client gain the right to cheat the lawyer by imparting

20  confidences to him.'" *Id.* at 182 (quoting *Doe v. A Corp.*, 709 F.2d 1043, 1050 (5th Cir.1983)).

21         The *Kachma*r court opined, "[i]n balancing the needed protection of sensitive information

22  with the in-house counsel's right to maintain the suit, the district court may use a number of

23  equitable measures at its disposal 'designed to permit the attorney plaintiff to attempt to make the

24  necessary proof while protecting from disclosure client confidences subject to the privilege.'" *Id.*

25  at 182 (quoting *General Dynamics*, 7 Cal. 4th at 1190). The court acknowledged that such an

26  approach would likely "entail more attention by a judicial officer than in most other Title VII

27  actions," but concluded, "we are not prepared to say that the trial court, after assessing the

28  sensitivity of the information offered at trial, would not be able to draft a procedure that permits

United States District Court
Northern District of California

1   vindicating [the plaintiff's] rights while preserving the core values underlying the attorney-client

2   relationship."  *Id.*

3        The *Van Asdale* court's reliance on *Kachmar* and the "balancing" approach endorsed in

4   that case suggest to the undersigned that the Ninth Circuit envisions that there is *some* room for

5   the use of privileged information, including the use of such evidence offensively, to establish

6   whistleblower retaliation claims under Sarbanes-Oxley.  This conclusion also finds support in the

7   Ninth Circuit's reliance on the "text and structure of the Sarbanes-Oxley Act" in support its

8   holding.  *Id.* at 996.  In particular, it cites Section 1514A(b), which "expressly authorizes any

9   'person' alleging discrimination based on protected conduct to file a complaint with the Secretary

10   of Labor and, thereafter to bring suit in an appropriate district court."  *Id.*  The court reasoned,

11   "[n]othing in this section indicates that in-house attorneys are not also protected from retaliation

12   under this section, even though Congress plainly considered the role attorneys might play in

13   reporting possible securities fraud."  *Id.* (citing 15 U.S.C. § 7245).

14        Other federal cases also seem to support the conclusion that privileged communications and

15   confidential information may be used, with appropriate protections, to establish whistleblower

16   retaliation claims under the federal common law.   For example, in *Willy*, the Fifth Circuit held

17   that in the context of an administrative proceeding involving a Sarbanes-Oxley whistleblower

18   retaliation claim by in-house counsel, there was "no *per se* bar to retaliation claims under the

19   federal whistleblower statutes, *ie*., that the attorney-client privilege mandates exclusion of all

20   documents subject to privilege."  423 F.3d 483, 500 (5th Cir. 2005).  In that case, the Fifth Circuit

21   addressed the admissibility in the DOL proceeding of an internal audit report that was prepared by

22   the plaintiff and was alleged to have been one of the reasons for his termination by the client.  *Id.*

23   at 486-488.   The Secretary of Labor concluded that the internal report was admissible under the

24   exceptions to attorney-client privilege set forth in Supreme Court Rule Standard 503(d)(3) and

25   *Doe v. A Corp*.  *Id.* at 494.  The Fifth Circuit agreed, citing the same language from *Doe* relied on

26   by the *Kachmar* court (see above) and pointing to Rule 1.6 of the Model Rules of Profession

27   Conduct, explaining its conclusion as follows:

28        As noted, the Model Rules specifically provide **that "[a] lawyer**

> **may reveal . . . information [relating to representation of a client] to the extent the lawyer reasonably believes necessary . . . to establish a *claim* or defense *on behalf of the lawyer in a controversy between the lawyer and the client* . . . .**" That a lawyer may assert a "claim" against his client means that the client breached a duty to the lawyer, not the opposite, as the ARB held. The American Bar Association endorses this view as well:

> > The Model Rules do not prevent an in-house lawyer from pursuing a suit for retaliatory discharge when a lawyer was discharged for complying with her ethical obligations. An in-house lawyer pursuing a wrongful discharge claim must comply with her duty of confidentiality to her former client *and may reveal information to the extent necessary to establish her claim against her employer.* The lawyer must take reasonable affirmative steps, however, to avoid unnecessary disclosure and limit the information revealed.

*Id.* at 500 (quoting Model Rules of Professional Conduct Rule 1.6(b)(2) (1983) and American Bar Ass'n Formal Ethics Opinion 01–424 (Sep. 22, 2001)(emphasis in italics added by Fifth Circuit in *Willy;* emphasis in bolded supplied by the undersigned)).

While the court in *Willy* expressly declined to reach the question of whether it would have reached the same result in public proceedings involving a jury, *see id.* at 501, it rejected the Labor Administration Review Board's conclusion that either *Siedle v. Putman Investments, Inc*., 147 F.3d 7 (First Cir. 1998) (cited by Bio-Rad in support of its position) or *Kachmar* "stands for the overbroad proposition that the attorney-client privilege is a *per se* bar to an attorney's use of privilege information in a claim against his former client or employer." *Id.* at 498.

The undersigned agrees with the *Willy* court's reading of *Siedle*; that case does not support Bio-Rad's assertion that Wadler's claims cannot go forward because they will require the disclosure of privileged and confidential information. Rather, in *Siedle* the First Circuit merely held that the district court had erred in unsealing documents that the defendant claimed were subject to attorney-client privilege without addressing the privilege issue at all, or conducting any kind of balancing to determine whether the documents should be under seal. 147 at F.3d at 11. In fact, the court expressly stated that there was no reason the documents could not have remained under seal pending a determination of whether they were privileged, explaining:

> The fact that the allegedly privileged information may be necessary to permit Siedle to plead his claim with the requisite specificity—a fact alluded to both by Siedle and by the lower court—is beside any

United States District Court
Northern District of California

1   pertinent point. *Merely sealing that information would not in any
    way render Siedle's complaint inadequate.*

2   *Id.* at 12 (emphasis added).

3   The Court further concludes that the standard set forth in Rule 1.6 of the Model Rules of

4   Professional Conduct is the applicable standard under federal common law and therefore under

5   Rule 501 of the Federal Rules of Evidence in this case.  Moreover, there is nothing in the cases

6   discussed above – *Kachmar*, *Doe, Willy* or *Van Asdale* --  that suggests that the reasons for making

7   an exception to attorney-client privilege under federal common law are any less applicable in

8   litigation in federal court than in an administrative proceeding.   Rather, they point to the

9   conclusion that the Court may need to take some special measures when Wadler seeks to introduce

10  sensitive communications and to be vigilant in ensuring that such evidence is admitted only when

11  plaintiff's belief that it is necessary to prove a claim or defense is *reasonable*.

12  In this case, the rules discussed above lead the Court to conclude that Wadler should be

13  permitted to rely on privileged communications and confidential information that is reasonably

14  necessary to any claim or defense in the case, including communications and information pertinent

15  to the following topics: 1) whether the concerns Wadler expressed in the Audit Committee Memo

16  were objectively reasonable and whether Wadler had a subjective belief that his concerns were

17  legitimate; and 2) whether Bio-Rad's claims that Wadler was fired for other reasons, including

18  alleged failure to implement adequate FCPA compliance policies in China, delay in connection

19  with the Form 10-K and quarterly report filings,  unauthorized conduct in connection with the Life

20  Technologies settlement negotiations, and difficulties in his relationships with other employees,

21  are credible.  While there almost certainly will be evidence on many or all of these topics that is

22  neither privileged not confidential, to the extent that such evidence is "intertwined" with

23  privileged and confidential information  (something Bio-Rad itself recognized in the Motion), the

24  Court will permit that evidence where it finds that it meets the standards set forth above.[6]

25  _____

26  [6] The list of topics set forth here is non-exclusive.  It does not preclude Wadler from introducing
    privileged or confidential evidence or testimony on other topics so long as it satisfies the

27  requirements of federal common law discussed above.  It also does not preclude Bio-Rad from
    arguing, *with respect to specific evidence and testimony*, that it should be excluded on the basis

28  that Wadler could not reasonably believe that the evidence is necessary to prove a claim or

### C.   Whether Bio-Rad Has Waived Attorney-Client Privilege and the Scope of the Waiver

Even aside from the latitude afforded under federal common law to use privileged communications in whistleblower retaliation actions, the rules governing waiver of attorney-client privilege also support the conclusion that Wadler may introduce privileged and confidential communications and information on a broad variety of topics because of Bio-Rad's open and aggressive approach to litigation of this case as well as its public disclosures in the SEC and DOL proceedings.

#### 1.   Principles Governing Waiver of Attorney-Client Privilege

"Under certain circumstances, the attorney-client privilege will protect communications between clients and their attorneys from compelled disclosure in a court of law." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Court have recognized that such protection is necessary to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* (quoting *Upjohn Co.*, 449 U.S. at 389).   Because this privilege "contravene[s] the fundamental principle that the public has a right to every man's evidence," courts "construe it narrowly to serve its purposes" and "recognize several ways by which parties may waive the privilege."  *Id.* (citations and quotations omitted).

One way attorney-client privilege may be waived is where there has been an express waiver. "An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public."  *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).   When there is an express waiver, "once documents have been turned over to another party voluntarily, the privilege is gone, and the litigant may not thereafter reassert it to block discovery of the information and related communications by his adversaries."  *Id.*   Another basis for finding waiver is under an implied waiver.  Such a waiver occurs when "a litigant  . . . put[s] the lawyer's performance at

defense.  Bio-Rad may also alert the Court in cases involving highly sensitive information so that the Court can take measures to protect the confidentiality of the information if it deems such measures necessary and appropriate.

United States District Court
Northern District of California

issue during the course of litigation." *Id*. at 718.   In *Bittaker*, the Ninth Circuit explained that "[t]he principle is often expressed in terms of preventing a party from using the privilege as both a shield and a sword. . . .   In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials." *Id*.

Although the Federal Rules of Evidence were modified in 2008 to add a rule that specifically addresses the result of disclosures made in government proceedings, the Ninth Circuit made clear in *In re Pacific Pictures* that this rule does not create a "new privilege to protect disclosures of attorney-client privileged materials to the government," or adopt a rule of "selective disclosure." *Id*. at 1128.   Instead, voluntary disclosures of privileged materials in government proceedings, like other disclosures, generally waive the privilege.   *Id*.   Rule 502 makes clear, however, that disclosure of privileged communications and information in a federal proceeding does not automatically result in a broad subject-matter waiver.   Rather, such a disclosure of privilege material will give rise to a waiver as to undisclosed communications only if the following requirements are met:

> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).   The 2007 Advisory Committee Notes explains that under this provision,  "a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary."   Advisory Committee Notes to Fed.R. Evid. 502.

Finally, it is the burden of the party who asserts privilege to show that the privilege has not been waived.   *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).

United States District Court
Northern District of California

### 2. Disclosures to the SEC and DOJ

The primary disclosure in the SEC Proceeding that relates to Wadler's claims in this action is the DPW Presentation.  Although that document was filed under seal in this action, by disclosing it to the SEC and DOJ there is no doubt that Bio-Rad waived any privilege it might have claimed as to the document itself.  Indeed, Bio-Rad now concedes that it has waived attorney-client privilege as to this document.  *See* Reply at 7 ("For the purposes of this Motion, Bio-Rad recognizes that its report to the government of its investigation is not privileged.").  The Court further finds that under Rule 502(a), fairness requires that the waiver extend beyond the DPW Presentation because Bio-Rad has repeatedly relied on that document as a sword by citing to its conclusion that Wadler's concerns about possible FCPA violations in China were unjustified.

In *IGT v. Alliance Gaming Corp*., which involved many of the same parties as the *Van Asdale* case and various overlapping issues, the court addressed a similar issue.  No. 04-cv-1676 RCJ (RJJ), 2006 WL 8071393 (D. Nev. Sept. 28, 2006).  In that case, which involved a discovery dispute, the defendant ("Bally") asserted that disclosures of privileged communications by IGT in the *Van Asdale* litigation and in the Sarbanes-Oxley DOL proceeding that the Van Asdales had brought had resulted in a subject matter waiver as to those disclosures. 2006 WL 8071393, at *8, 10.  In contrast, IGT argued that the waiver extended only to the documents that had actually been disclosed.  *Id*. at *8.  The court ruled, for the purposes of discovery, that the waiver in that case extended beyond the documents but did not find a broad subject matter waiver, noting that such waivers typically arise only where a party has attempted to assert the waiver as a "sword and shield."  *Id*.  In particular, the court found that the waiver extended to "only those communications about the matters actually disclosed."  *Id*.  *Id*.  Notably, the court apparently did not find that the defendant in that case had attempted to use the materials that Bally sought as a "sword and a shield."

Based on the reasoning of *IGT*, the Court concludes that the disclosure of the DPW Presentation, like the disclosures in *IGT*, resulted in waiver of attorney-client privilege not only as to the document itself but also any privileged communications about the specific matters disclosed in the DPW Presentation.  For example, the DPW repeatedly references specific issues Wadler

28

brought to the attention of the Audit Committee relating to possible FCPA violations in China.  At a minimum, then, there is a waiver as to Wadler's Audit Committee Memo and any other communications between Wadler and Bio-Rad relating to those concerns.  The DPW Presentation also references communications between outside counsel and Wadler and between outside counsel and Bio-Rad as to his concerns.  Therefore, the waiver extends to these communications to the extent they are related to the same subject matter as the communications disclosed in the DPW Presentation.   As a practical matter, then, this waiver extends to privileged communications and confidential information that Wadler reasonably believes are necessary to show that he had an objectively reasonable belief that Bio-Rad was violating the FCPA in China in the ways suggested in the Audit Committee Memo and addressed in the DPW Presentation.

The Court rejects Bio-Rad's reliance on *In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521 (S.D.N.Y. 2015) in support of  its assertion that it may rely on the conclusions of outside counsel without waiving attorney-client privilege as to the underlying communications on which those conclusions were based.  In that case, the court held that the disclosure of certain facts from an investigative report in a government proceeding did not defeat attorney-client privilege because privilege does not extend to information but only communications.   80 F. Supp. 3d at 528.   It went on to hold that the privilege was not waived under Rule 502 where the defendant "neither offensively used the [Investigative Report] in litigation nor made a selective or misleading presentation that is unfair to adversaries in this litigation or any other."  *Id*. at 533.  This case differs from *General Motors* in that the DPW Presentation does not just state conclusions; it also describes the underlying investigation by outside counsel in great detail.  Moreover, in contrast to the facts of that case, Bio-Rad is poised to use the conclusions of outside counsel offensively at trial to defeat Wadler's retaliation claim while precluding Wadler from presenting related communications to rebut this evidence, as discussed above.  Therefore, the *General Motors* case is not on point.

### 3.  Disclosures to the DOL

In the DOL Proceeding, Bio-Rad introduced the same DPW Presentation discussed above, as well as a detailed response offering alternative reasons for Wadler's termination, along with

1    supporting declarations by high-level managers describing their interactions and communications

2    with Wadler.  As discussed above, privilege is waived as to the DPW Presentation, the Audit

3    Committee Memo and communications on the topics addressed in those documents.  Thus, the

4    only question is whether the submission of declarations by upper-level management gives rise to

5    any further waiver of privilege.  The Court finds that it does.

6         Bio-Rad contends these declarations do not disclose any privileged communications – that

7    they merely reveal certain "historical facts necessary to rebut Plaintiff's claims," and that they at

8    most reveal facts that were either disclosed to Bio-Rad's outside auditors at the time (thus waiving

9    any privilege) or were never privileged.  Reply at 10.  Yet Plaintiffs have highlighted at least three

10   examples in the Drapeau Declaration that appear to implicate privilege:  1) his statement that

11   Wadler offered "far more than management was willing to pay" to settle with Life Technologies;

12   2) his statement that Wadler objected to Bio-Rad's accrual for the Life Technologies Audit prior

13   to the filing of a Form 10-K; and 3) his statement that Wadler "took actions to undermine Bio-

14   Rad's new Compliance Officer."  Drapeau Decl. ¶¶ 7, 11, 13.  To the extent that these statements

15   disclose privileged communications between Wadler and Bio-Rad, any privilege as to these

16   communications or communications on the same subject matter has been waived (particular as

17   Bio-Rad has now expressly stated that nothing in these declarations is protected by privilege).

18   Further, the response and declarations submitted in the DOL broadly accuse Wadler of misconduct

19   and incompetence even while Bio-Rad attempts to prevent Wadler from introducing any

20   privileged or confidential communications to show that these allegations are pretextual.  That is

21   the sort of unfairness that Rule 502 does not permit.  Accordingly, the Court finds that the waiver

22   that results from Bio-Rad's submissions to the DOL extends to communications on the topics

23   addressed in those documents relating to his alleged misconduct and incompetence.

24        The Court rejects Bio-Rad's suggestion that the disclosures to the DOL were, in essence,

25   involuntary and therefore did not give rise to any waiver.  *See* Reply at 10. The only case cited for

26   this proposition is *Dukes v. Wal-Mart Stores, Inc..*, No. 01-cv-2252 CRB, 2013 WL 1282892, at

27   *4 (N.D. Cal. Mar. 26, 2013).  That case involved a memorandum of counsel that was undeniably

28   privileged that somehow fell into the hands of the New York Times without the authorization of

United States District Court
Northern District of California

30

the client and despite its diligent efforts to protect the confidentiality of the document.  Under those circumstances, the court found that there had been no voluntary disclosure.  Here, on the other hand, Bio-Rad intentionally submitted the declarations to DOL. When it did so, it did not even claim these declarations disclosed privileged communications, much less seek to protect that privilege.  Instead, it characterized them as unprivileged.  Therefore, the facts here are distinguishable from those in *Dukes* and the holding in that case does not apply.

### 4.  Disclosures in this Action

Finally, in this action Bio-Rad has repeatedly, and in great detail, described Wadler's communications with the Audit Committee and the investigations of outside counsel (both Steptoe & Johnson and DPW) relating to Wadler's concerns.  It has also described Wadler's  legal advice to Bio-Rad with respect to the  accrual amount for the Form 10-K and his communications with Bio-Rad management relating to the Life Technologies settlement negotiations, among other things, in support of its claim that its termination of Wadler was justified.  In addition, Bio-Rad has freely filed in the public record documents that reference or describe communications between Wadler, Bio-Rad and outside counsel in support of its motion to dismiss and its Motion to Strike, and expressly permitted Wadler to file a complaint in this action that mirrored his DOL complaint, even though Bio-Rad had previously told the DOL that Wadler's complaint disclosed privileged communication.

The disclosures have been most glaring in the expert reports Bio-Rad filed in the public record in connection with the Motion to Strike, which repeatedly reference and quote materials that Bio-Rad has claimed are privileged.  Although Bio-Rad contends that these reports were filed only to advance its position on a tangential question relating to the propriety of Plaintiff's expert report, by filing them in the public record Bio-Rad has waived attorney-client privilege on the subject matter at issue in all of the communications described in the reports.  The Court rejects Bio-Rad's argument that its disclosure of the expert reports does not result in any waiver because they were only offered in support of their Motion to Strike and not to advance their substantive legal positions.  The Court finds no authority suggesting that an express and intentional disclosure of privileged communications in litigation does not result in waiver unless it is made in connection

31

with an attempt to prevail *on the merits* of that party's position rather than simply attempting to gain an advantage on an evidentiary matter.

In addition to the express waiver that arises from Bio-Rad's extensive disclosures of communications that it now claims are privileged, the allegations Bio-Rad has made as to the reasons for Wadler's termination -- for example, that he failed to put into place proper measures to ensure FCPA compliance in China, that he acted unreasonably with respect to various Bio-Rad filings, and that he acted without authorization when he made a settlement offer in the Life Technologies negotiations – give rise to an implied waiver as to communications that are relevant to these allegations.

### 5. Conclusion

In sum, there appears to be a significant quantity of evidence relating to Wadler's claims and Bio-Rad's defenses as to which privilege has been waived in the course of the administrative proceedings and this litigation.  In particular, Bio-Rad has waived attorney-client privilege at least as to:

- The DPW Presentation and all communications between Wadler and Bio-Rad and with outside counsel relating to the concerns described in the presentation and the conclusions of outside counsel relating to the validity of Wadler's concerns;

- Communications involving Wadler, outside counsel and Bio-Rad relating to:  1) Wadler's advice regarding the accrual amount in the 10-K Filing or the reasons for its delay; 2) the alleged delay relating to the quarterly report due in April 2013;  3) Wadler's  conduct in the Life Technologies Settlement negotiations with respect to the amount he allegedly proposed to Life Technologies and his authorization to propse that amount; 4) Wadler's alleged failure to ensure adequate FCPA compliance measures were taken in China; and 5) his alleged unprofessional conduct in his interactions with other Bio-Rad employees, including in connection with the reporting requirements for the French legal department.

- Any communications that were referenced or quoted in the expert reports that Bio-Rad filed in the public record in connection with the Motion to Strike, or that are on the

United States District Court
Northern District of California

same subject matter of the disclosed communications.

**D.    Whether California Law is Preempted by the Regulations Promulgated Under the Sarbanes-Oxley Act**

The Court further finds that the California ethical rules cited by Bio-Rad in support of its assertion that Wadler may not disclose client confidences in connection with his Sarbanes-Oxley claim are preempted.

In Section 307 of the Sarbanes-Oxley Act, 15 U.S.C. § 7245, Congress instructed the SEC to:

> issue rules, in the public interest and for the protection of investors, setting forth minimum standards of professional conduct for attorneys appearing and practicing before the Commission in any way in the representation of issuers, including a rule—
>
> (1)  requiring an attorney to report evidence of a material violation of securities law or breach of fiduciary duty or similar violation by the company or any agent thereof, to the chief legal counsel or the chief executive officer of the company (or the equivalent thereof); and
>
> (2)  if the counsel or officer does not appropriately respond to the evidence (adopting, as necessary, appropriate remedial measures or sanctions with respect to the violation), requiring the attorney to report the evidence to the audit committee of the board of directors of the issuer or to another committee of the board of directors comprised solely of directors not employed directly or indirectly by the issuer, or to the board of directors.

15 U.S.C. § 7245.  In addition, Section 806 of Sarbanes-Oxley, 15 U.S.C. § 1514A, prohibits retaliation against any employee of a company that is subject to Sarbanes-Oxley based on that employee's compliance with applicable reporting and disclosure requirements.

The SEC implemented Section 307 by enacting Standards of Professional Conduct for Attorneys, 17 C.F.R. Part 205.  Part 205 requires attorneys to report material violations "up the ladder" by making a Part 205 Report and to continue to report up the ladder until the attorney receives an "appropriate response."  17 C.F.R. § 205.3(b) ("Duty to report evidence of a material violation").  It further provides that an attorney may use "[a]ny report under this section (or the contemporaneous record thereof) or any response thereto (or the contemporaneous record thereof) may be used by an attorney in connection with any investigation, proceeding, *or litigation* in which the attorney's compliance with this part is in issue."  17 C.F.R. § 205.3(d)(1) (emphasis added).   In the comments accompanying the final rule, the SEC explained:

Paragraph (d)(1) makes clear that an attorney may use any records the attorney may have made in the course of fulfilling his or her reporting obligations under this part to defend himself or herself against charges of misconduct. It is effectively equivalent to the ABA's present Model Rule 1.6(b)(3) and corresponding "self-defense" exceptions to client-confidentiality rules in every state. **The Commission believes that it is important to make clear in the rule that attorneys can use any records they may have prepared in complying with the rule to protect themselves**.

Implementation of Standards of Professional Conduct for Attorneys, 68 Fed. Reg. 6296-01; *see also* Clune Decl., Ex. Q (*Jordon v. Sprint Nextel Corp.*, Amicus brief by SEC in DOL ARB proceeding) at 4 (opining that this rule is "entirely consistent with the rule – established by the vast majority of state bars, the ABA Model Rules of Professional Conduct, as well as the federal common law – that an attorney may use client confidences in support of 'claims or defenses' in litigation against a client.").

There is nothing in this rule that precludes offensive as well as defensive use of these records; it only requires that an attorney's compliance must be "in issue."   Moreover, use of such records in a whistleblower action are not offensive in the traditional sense given that it is the attorney who is *defending* against retaliation.  *See* SEC Amicus Brief at 8.  In this situation, fairness requires that a lawyer be able to present his or her "claim or defense without handicap." *Id.* at 9.  This conclusion finds further support in the remedial purposes of securities laws enacted to combat fraud.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 386-87 (1983)("Yet we have repeatedly recognized that securities laws combating fraud should be construed 'not technically and  restrictively, but flexibly to effectuate [their] remedial purposes.'" ) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195 (1963)).  In addition, the SEC has now endorsed this interpretation of its own regulation in two amicus briefs, including one in this action, and that interpretation is entitled to further deference because it is a reasonable reading of Part 205.  *See Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1214 (9th Cir. 2009) ("'[W]hen an agency invokes its authority to issue regulations, which then interpret ambiguous statutory terms, the courts defer to its reasonable interpretations.'") (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 128 S.Ct. 1147, 1154, 170 L.Ed.2d 10 (2008)).

Further, the SEC specifically addressed the possibility that the ethical rules of some states

that have stricter rules regarding attorney disclosures might prohibit an attorney from using a Part

205 Report in connection with a Sarbanes-Oxley retaliation claim.  First, in Section 205.1 it

described the purpose and scope of the rule as follows:

> This part sets forth minimum standards of professional conduct for attorneys appearing and practicing before the Commission in the representation of an issuer. These standards supplement applicable standards of any jurisdiction where an attorney is admitted or practices and are not intended to limit the ability of any jurisdiction to impose additional obligations on an attorney not inconsistent with the application of this part. *Where the standards of a state or other United States jurisdiction where an attorney is admitted or practices conflict with this part, this part shall govern*.

17 C.F.R. § 205.1 (emphasis added).  Second, the SEC addressed this issue in the comments that

accompanied the final rule, explaining:

> Proposed Section 205.1 stated that this part will govern "[w]here the standards of a state where an attorney is admitted or practices conflict with this part." In the proposing release, we specifically raised the question whether this part should "preempt conflicting state ethical rules which impose a lower obligation" upon attorneys. . . . A number of commenters questioned the Commission's authority to preempt state ethics rules, at least without being explicitly authorized and directed to do so by Congress. . . . Another comment letter noted that the Constitution's Commerce Clause grants the federal government the power to regulate the securities industry, that the Sarbanes-Oxley Act requires the Commission to establish rules setting forth minimum standards of conduct for attorneys appearing and practicing before it, and that, under the Supremacy Clause, duly adopted Commission rules will preempt conflicting state rules. . . . Finally, several commenters questioned why the Commission would seek to supplant state ethical rules which impose a higher obligation upon attorneys. . . . **The language which we adopt today clarifies that this part does not preempt ethical rules in United States jurisdictions that establish more rigorous obligations than imposed by this part. At the same time, the Commission reaffirms that its rules shall prevail over any conflicting or inconsistent laws of a state or other United States jurisdiction in which an attorney is admitted or practices.**

Implementation of Standards of Professional Conduct for Attorneys, 68 Fed. Reg. 6296-01.

"Federal regulations have no less pre-emptive effect than federal statutes."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  The Court in *de la Cuesta* explained that

"[w]hen the administrator promulgates regulations intended to pre-empt state law, the court's

inquiry is  . . .limited: 'If [h]is choice represents a reasonable accommodation of conflicting

policies that were committed to the agency's care by the statute, we should not disturb it unless it

1    appears from the statute or its legislative history that the accommodation is not one that Congress

2    would have sanctioned.'" *Id.* (quoting *United States v. Shimer*, 367 U.S. 374, 383 (1961)).  Here,

3    the SEC has adopted a rule that expressly states that Part 205 Reports and any responses to such

4    reports may be used by an attorney "in connection with any investigation, proceeding, or litigation

5    in which the attorney's compliance with this part is in issue."  17 C.F.R. § 205.3(d)(1).  That

6    statement is sufficiently broad to support the conclusion that it applies to whistleblower claims

7    asserted in litigation.  Further, such a rule appears to be both within the authority granted under

8    Section 307 and to reflect a reasonable balancing of conflicting policies to the extent it protects

9    attorney whistleblowers from retaliation even as it requires them to report violations.  Therefore,

10   the Court concludes that to the extent California's ethical rules allow for more limited disclosures

11   of privileged and confidential communications in connection with Sarbanes-Oxley whistleblower

12   retaliation claims than is permitted under the regulations promulgated by the SEC, there is a direct

13   conflict that gives rise to preemption of California's ethical rules.[7]

14        Finally, the Court concludes that Bio-Rad's reliance on *Barrientos* is misplaced.  In that

15   case, the Ninth Circuit addressed whether a local ordinance limiting evictions was preempted by a

16   regulation promulgated by the Department of Housing and Urban Development ("HUD") where

17   the local law was more stringent than the federal regulation.  583 F.3d at 1202.  The court found

18   that it was not, reasoning that while the federal regulation permitted conduct that the state forbade,

19   the state's more stringent limitations did not actually "interfere with the methods by which the

20   federal statute was designed" to reach its objectives.  *Id.* at 1211.  It further concluded that there

21   was no "unambiguous intent" to preempt state law with respect to HUD's regulation.  As a

22   consequence, the Court concluded, there was no actual conflict between the federal regulation and

23   state law.  *Id.* at 1215.

24        In contrast, the rule adopted by the SEC here reflects an unambiguous intent to preempt

25

26   ────────────────

27   [7] In its response to the SEC amicus brief, Bio-Rad asks the Court to limit its holding to the Audit Committee Memo, which Bio-Rad now has conceded may be disclosed.  As Bio-Rad challenges the admissibility of other communications that the Court finds are admissible under Sarbanes-Oxley, the Court declines to limit its holding in the manner requested by Bio-Rad.

28

United States District Court
Northern District of California

state ethical rules that prevent attorneys from disclosing privileged information necessary to comply with Sarbanes-Oxley.   To the extent that one of the methods Congress chose for achieving that objective was to afford protection from retaliation to those who comply with these reporting requirements, an ethical rule that deprives an attorney of such protection interferes with the methods by which Sarbanes-Oxley was designed to achieve its objective.  In other words, this is a textbook example of "obstacle preemption."  *See Nation v. City of Glendale*, 804 F.3d 1292, 1297 (9th Cir. 2015) ("Obstacle preemption arises when a challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (internal quotation and citation omitted)).

Accordingly, the Court finds that to the extent the ethical obligations governing attorneys who practice in California impose stricter limits on the disclosure of privileged and confidential information in this action than are imposed under the Sarbanes-Oxley  Act, as reflected in Part 205, the former are preempted.

## IV.     CONCLUSION

For the reasons stated above, the Motion is DENIED.

**IT IS SO ORDERED.**


Dated: December 20, 2016


_____
JOSEPH C. SPERO
Chief Magistrate Judge