1  JOHN M. POTTER (Bar No. 165843)
   johnpotter@quinnemanuel.com
2  KARIN KRAMER (Bar No. 87346)
   karinkramer@quinnemanuel.com
3  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   50 California Street, 22nd Floor
4  San Francisco, CA  94111
   Telephone:    (415) 875-6600
5  Facsimile:    (415) 875-6700

6  JAMES R. ASPERGER (Bar No. 83188)
   jimasperger@quinnemanuel.com
7  865 South Figueroa Street, 10th Floor
   Los Angeles, CA 90017
8  Telephone:    (213) 443-3000
   Facsimile:    (213) 443-3100

9
   *Attorneys for Defendants Bio-Rad Laboratories, Inc.*
10 *and Norman Schwartz*

11                      UNITED STATES DISTRICT COURT
12                     NORTHERN DISTRICT OF CALIFORNIA
                            SAN FRANCISCO DIVISION
13

14 SANFORD S. WADLER, an individual,            Case No. 3:15-CV-2356 JCS

15
                           Plaintiff,           **DEFENDANTS' NOTICE OF MOTION
16                                              AND RENEWED MOTION FOR
                                                JUDGMENT AS A MATTER OF LAW
17        v.                                    PURSUANT TO FED. R. CIV. P. 50(B)
                                                AND MOTION FOR NEW TRIAL
18                                              PURSUANT TO FED. R. CIV. P. 59**

19 BIO RAD LABORATORIES, INC., a Delaware
   corporation; Norman Schwartz; Louis Drapeau;
20 Alice N. Schwartz; Albert J. Hillman; Deborah J.   **Date**: May 19, 2017
   Neff,
21                                              **Time**: 9:30 AM

22                         Defendants.          **Place**: Courtroom G, 15th Floor

23                                              **Judge**: The Honorable Joseph C. Spero

24

25

26
                                                       Case No. 3:15-CV-2356 JCS
27
   DEFENDANTS' NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
28 PURSUANT TO FED. R. CIV. P. 50(B) AND MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on Friday, May 19, 2017, at 9:30 AM, or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, Courtroom G—15th Floor, at 450 Golden Gate Ave., San Francisco, California, 94102, before the Honorable Joseph C. Spero, Defendants Bio-Rad Laboratories, Inc. and Norman Schwartz will and hereby do move, pursuant to Fed. R. Civ. P. 50(b), for an order entering judgment as a matter of law in favor of Defendants as to all of Plaintiff's claims and the award of punitive damages, dismissing Plaintiff's claims with prejudice and reversing the award of punitive damages, renewing Defendants' motion pursuant to Fed. R. Civ. P. 50(a) made at the close of the evidence. Defendants move alternatively for a new trial pursuant to Fed. R. Civ. P. 59 on all claims.

This motion is based on this notice, the accompanying memorandum of points and authorities, all other papers submitted in support of the Motion, the Declaration of Karin Kramer and accompanying exhibits, the records in this case, any additional evidence and argument that may be presented at or before the hearings, and all other matters of which the Court may take judicial notice.

DATED:  March 10, 2017                        QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP

                                      By      /s/ John M. Potter
                                              John M. Potter

                                              *Attorneys for Defendants Bio-Rad Laboratories,*
                                              *Inc. and Norman Schwartz*

DEFENDANTS' NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FED. R. CIV. P. 50(B) AND MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

1  JOHN M. POTTER (Bar No. 165843)
   johnpotter@quinnemanuel.com
2  KARIN KRAMER (Bar No. 87346)
   karinkramer@quinnemanuel.com
3  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   50 California Street, 22nd Floor
4  San Francisco, CA  94111
   Telephone:     (415) 875-6600
5  Facsimile:     (415) 875-6700

6  JAMES R. ASPERGER (Bar No. 83188)
   jimasperger@quinnemanuel.com
7  865 South Figueroa Street, 10th Floor
   Los Angeles, CA 90017
8  Telephone:     (213) 443-3000
   Facsimile:     (213) 443-3100

9
   *Attorneys for Defendants Bio-Rad Laboratories, Inc.*
10 *and Norman Schwartz*

11                    UNITED STATES DISTRICT COURT
12                    NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO DIVISION
13

14 SANFORD S. WADLER, an individual,          Case No. 3:15-CV-2356 JCS

15
                          Plaintiff,          **DEFENDANTS' MEMORANDUM IN**
16                                            **SUPPORT OF THEIR RENEWED**
                                              **MOTION FOR JUDGMENT AS A**
17        v.                                  **MATTER OF LAW PURSUANT TO FED.**
                                              **R. CIV. P. 50(B) AND MOTION FOR**
18                                            **NEW TRIAL PURSUANT TO FED. R.**
19 BIO RAD LABORATORIES, INC., a Delaware     **CIV. P. 59**
   corporation; Norman Schwartz; Louis Drapeau;
20 Alice N. Schwartz; Albert J. Hillman; Deborah J.
   Neff,                                      **Date**: May 19, 2017
21
                                              **Time:** 9:30 AM
22                        Defendants.
                                              **Place**: Courtroom G, 15th Floor
23
                                              **Judge**: The Honorable Joseph C. Spero
24

25

26
                                                        Case No. 3:15-CV-2356 JCS
27
   DEFENDANTS' NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
28 PURSUANT TO FED. R. CIV. P. 50(B) AND MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF ISSUES TO BE DECIDED ................................................................... 1

LEGAL STANDARD ......................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.   DEFENDANTS ARE ENTITLED TO JMOL OR A NEW TRIAL ON ALL
     CLAIMS BECAUSE THE FINDING THAT MR. WADLER ENGAGED IN
     PROTECTED ACTIVITY IS NOT REASONABLE AND IS AGAINST THE
     WEIGHT OF THE EVIDENCE ................................................................................. 3

     A.   No Reasonable Jury Could Find That Mr. Wadler Subjectively Believed
          That He Was Reporting An FCPA Violation .................................................. 4

     B.   No Reasonable Jury Could Find That Mr. Wadler's Belief Was Objectively
          Reasonable ..................................................................................................... 9

II.  DEFENDANTS ARE ENTITLED TO JMOL OR A NEW TRIAL ON ALL
     CLAIMS BECAUSE THE FINDING THAT THE MEMO WAS A
     CONTRIBUTING OR SUBSTANTIAL FACTOR IN MR. WADLER'S
     TERMINATION IS NOT REASONABLE AND IS AGAINST THE WEIGHT OF
     THE EVIDENCE ..................................................................................................... 12

III. DEFENDANTS ARE ENTITLED TO JMOL OR A NEW TRIAL ON ALL
     CLAIMS BECAUSE THE EVIDENCE OF LEGITIMATE REASONS TO
     TERMINATE MR. WADLER WAS OVERWHELMING AND UNREBUTTED .......... 16

IV.  DEFENDANTS ARE ENTITLED TO JMOL ON PUNITIVE DAMAGES
     BECAUSE NONE OF MR. WADLER'S CLAIMS PERMITS SUCH DAMAGES ........ 20

V.   DEFENDANTS ARE ENTITLED TO JMOL ON THE SOX CLAIM BECAUSE
     MR. WADLER'S REPORTING OF SUPPOSED FCPA VIOLATIONS IS NOT
     PROTECTED ACTIVITY UNDER SOX .................................................................. 21

VI.  DEFENDANTS ARE ENTITLED TO JMOL ON THE DODD-FRANK CLAIM
     BECAUSE MR. WADLER DID NOT REPORT TO THE SEC ..................................... 22

CONCLUSION ................................................................................................................... 22

DEFENDANTS' NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FED. R. CIV. P. 50(B) AND MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

1

## <u>TABLE OF AUTHORITIES</u>

2

3

*Allen v. Admin. Review. Bd.*,
    514 F.3d 468 (5th Cir. 2008) ............................................................................................... 9

4

*Barnes v. Arden Mayfair, Inc.*,
    759 F.2d 676 (9th Cir. 1985) ............................................................................................... 1

5

*City of Moorpark v. Superior Court*,
    18 Cal. 4th 1143 (1998) ..................................................................................................... 21

6

*Day v. Staples, Inc.*,
    555 F.3d 42 (1st Cir. 2009) ................................................................................................. 9

7

8

*Dutra v. Mercy Med. Ctr. Mt. Shasta*,
    209 Cal. App. 4th 750 (2012) ............................................................................................ 21

9

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
    762 F.3d 829 (9th Cir. 2014) ........................................................................................... 2, 9

10

11

*Gunning v. Cooley*,
    281 U.S. 90 (1930) .............................................................................................................. 1

12

*In re Gupta*,
    Case No. 2010–SOX–54, 2011 WL 121916 (Dep't of Labor Jan. 7, 2011) ........................ 21

13

14

*Harkness v. C-Bass Diamond, LLC, CCB-08-231*,
    2010 WL 997101 (D. Md. Mar. 16, 2010) .................................................................... 11, 12

15

*Heim v. BNSF R. Co.*,
    No. 8:13-CV-369, 2015 WL 5775599 (D. Neb. Sept. 30, 2015) ......................................... 14

16

17

*Heim v. BNSF Ry. Co.*,
    No. 15-3532, 2017 WL 744039 (8th Cir. Feb. 27, 2017) .................................................... 14

18

*Johnson v. Stein Mart, Inc.*,
    440 F. App'x 795 (11th Cir. 2011) ..................................................................................... 16

19

20

*Lakeside-Scott v. Multnomah Cty.*,
    556 F.3d 797 (9th Cir. 2009) ............................................................................................... 1

21

*Mann v. Fifth Third Bank*,
    1:09-cv-014, 2011 WL 1575537 (S.D. Ohio Ap. 25, 2011) ................................................ 10

22

23

*Meng-Lin Liu v. Siemens A.G.*,
    978 F. Supp. 2d 325 (S.D.N.Y. 2013) ................................................................................. 21

24

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) ............................................................................................... 2

25

26

27

28

DEFENDANTS' NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FED. R. CIV. P. 50(B) AND MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

*Montgomery Ward & Co. v. Duncan*,
    311 U.S. 243 (1940) ............................................................................................ 2

*Pearl v. DST Sys., Inc.*,
    No. 06-0918-CV-W-SWH, 2008 WL 8602367 (W.D. Mo. Ap. 25, 2008),
    *aff'd*, 359 F. App'x 680 (8th Cir. 2010) ........................................................... 7, 8

*Rattray v. City of National City*,
    51 F.3d 793 (9th Cir. 1994) ................................................................................ 2

*Reeves v. Sanderson Plumbing Prods. Co.*,
    530 U.S. 133 (2000) ............................................................................................ 1

*Somers v. Digital Realty Inc.*,
    __ F.3d __, 2017 WL 908245 (9th Cir. Mar. 8, 2017) ...................................... 22

*Stevenson v. Superior Court*,
    16 Cal. 4th 880 (1997) ...................................................................................... 21

*Tameny v. Atlantic Richfield Co.*,
    27 Cal. 3d 167 (1980) ..................................................................... 3, 12, 14, 20

*Thomas v. Costco*, 13-CV-275, Dkt.,
    121 at 27 (C.D. Cal. Mar. 25, 2014), *aff'd*, --- F. App'x ---,
    2016 WL 7228832 (9th Cir. Dec. 14, 2016) .................................................... 17

*Tribble v. Raytheon Co.*,
    414 F. App'x 98 (9th Cir. 2011) ....................................................................... 21

*Turner v. Anheuser-Busch, Inc.*,
    7 Cal. 4th 1238 (1994) ...................................................................................... 14

*Van Asdale v. Int'l Game Tech.*,
    577 F.3d 989 (9th Cir. 2009) ........................................................................... 4, 9

### **Statutory Authorities**

15 U.S.C. § 78u-6(a)(6) .................................................................................... 1, 22

18 U.S.C. § 1514A(a)(1) ................................................................................... 1, 21

### **Rules**

Fed. R. Civ. P. 50(b) ............................................................................................ 1

Fed. R. Civ. P. 59 ............................................................................................. 1, 2

-iii-                       Case No. 3:15-CV-2356 JCS

Defendants Bio-Rad Laboratories, Inc. and Norman Schwartz respectfully submit this memorandum in support of their renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) and motion for new trial pursuant to Fed. R. Civ. P. 59 on each of Plaintiff's claims and the award of punitive damages.

## STATEMENT OF ISSUES TO BE DECIDED

1.  Whether Defendants are entitled to judgment as a matter of law because no reasonable jury could find in Plaintiff's favor on his claims for:  (a) retaliatory discharge in violation of 18 U.S.C. § 1514A (Sarbanes-Oxley); (b) retaliatory discharge in violation of 15 U.S.C. § 78u-6 (Dodd-Frank); (c) wrongful termination in violation of California public policy; and (d) punitive damages, which are not permitted on these claims?

2.  Whether, in the alternative, Defendants are entitled to a new trial on Plaintiff's claims because the jury's verdict is against the weight of the evidence and/or constitutes a miscarriage of justice?

## LEGAL STANDARD

Judgment as a matter of law under Fed. R. Civ. P. 50(b) is required where "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802 (9th Cir. 2009) (internal quotation marks omitted) (reversing denial of JMOL to employer because there was insufficient evidence that retaliatory animus was substantial or motivating factor in discharge).  While reasonable inferences must be drawn in the non-movant's favor, "a reasonable inference 'cannot be supported by only threadbare conclusory statements instead of significant probative evidence.'"  *Id.* (quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680-81 (9th Cir. 1985)).  The Court must examine the record as a whole, *see Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133, 149-50 (2000), and "[a] mere scintilla of evidence is not enough" to sustain a verdict, *Gunning v. Cooley*, 281 U.S. 90, 94 (1930); *accord Lakeside-Scott*, 556 F.3d at 802-03.

A new trial is appropriate under Fed. R. Civ. P. 59 where "'the verdict is against the weight of the evidence, [] the damages are excessive, or [] for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)); *see Rattray v. City of National City*, 51 F.3d 793, 800 (9th Cir. 1994) (same, prevent "miscarriage of justice"). "Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014); *see Molski*, 481 F.3d at 729 (on motion for new trial, "the district court has the duty ... to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence") (citation omitted).

## ARGUMENT

Defendants are entitled to JMOL or at the very least a new trial because the evidence at trial was woefully insufficient to support the jury's liability and punitive damages verdicts. Bio-Rad terminated Mr. Wadler on June 7, 2013, immediately after serious deficiencies in his legal judgment had been confirmed and after months of obstructive, irrational, and belligerent behavior that no public company should be forced to tolerate from its General Counsel. His behavior led to calls for his termination by the head of Human Resources, the Board of Directors, and the CFO. (Exh. 1.)[1] The Board and the CFO both reached the point of "him or me," *i.e.*, if Mr. Wadler stayed on, they would resign because of his risky and intolerable behavior. (Exh. 2.)

Despite his combative stance during cross-examination, Mr. Wadler admitted that a General Counsel needs to show good judgment and work effectively with senior management.

---

[1] All exhibits are attached to the Declaration of Karin Kramer, filed herewith.

(Exh. 3.)  By June 7, 2013, Mr. Wadler had long-since ceased doing either of those things.  His claim to be a whistleblower—which was not based on even the slightest investigation—was discredited by everyone who reviewed it in real time.  Whatever may have led the jury to find for Mr. Wadler in this case, it was not a result of applying the law to the evidence.  The evidence was overwhelming that Mr. Wadler did not engage in protected activity, that any protective activity was not the cause of his termination, and that he was temperamentally unsuited and professionally unprepared to be Bio-Rad's General Counsel at this point in the company's development.  JMOL or at the very least a new trial is warranted on all claims.

## I.  DEFENDANTS ARE ENTITLED TO JMOL OR A NEW TRIAL ON ALL CLAIMS BECAUSE THE FINDING THAT MR. WADLER ENGAGED IN PROTECTED ACTIVITY IS NOT REASONABLE AND IS AGAINST THE WEIGHT OF THE EVIDENCE

No reasonable jury could find that Mr. Wadler engaged in the "protected activity" necessary to sustain his claims under the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A; the Dodd-Frank Act, 15 U.S.C. § 78u-6; and California's common law prohibiting wrongful termination in violation of public policy, known as a "*Tameny* claim" (*see Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980)).  As the Court instructed the jury, Mr. Wadler was required for each of these claims to prove that he "personally and in good faith believed that the conduct he was disclosing constituted a violation of" an SEC rule or regulation *and* that his belief "was objectively reasonable under the circumstances"—that is, "a reasonable person with the same training and experience" would have held the same belief.  (Exh. 4.)  Mr. Wadler relies solely on "his report [of alleged violations of the Foreign Corrupt Practices Act ("FCPA") in China] to the Audit Committee dated February 8, 2013" (the "Memo") as the alleged "protected activity."  (Exh. 5.)

No reasonable jury could find that the allegations in Mr. Wadler's Memo—a report that two independent law firms and two government agencies thoroughly rejected—were subjectively

1  and objectively reasonable.  It is undisputed that, before submitting his Memo, Mr. Wadler did

2  not:

3  • conduct any investigation;

4  • consult FCPA experts who were readily available to him;

5  • debrief his own legal department; or

6  • talk to other Bio-Rad employees who possessed all the information he needed to show the allegations in his Memo were unfounded.

7

8  Even taking the evidence in the light most favorable to Mr. Wadler, the proof that he acted

9  in both a subjectively and objectively reasonable manner in reporting his unfounded allegations is

10  highly deficient.  Bio-Rad is entitled to judgment as a matter of law or at the very least a new trial

11  on all claims.

12  **A.  No Reasonable Jury Could Find That Mr. Wadler Subjectively Believed That**

13  **He Was Reporting An FCPA Violation**

14  A plaintiff seeking to prove subjective belief must show that he ***actually believed*** that the

15  conduct he was reporting violated the relevant law and that his alleged belief was ***reasonable*** and

16  ***in good faith***.  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000, 1002 (9th Cir. 2009).  No

17  reasonable jury could find that Mr. Wadler actually, reasonably, and in good faith believed Bio-

18  Rad had committed any FCPA violations in China.

19  Mr. Wadler's own testimony at trial shows he did not actually believe the allegations in his

20  Memo.  The Memo unequivocally alleged "serious and prolonged violations" of the FCPA for

21  which the evidence was "so clear." (Exh. 6.)  His italicized finale was emphatic:  *"The only*

22  *conclusion I can draw from this limited collection of documents is that these practices are*

23  *endemic and that high levels of management within the company had to know they were*

24  *happening."*  (Exh. 7.)   But at trial, Mr. Wadler backed off from this professed certitude,

25  conceding that he had no proof of actual FCPA violations and that an investigation—which he had

26  not conducted prior to submitting the Memo—would have been necessary to uncover any such

27

28  -4-                                      Case No. 3:15-CV-2356 JCS

violations. (*See* Exh. 8: "Somebody needs to look at this."; Exh. 9: "This memory [sic] was a request for an investigation. … I hadn't done my own investigation, you know, that would be conclusive."). A claim that an investigation is required is a far cry from an actual belief in the "serious," "prolonged," "clear," and "endemic" violations he alleged in his Memo.

The evidence at trial also unequivocally contradicted Mr. Wadler's assertion that he acted reasonably and in good faith, precluding a reasonable jury from so finding. *First*, upon receiving the document attached to his Memo that he claimed showed free products and raised a specter of bribery on November 1, 2012, Mr. Wadler **waited more than three months** to report the allegedly urgent FCPA violations to the Audit Committee. (Exh. 10.) In the interim, he learned of the "tone at the top" meeting with federal prosecutors where he would be required to answer "tough questions" about his abject failure to advise Bio-Rad about the FCPA and its compliance requirements. (Exh. 11.) He then searched for employment lawyers—time he might have spent investigating whether his allegations had any merit. (Exh. 12.) And, in testimony exposing his motive, he made clear at trial that he understood that the person who submits a report typically avoids liability. (Exh. 13.)

*Second*, it is undisputed that, during this three-month delay, Mr. Wadler **took no steps** to determine whether there was in fact an FCPA violation. Abundant sources of relevant information were available to Mr. Wadler, but he turned to none of them to investigate his allegations. He did not talk to the hundreds of people in the Life Sciences Group on the same campus in Hercules, the company's long-time lawyers at Latham & Watkins with whom he had many conversations during that period, or Patrick Norton of Steptoe & Johnson, with whom he spoke just prior to submitting the Memo, and further, he ignored advice from the Finance department that Bio-Rad's records were more than sufficient. He did not talk to members of his own legal department. (Exh. 14.) And there is no evidence that he conducted any legal research. When the CFO, Ms. Tsingos, informed him his bribery allegations were wrong, he simply ignored her. (Exh. 15.)

*Third*, Mr. Wadler's belated accusations that senior management was involved in the purported FCPA violation is definitively refuted by his own Memo.   In contrast to his uncorroborated testimony at trial that he spoke with Mr. Schwartz about his concerns before reporting to the Audit Committee, he contemporaneously stated in his Memo that he ***did not*** discuss the matter with senior management.   Despite the extraordinary scope of documents from the company and company lawyers to which Mr. Wadler had access in this case because of the Rule 502 order, he could not produce a single document that supported this accusation.   Mr. Norton never heard it; Ms. Beamon of Davis Polk never heard it; and it never showed up on the lengthy list of topics Mr. Wadler wanted Davis Polk to investigate.  (Exh. 16.)

*Fourth*, Mr. Wadler's effort to turn the Life Technologies audit—a purely private commercial dispute—into an FCPA issue further shows his bad faith.   The evidence was overwhelming and undisputed at trial that there was no link between that audit (including Mr. Wadler's inability to turn up relevant documents) and the FCPA.  (Exh. 17.)  Yet Mr. Wadler alleged such a link in the Memo, and it is undisputed that he did so without consulting anyone. His conflation of the two distinct matters was so flawed that no reasonable jury could find it to be anything other than deliberate obfuscation.

*Finally*, the remaining accusations in the Memo are likewise so devoid of evidentiary support as to preclude a reasonable jury from finding that Mr. Wadler reasonably and in good faith believed he was reporting actual FCPA violations:

- No evidence supported—and copious evidence refuted—Mr. Wadler's allegation that the 2 product/5 product description on the document attached to the Memo showed evidence of bribery:

  - CFO Tsingos disabused Mr. Wadler of the idea, using the three-piece suit analogy. (Exh. 18.)

  - Ms. Tumolo, a manager of the Life Sciences Group, explained why it was untrue. (Exh. 19.)

  - A PowerPoint prepared for Mr. Wadler's legal department, attached the same document and explained the system/components configuration of the invoices. (Exh. 20.)

- While Mr. Wadler testified that a member of his legal team, John Cassingham, had raised the issue with him, Mr. Wadler did not include that allegedly corroborating fact in his Memo, he did not relay it to Ms. Beamon, and Mr. Cassingham never mentioned it when Ms. Beamon interviewed him. Nor does it appear in any of the thousands of emails, memos, PowerPoints, or other documents in the litigation. Similarly, Mr. Wadler's reference to a scheme purportedly widely known as "under the covers," was not supported by any witness or document, and Ms. Beamon said she had never heard the term used. (Exh. 21.)

- The undisputed testimony was that the books and records underlying the asserted FCPA violations belonged to third parties—which as the Court instructed cannot support an FCPA violation by Bio-Rad—and that Bio-Rad's books and records had no deficiencies. Argument from Mr. Wadler's counsel to the contrary is insufficient to sustain the verdict. (Exh. 22.)

- No testimony or evidence supported the allegation that missing language from Chinese contract documents reflected an effort by the Chinese employees to "*knowingly* circumvent a system of internal accounting controls," as would be necessary for an FCPA violation. Rather, the undisputed evidence showed that the Chinese employees were doing their best to work with complicated English-language contracts Mr. Wadler's team had given them, and they reverted to older Chinese-language versions that they and their customers could understand when their request for translations went unmet. When asked, every distributor signed two-page letter agreements in Chinese with all necessary language. The undisputed evidence also showed that Mr. Wadler's own legal department had obtained Chinese translations at the Chinese employees' request, but those translations were sitting in a desk drawer in the Hercules legal department. (Exh. 23; emphasis added to "knowingly.")

The complete failure of such an experienced attorney as Mr. Wadler to investigate his allegations before accusing senior management of criminal violations belies the jury's finding of good faith. This is particularly so given that, as shown at trial, had Mr. Wadler not been deliberately passive, he easily could have discovered the facts showing that his allegations had no merit. On these points, the decision in *Pearl v. DST Sys., Inc.*, No. 06-0918-CV-W-SWH, 2008 WL 8602367 (W.D. Mo. Ap. 25, 2008), *aff'd*, 359 F. App'x 680 (8th Cir. 2010), is instructive.

There, the court granted summary judgment to the employer on a SOX retaliatory discharge claim because the plaintiff could not meet the SOX standard for protected activity. The plaintiff reported that the company understated its earnings by $12 million. Among the facts the Court considered in ruling the plaintiff lacked a subjective belief as a matter of law was that he "did not consult with anyone" prior to making his report, "never learned any more factual information," "had scant factual information on which to make the allegation," "did not have

1    sufficient knowledge to know if a SOX violation had occurred," had not seen underlying

2    documents, and did not know who first discovered the problem.  *Id.* at *14.  The court

3    distinguished between actual information, which plaintiff did not have, and rumor and hearsay on

4    which his allegations were based.  *Id.*  Here, Mr. Wadler was not even acting on rumor and

5    hearsay; instead, he strung together a hodge-podge of untested and unfounded allegations, then

6    cloaked those allegations in urgency and alarm to create concern among the Audit Committee

7    members.   Just as summary judgment was warranted in *Pearl*, JMOL is warranted on all claims

8    here.

9            Even if there were sufficient evidence to support the jury's verdict (there is not), at the

10   very least a new trial is required because the jury's subjective-belief finding is against the clear

11   weight of the evidence given Mr. Wadler's undisputed failure to take a single step to verify the

12   accuracy of the serious allegations that he made against Bio-Rad and its senior management, with

13   whom he had worked for decades.  To counter Bio-Rad's position that he contrived his Memo to

14   push off the "tone at the top" meeting and distract attention from his own failings, Mr. Wadler told

15   the jury he had no concern about the meeting or losing his job and that he "would have been

16   crazy" to think his job might be in jeopardy.  (Exh. 24.)  But those assertions are simply not

17   credible given the undisputed testimony and evidence that Mr. Norton had told Mr. Wadler he was

18   recommending his termination to the Board because the government would not understand how a

19   company could retain a General Counsel who had ignored the FCPA for decades;  Mr. Greenburg

20   of Latham & Watkins had told Mr. Wadler he would need to answer "tough questions" from

21   federal prosecutors while his boss was in the room;  Mr. Wadler expressed concern about the

22   meeting to Ms. Beamon and demanded counsel be provided for him; Mr. Wadler had searched the

23   Internet for employment lawyers during this time—but lied about doing so on the witness stand.

24   (Exh. 25.)  This evidence supports the reasonable—if not inescapable—inference that Mr. Wadler

25   was concerned about his future.  The Court should reject his facially implausible testimony to the

26

27

28                                              -8-                        Case No. 3:15-CV-2356 JCS

1    contrary in considering whether to grant a new trial.  *See, e.g.*, *Experience Hendrix*, 762 F.3d at

2    842.

3         Finally, Mr. Wadler's counsel compounded Mr. Wadler's lie by telling the jury that a

4    search for employment lawyers was something a person "might not remember" after three years—

5    knowing full well that Mr. Wadler himself had confirmed his search for employment lawyers to

6    the Court *the same morning* he denied it on the stand.  (Exh. 26.)  Counsel's argument disregarded

7    the actual facts and undermined the Court's instruction.  Given Defendants' theory of the case—

8    that Mr. Wadler concocted his allegations of FCPA violations to forestall the ruination of his

9    career—Mr. Wadler's outright lie on this central issue, and his counsel's mischaracterization of

10   the evidence to the jury, contributed to a miscarriage of justice that warrants a new trial.

11       **B.**     **No Reasonable Jury Could Find That Mr. Wadler's Belief Was Objectively**

12             **Reasonable**

13         Defendants are entitled to JMOL on all claims for the additional reason that, upon

14   considering "what a reasonable person with the same training and experience as plaintiff would

15   believe under the circumstances at the time he filed his disclosure," no reasonable jury could find

16   that Mr. Wadler's belief that the underlying conduct constituted FCPA violations was objectively

17   reasonable.  (Exh. 27); *see Van Asdale*, 577 F.3d at 1001 ("'To have an objectively reasonable

18   belief there has been shareholder fraud, the complaining employee's theory of such fraud must at

19   least approximate the basic elements of a claim of securities fraud.'") (quoting *Day v. Staples,*

20   *Inc.*, 555 F.3d 42, 55 (1st Cir. 2009)); *Allen v. Admin. Review. Bd.*, 514 F.3d 468, 476 (5th Cir.

21   2008) ("The objective reasonableness of a belief is evaluated based on the knowledge available to

22   a reasonable person in the same factual circumstances with the same training and experience as the

23   aggrieved employee.").

24         The evidence was overwhelming that a reasonable person with the same training and

25   experience as Mr. Wadler would not have believed Bio-Rad had committed an FCPA violation in

26   China.  Mr. Norton testified he did not believe there was an FCPA violation; Ms. Beamon testified

27

28                                   -9-                          Case No. 3:15-CV-2356 JCS

1   she did not believe there was an FCPA violation; and neither could have been more emphatic that

2   Mr. Wadler's quest to find such a violation at all costs was unfocused, ill-conceived, and

3   illegitimate.  Likewise, neither the SEC nor the DOJ found that Bio-Rad had committed an FCPA

4   violation in China as Mr. Wadler had asserted.  (Exh. 28.)  Determinations by government

5   regulators are highly relevant to the objectivity inquiry.  *See, e.g.*, *Mann v. Fifth Third Bank,* 1:09-

6   cv-014, 2011 WL 1575537, at *11 (S.D. Ohio Ap. 25, 2011) (rejecting plaintiff's claim of

7   protected activity because "the fact that the Federal Reserve regulators did not appear to consider

8   [the reported facts] violations militates against finding that belief objectively reasonable").

9        Moreover, it is undisputed that Mr. Wadler did nothing a lawyer of equivalent training and

10  experience would have done—experience that by then included a prior thorough FCPA

11  investigation.   There is no evidence he researched his outlandish books-and-records claim.

12  Moreover, he did not consult with the very experienced lawyers available to him at Latham &

13  Watkins or Steptoe and Johnson, despite frequent contact with them leading up to the time he

14  submitted his Memo; he did not consult Ms. Model, the company's compliance expert (also a

15  lawyer); he did not follow-up with the lawyers in his legal department who would have shown that

16  the use of Chinese-language contracts by Chinese employees was not an effort to avoid

17  compliance and that his own staff had the Chinese translations; he did not talk to the easily

18  accessible members of the Life Sciences Group who were familiar with the products at issue even

19  after Ms. Tsingos, as well as Mr. Thomsen and Ms. Iwashita (who themselves traveled to China to

20  review this very issue) had told him the product descriptions represented a system and

21  components; and he did not consult any of the many native Chinese speakers in Hercules who

22  could have helped him understand the Chinese-language documents he allegedly thought showed

23  free products.   He did nothing.   In the end, the lawyers Mr. Wadler selected to pursue the

24  investigation, not only found his claims meritless, they warned Bio-Rad Mr. Wadler was setting

25  himself up as a whistleblower, a warning that proved prescient.  (Exh. 29.)

26

27

28                                   -10-                        Case No. 3:15-CV-2356 JCS

*Harkness v. C-Bass Diamond, LLC,* CCB-08-231, 2010 WL 997101 (D. Md. Mar. 16, 2010), also involved a claim for retaliatory discharge by a General Counsel and bears some similarities to this case.  The plaintiff there was a 20-year lawyer.  *Id.* at *6.  Within a year of being hired by C-Bass, she reported to the Audit Committee what she alleged was a violation of SEC regulation FD by the company's president.  *Id.*  Prior to her report, the plaintiff did not investigate whether the regulation applied, did not ask members of her legal staff, and did not consult outside counsel.  *Id.* at *2.  Thereafter, the relationship between the plaintiff and the president deteriorated, and her termination followed.  *Id.*  The court granted summary judgment to the company:  "Ms. Harkness took the time to research her reporting obligations under the Sarbanes-Oxley Act, but did not research the threshold question of whether Regulation FD applied.  Neither did Ms. Harkness ask outside securities counsel for their opinion on the applicability of Regulation FD or direct any members of her legal staff to look into the question."  *Id.* at *5.  The court thus concluded that the report to the Audit Committee did not constitute protected activity:  "In light of Ms. Harkness's professional experience and the legal resources available to her, Ms. Harkness's belief that [the president] was in violation of Regulation FD was not objectively reasonable and therefore, her January 2005 report … does not constitute protected activity under the Sarbanes-Oxley Act."  *Id.* at *7.  JMOL is warranted here for similar reasons.

Against the undisputed evidence above, Mr. Wadler offered no percipient or expert witness to testify his conduct was reasonable or that his allegations made out the basic elements of an FCPA claim.   Rather, Mr. Wadler's evidence of objective reasonableness rested entirely on inferences drawn from disparate words and phrases, taken out of context.   None of those inferences is reasonable:

- The Audit Committee's agreement that an investigation was necessary is not proof of objective reasonableness because the members of the Audit Committee do not have "the same training and experience as plaintiff"—a lawyer with forty years of experience.  It is undisputed that they were taking advice from the company's General Counsel. (Exh. 30.)

- Davis Polk's statement in its report that China warranted more investigation is not proof of objective reasonableness given the undisputed testimony showing that Davis Polk thought more investigation was warranted *because* the General Counsel had raised the allegations and they had to be taken seriously as a result. (Exh. 31.) Mr. Wadler cannot use the fact that he made the allegations as proof of their reasonableness.

- Mr. Norton's references to "smoke" and "skullduggery" regarding discrepancies in the Chinese-language documents are not proof of objective reasonableness in light of the undisputed record as to those terms. The evidence showed that "smoke" referred to Mr. Norton's prior investigation, not the one prompted by Mr. Wadler's Memo; and while "skullduggery" was one possibility that Mr. Norton posited at the outset of the investigation, he all-but-dismissed it in the same document (trial exhibit 124: "More likely or more common, I think, it just reflects the very poor contracting practices of many of these entities …"), and then definitively rejected it in a single day. (Exh. 32.)

- The fact that two law firms spent over a million dollars investigating Mr. Wadler's allegations are not proof of objective reasonableness given the undisputed testimony from lawyers at both firms that a General Counsel's concerns must be pursued, particularly where there is a current government investigation and settlement pending. Again, Mr. Wadler may not use his position as General Counsel to bootstrap a finding that his allegations were objectively reasonable. (Exh. 33.)

Accordingly, much as in *Harkness*, no reasonable jury could find based on the record as a whole that Mr. Wadler's allegations of FCPA violations were objectively reasonable. But even if they could, for the reasons explained above, the weight of the evidence regarding objective reasonableness overwhelmingly favored Bio-Rad. At the very least, a new trial is warranted.

## II.   DEFENDANTS ARE ENTITLED TO JMOL OR A NEW TRIAL ON ALL CLAIMS BECAUSE THE FINDING THAT THE MEMO WAS A CONTRIBUTING OR SUBSTANTIAL FACTOR IN MR. WADLER'S TERMINATION IS NOT REASONABLE AND IS AGAINST THE WEIGHT OF THE EVIDENCE

Defendants are also entitled to JMOL on all claims because no reasonable jury could have concluded that any protected activity was a "contributing factor" in (SOX and Dodd-Frank claims), or a "substantial motivating reason" for (*Tameny* claim), Mr. Wadler's termination.[2] (Exh. 34.)   As explained below, there was no evidence that Mr. Wadler was terminated because of his Memo.

---

[2]   Defendants maintain their objections to the "contributing factor" standard of causation for both the Sarbanes-Oxley claim and the Dodd-Frank claim. *See* Dkt. 111 at 7-8, 19.

1    Mr. Schwartz's testimony was clear that there was no one event that led to Mr. Wadler's

2  termination.   He was terminated because of a pattern of behavior reflecting a serious and

3  troublesome change in his conduct that led to an inability to work productively with the other

4  members of management.   The Davis Polk report, which Mr. Schwartz referred to as "the last

5  piece of the puzzle," demonstrated Mr. Wadler's incompetence as General Counsel:  He still did

6  not understand how Bio-Rad's business worked in China nor how to identify FCPA issues.  (Exh.

7  35.)  Thus, although Mr. Schwartz answered in the negative when asked general questions about

8  whether "anything" happened between December 20, 2012 and February 8, 2013, or April and

9  June 2013 that led to Mr. Wadler's termination, he and others also testified unequivocally to the

10  many events that occurred during those periods that were bound up in the decision to terminate

11  Mr. Wadler.   These included incidents involving other members of the management team,

12  incidents regarding the company's SEC filings, and, of course, Davis Polk's report revealing Mr.

13  Wadler to be an utterly inadequate choice to lead the legal department of a Fortune 1000 company

14  with very substantial international business.[3]  (Exh. 36.)

15    Mr. Wadler, in contrast, sought to prove causation based on unreasonable inferences,

16  contradicted by actual evidence, and distortions of testimony derived from incomplete quotations.

17  No reasonable jury could have relied on any of his arguments to support a finding of causation.

18    *First*, Mr. Wadler's counsel argued in closing that Mr. Schwartz had testified that the

19  Memo was "somewhat" and "in part" responsible for his firing.   But that is not a fair

20  characterization of Mr. Schwartz's testimony.   In deposition, Mr. Schwartz answered "somewhat"

21  when asked if the "investigation"—not the Memo—related to Mr. Wadler's termination.  (Exh.

22  37.)   He then immediately explained:  "I was concerned that he – he really didn't have a good

23  grasp of how business worked in China and – and had sent us off on a, in this case, a wild goose

24  chase to redo all the work that had already been done around – around how business was

25

26    [3]  These events are in addition to the disturbing incidents involving Mr. Wadler that occurred
between February 9, 2013 and April 2013.

27

28                                          -13-                        Case No. 3:15-CV-2356 JCS

conducted in China." *Id.* A General Counsel who fails to understand how business is done in one of the company's most important markets is not up to the job. Mr. Schwartz's "in part" testimony was similarly mischaracterized. Questioned in compound fashion about whether Mr. Wadler's termination was "actually related to that report and investigation," Mr. Schwartz first answered, "in part." He then immediately denied that there was "a direct connection between Mr. Wadler's report to the Audit Committee and his termination." (Exh. 38.). Mr. Schwartz explained that he wanted to see the results of the Audit Committee investigation by Davis Polk before making a decision whether to terminate Mr. Wadler. (Exh. 39.) To be sure, the results of the investigation were a factor in the termination because they showed Mr. Wadler's incompetence and unsuitability to be General Counsel. But a termination following an investigation that revealed a report to be unfounded and submitted without any due diligence whatsoever does not tie a termination to the report itself.[4] As Mr. Schwartz effectively testified, given the results of the Davis Polk investigation, it would have been irresponsible for Bio-Rad to do anything other than terminate Mr. Wadler as General Counsel.

Nor, *second*, could a reasonable jury find causation based on the incomplete review from 2013. The question Mr. Wadler's counsel asked in closing perhaps explains best why the document does not support his argument. He stated to the jury: "If everything they said was true, that this wasn't just a slam on Sandy Wadler, why did they need to make up this document at all?" (Exh. 40.) But Bio-Rad's point was that everything in the document *is* true—based on notes collected over the year that led to its creation. Mr. Wadler does not seriously contend otherwise:

---

[4] *See e.g., Heim v. BNSF R. Co.*, No. 8:13-CV-369, 2015 WL 5775599, at *3-4 (D. Neb. Sept. 30, 2015) ("The Court cannot accept the implication that an injury report is a 'contributing factor' to an adverse action simply because it is part of the administrative process which resulted in discipline."), *aff'd sub nom. Heim v. BNSF Ry. Co.*, No. 15-3532, 2017 WL 744039 (8th Cir. Feb. 27, 2017); *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1258 (1994) (*Tameny* claim failed where "there is no indication in the record that management regarded Turner as a disloyal employee and troublemaker for his reporting of illegal activity" and "[i]n response to Turner's complaints, ABI managers did not dismiss his concerns or admonish him to cease communication, but investigated and made their own determinations that illegal activity was not taking place").

His counsel argued that only the third comment was untrue, but the undisputed evidence shows every line of that comment is accurate.  (Exh. 41.)  Thus, while there was evidence of metadata showing the actual document that is Trial Exhibit 87 was created in July 2013, no evidence contradicted Mr. Schwartz's testimony that he likely worked from notes in preparing the document because that was his practice, or Ms. Corey's testimony that she recalls seeing notes when they discussed the review in Spring 2013.[5]  (Exh. 43.)  And no evidence contradicted the statements in the document itself.

*Third*, Mr. Wadler's counsel argued in closing that Mr. Schwartz probably said the company needed a negative review in Mr. Wadler's personnel file, thus leading to the creation of the incomplete review.  But there was no evidence of such a motivation, and in fact the actual evidence conclusively undermines that inference, as the review was never completed, never scored, and never placed in Mr. Wadler's personnel file.  (Exh. 44.)  Again, Plaintiff had an extraordinary collection of documents available to him, many created in the expectation they would remain privileged and confidential, yet not a single one supports his inferences.

*Fourth*, Mr. Wadler's counsel also made up in closing supposed conversations that occurred between Mr. Schwartz and others, even though the actual testimony was to the contrary. For example, counsel imagined a conversation between Mr. Schwartz and Mr. Drapeau where they discussed the fact that Mr. Wadler was not a team player and his investigation would cost the company money.  (Exh. 45.)  Pure fiction.  So was the imagined conversation where Mr. Schwartz supposedly disclosed to Ms. Corey that Mr. Wadler had submitted his Memo to the Audit

---

[5]   Mr. Schwartz testified, without contradiction, that he kept "important" notes (a number of which are in evidence), but that he did not keep notes that ultimately became part of an employment review because there was no need to do so once the notes were typed up.  (Exh. 42.) Plaintiff's argument that Mr. Schwartz "destroyed" notes related to the December 2012 review was completely fabricated.  Mr. Schwartz had no duty to preserve the notes at the time they were transcribed into the formal review document; telling the jury otherwise was inflammatory.

1   Committee before she recommended that Mr. Wadler be terminated. (Exh. 46.) There is no such

2   evidence in the record, and the evidence is to the contrary.

3         *Finally*, Mr. Wadler relied on the email from Mr. Schwartz to Ms. Corey proffering the

4   idea that Mr. Wadler be placed on administrative leave as evidence of contributing factor but,

5   again, the record contradicts such an inference. The undisputed evidence showed that the

6   contemplated leave would have been paid and was intended to give Mr. Wadler an opportunity to

7   address whatever was bothering him. (Exh. 47.) Mr. Wadler in fact argued strenuously to the jury

8   that Bio-Rad should have reached out to him to see if he needed some help—which was precisely

9   the purpose of the proposed administrative leave. (Exh. 48.)

10        Thus, without any evidence that the Memo was even *a* factor in Mr. Wadler's termination,

11  no reasonable jury could have found causation satisfied for any of his claims. Were there any

12  doubt on this issue, however, a new trial is warranted because the great weight of the evidence

13  shows that Mr. Wadler was terminated for other reasons, including that the investigation that

14  followed his report showed that he was not performing adequately as General Counsel, not

15  because he made a report to the Audit Committee.

16  **III.   DEFENDANTS ARE ENTITLED TO JMOL OR A NEW TRIAL ON ALL CLAIMS
        BECAUSE THE EVIDENCE OF LEGITIMATE REASONS TO TERMINATE MR.
17      WADLER WAS OVERWHELMING AND UNREBUTTED**

18        Even if a reasonable jury could have found that protected activity was a contributing or

19  substantial factor in Mr. Wadler's termination (it could not), JMOL or at the very least a new trial

20  is independently warranted because no reasonable jury could find that Defendants failed to prove

21  by clear and convincing evidence that they would have terminated Mr. Wadler at the same time

22  for "any reason other than the reasons forbidden by the Sarbanes-Oxley Act" or "the Dodd-Frank

23  Act." (Exh. 49.) The law is clear that "[f]ederal courts do not sit as a super-personnel department

24  that re-examines an entity's business decisions." *Johnson v. Stein Mart, Inc.,* 440 F. App'x 795,

25  801-02 (11th Cir. 2011) (affirming grant of summary judgment to employer on SOX claim). The

26  Ninth Circuit thus has recently upheld an instruction advising the jury that: "The laws that

27

28                                        -16-                    Case No. 3:15-CV-2356 JCS

prohibit retaliation do not take away an employer's right to make and interpret its own rules, policies or guidelines as it chooses, so long as they do so in a non-retaliatory manner.  The laws that prohibit retaliation are not a shield against harsh treatment at the workplace.  An employer's legitimate, non-retaliatory reason does not have to be a reason that the judge or jurors would act upon or approve." *Thomas v. Costco*, 13-CV-275, Dkt. 121 at 27 (C.D. Cal. Mar. 25, 2014), *aff'd* --- F. App'x ---, 2016 WL 7228832 (9th Cir. Dec. 14, 2016).

Here, as shown above, Bio-Rad adduced overwhelming evidence that it had legitimate business reasons to terminate Mr. Wadler relating to a pattern of disruptive and uncooperative conduct that alienated every member of the management team with whom he needed to work.  He traumatized the CFO and visitors from the French office, in separate screaming fits.  He engaged in such alarming behavior that the company felt compelled to perform a threat assessment.  He incited a harassment claim under French law.  He showed utter disregard for an employee with breast cancer.  He created havoc around two consecutive SEC filings.  He told Mr. Schwartz that he believed Mr. Schwartz had been harboring resentment against him for 10 years.  He screamed at the mild-mannered head of HR on two occasions, once over his salary and once over the French legal reorganization.  He stopped talking to his long-time friend and management colleague John Goetz.  (Exh. 50.)  Mr. Wadler's bad conduct was even directed at Ms. Beamon, who recounted an incident where her male partner had to intervene to stop Mr. Wadler's aggressive conduct towards her.  (Exh. 51.)

Other than creating some confusion about who was ultimately responsible for the late 10-K filing, Mr. Wadler did not offer any rebuttal testimony to any of these incidents, including the debacle around the May 2013 10-Q filing.[6]  And Mr. Wadler's argument that these incidents were

---

[6]   Despite having worked at Bio-Rad for 25 years, Mr. Wadler did not produce a single witness to testify on his behalf, other than Ms. Model, who also had been terminated by the company.  And while Mr. Wadler adduced evidence that there were occasional incidents of yelling by other employees and that one employee yelled frequently before Mr. Schwartz was CEO, the

1   related to his legitimate business concerns, such as looking for documents for the Life Tech audit,

2   is irrelevant.  No one, let alone a senior executive, can engage in such a pattern of massively

3   unacceptable behavior, preying on colleagues and subordinates alike and exposing the company to

4   regulatory risk, and expect to keep their job.

5        Mr. Wadler's principal rejoinder at trial to this massive evidence of Bio-Rad's legitimate

6   business reasons to terminate him proceeded from both a false premise and a *non-sequitur*.  The

7   false premise was that Mr. Wadler got an "A+" employment review in December 2012, and the

8   *non-sequitur* was that, because he got that review, there could not have been any legitimate basis

9   to terminate him six months later.  (Exh. 52.)

10       As to the false premise, the December 2012 review was not an A+; it praised Mr. Wadler

11  for certain aspects of his performance, it criticized him for others, giving him some good grades,

12  some middling and below.  (Exh. 53.)   His overall score was 3.4 out of 4.9, not an A+ on any

13  known grading scale.  Although Mr. Wadler called it a "fabulous" review, the undisputed evidence

14  showed that he searched for an employment lawyer directly after receiving that review.  (Exh. 54.)

15       As to the *non-sequitur*, there was abundant, unrebutted evidence, including testimony by

16  Ms. Corey (the head of HR) and John Goetz (who received his 2011 review in late 2012), showing

17  that Mr. Wadler's December 2012 review was for focal year *2011* and would not have reflected

18  his performance in 2012.  (Exh. 55.) The unrebutted evidence showed that Mr. Schwartz is always

19  slow in finishing reviews, and in 2012 he had a cataclysmic event—the death of his father, who

20  was also his mentor in business—that contributed to additional delay.  (Exh. 56.)  The unrebutted

21  evidence also showed that Mr. Schwartz's direct reports held weekly "one-on-one" meetings with

22  him, where current issues were discussed, as distinct from the focal year reviews, which looked

23  backward.  (Exh. 57.)

24

25  _____

26  unrebutted record shows that Mr. Wadler's pattern of yelling and other uncivil behavior far
    exceeded anything that had previously occurred at Bio-Rad.

27

28                          -18-                    Case No. 3:15-CV-2356 JCS
    _____
    DEFENDANTS' NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
    PURSUANT TO FED. R. CIV. P. 50(B) AND MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

But even if the December 2012 review had reflected events through that date, and had been an A+ review, the evidence is overwhelming that Mr. Wadler's outrageous conduct mostly erupted in the first half of 2013—after his last review—providing independent legitimate grounds for termination.  Mr. Wadler never rebutted any of the incidents regarding his personal conduct during those final six months.  He could have taken the stand in rebuttal and given his version, but he did not.  Instead, he relied on arguments of counsel that looked to collateral issues, distortions of actual evidence, and trivialization of very real incidents that occurred at the company.  No reasonable jury could find that any of these arguments defeated Defendants' showing that they had legitimate business reasons to terminate Mr. Wadler.

Specifically, Mr. Wadler claimed he had received no warnings, and there were no records of his bad conduct in his personnel file or elsewhere.  That is not accurate, but even if it were, it does not matter in the face of unrebutted testimony of his belligerent behavior.  None of the statutes (or common law) at issue here provide that a company may terminate an employee for bad conduct only after documenting it in a particular way.  And Bio-Rad's own personnel policies expressly disclaim any such requirement:

> Notwithstanding any provision of this policy, Bio-Rad reserves the right at all times to determine what disciplinary action, if any, is appropriate based on the facts and circumstances involved. Bio-Rad may proceed directly to a written warning or termination, without resort to prior disciplinary steps where, in its sole discretion, Bio-Rad deems such action appropriate.

(Exh. 58.).  Ms. Corey testified without contradiction that, unlike for less-senior employees, Bio-Rad does not use precursor steps to termination for executives; executives enjoy a different set of rewards and are subject to a different set of expectations.  (Exh. 59.)

Mr. Wadler's assertion that he was never warned is in any event contradicted by the record.  Mr. Schwartz told him in February 2013 that if he could not get along with Finance, Mr. Schwartz would find others who could.  (Exh. 60.)  Mr. Schwartz met with Mr. Wadler in March 2013 to ask how they could get their relationship "back on track."  (Exh. 61.)  And Ms. Corey

1   testified she told Mr. Wadler early in 2013 that he was "ruining his relationships." (Exh. 62.) That

2   Mr. Wadler purports not to have viewed these comments from other senior executives, including

3   his own boss, as warnings does not mean that he was not warned.[7]

4          Thus, even if the Memo had been protected activity that contributed to his termination, Mr.

5   Wadler's pattern of troubling and disturbing conduct was ample reason to terminate him.  A public

6   company cannot keep a General Counsel who has everyone walking on egg-shells, creates havoc

7   around SEC filings, shows poor legal judgment, and leaves the CEO worrying about what he will

8   do next.  Any one of these issues—and particularly all of them taken together—would have been a

9   legitimate reason to terminate Mr. Wadler.  No reasonable jury could conclude otherwise.  JMOL

10  or new trial is warranted for this reason too.

11  **IV.    DEFENDANTS ARE ENTITLED TO JMOL ON PUNITIVE DAMAGES
           BECAUSE NONE OF MR. WADLER'S CLAIMS PERMITS SUCH DAMAGES**

12         Even if the jury's liability verdict is supported by sufficient evidence (it is not), the

13  punitive damages award should be vacated because none of his three claims permits punitive

14  damages as a matter of law.  There is no dispute that punitive damages are not available under

15  SOX or Dodd-Frank.  And because Mr. Wadler's *Tameny* claim is predicated on his SOX claim,

16  punitive damages are not available under that claim either.  It is well established under California

17  law that a common law *Tameny* claim for wrongful discharge in violation of public policy may not

18  be used to expand the remedies available under the statute that is the source of the policy:

19  "[*W*]*hen the constitutional provision or statute articulating a public policy also includes certain*

20  *substantive limitations in scope or remedy, these limitations also circumscribe the common law*

21  *wrongful discharge cause of action.* Stated another way, the common law cause of action cannot

23         [7]  The fact that no written warning appears in Mr. Wadler's personnel file is irrelevant as a
24  matter of law (*see supra*, at 19) and in any event consistent with Ms. Corey's unrebutted testimony
    that it was Bio-Rad's policy to include only certain types of documents in personnel files,
25  including completed performance reviews (which are a mechanism to record negative conduct),
    Performance Improvement Plans (which are not used with executives), and other formal
26  disciplinary actions.  (Exh. 63.)

27

28                                          -20-                        Case No. 3:15-CV-2356 JCS

1   be broader than the constitutional provision or statute on which it depends, and therefore it

2   'presents no impediment to employers that operate within the bounds of law.'" *Dutra v. Mercy*

3   *Med. Ctr. Mt. Shasta*, 209 Cal. App. 4th 750, 756 (2012) (emphasis in original) (quoting *City of*

4   *Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159 (1998)); *see Stevenson v. Superior Court*, 16

5   Cal. 4th 880, 908 (1997) (*Tameny* claim based on FEHA permitted because claim did not "expand

6   the array of available remedies … it merely provides another legal theory on which employees

7   may pursue remedies comparable in all relevant respects to those already available to them under

8   the FEHA."); *see also Tribble v. Raytheon Co.*, 414 F. App'x 98, 100 (9th Cir. 2011) (similar).

9   **V.    DEFENDANTS ARE ENTITLED TO JMOL ON THE SOX CLAIM BECAUSE
       MR. WADLER'S REPORTING OF SUPPOSED FCPA VIOLATIONS IS NOT**

10  **PROTECTED ACTIVITY UNDER SOX**

11          Judgment should be entered on the SOX claim for the additional reason that Mr. Wadler's

12  reporting of purported FCPA violations is not a protected activity under that statute.   SOX

13  prohibits a public company from retaliating against an employee who "provide[s] information,

14  cause[s] information to be provided, or otherwise assist[s] in an investigation regarding any

15  conduct which the employee reasonably believes constitutes a violation of [1] section 1341, 1343,

16  1344, or 1348, [2] any rule or regulation of the Securities and Exchange Commission, or [3] any

17  provision of Federal law relating to fraud against shareholders."   18 U.S.C. § 1514A(a)(1).   But

18  because alleged FCPA violations that do not involve fraud against shareholders are not within any

19  of the three categories covered by SOX and the SOX claim here involves no such allegations, that

20  claim fails as a matter of law.   *See Meng-Lin Liu v. Siemens A.G.*, 978 F. Supp. 2d 325, 330

21  (S.D.N.Y.  2013)  ("FCPA  violations  could  only  conceivably  fall  within  'fraud  against

22  shareholders,' but Liu has alleged no intent to defraud shareholders."); *In re Gupta*, Case No.

23  2010–SOX–54, 2011 WL 121916, at *5 (Dep't of Labor Jan. 7, 2011) ("a violation of the FCPA is

24  not within the scope of SOX.").[8]

─────────────

25

26      [8]  Defendants continue to maintain that a violation of the FCPA's anti-bribery provisions does
    not constitute a violation of a rule or regulation of the SEC, but appreciates that the Court has

27

28                                          -21-                        Case No. 3:15-CV-2356 JCS

**VI.   DEFENDANTS ARE ENTITLED TO JMOL ON THE DODD-FRANK CLAIM BECAUSE MR. WADLER DID NOT REPORT TO THE SEC**

Bio-Rad has argued throughout this case that Mr. Wadler's Dodd-Frank claim fails as a matter of law because he did not report his allegations to the SEC.  A divided panel of the Ninth Circuit, however, recently rejected this argument in *Somers v. Digital Realty Inc.*, __ F.3d __, 2017 WL 908245 (9th Cir. Mar. 8, 2017), holding that the Dodd-Frank Act does not have a reporting out requirement.  Defendants recognize that *Somers* is binding on this Court but maintain that it was wrongly decided in light of the plain statutory language defining a "whistleblower" as an individual who provides information "to the Commission."  15 U.S.C. § 78u-6(a)(6).  Defendants respectfully preserve this argument for appeal.

## CONCLUSION

Defendants respectfully request that the Court enter judgment as a matter of law in their favor on all of Plaintiff's claims as well as the award of punitive damages.  Alternatively, Defendants respectfully request, in light of the weight of the evidence, that the Court grant a new trial on all claims.

DATED:  March 10, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____ */s/ John M. Potter* _____
      John M. Potter

*Attorneys for Defendants Bio-Rad Laboratories, Inc. and Norman Schwartz*

---

ruled to the contrary.  For purposes of preserving the argument for appeal, Defendants incorporate by reference the arguments made in its Rule 50(a) motion.  [Dkt. 209] at 9-10.

Additionally, though there is an SEC rule or regulation regarding the FCPA's books-and-records provision, that provision applies to a company's own books and records, not those of a third party.  Mr. Wadler did not report any violation concerning Bio-Rad's own books and records (and there is no evidence of any such violation), so that rule or regulation does not provide a legally sufficient basis for SOX liability.

-22-                                          Case No. 3:15-CV-2356 JCS